Albertson's claimed process may be illustrated as follows:

$$R-CH_2-CH_2-\overset{\overset{\textstyle O}{\|}}{C}-N\!=\!\!=\!B \qquad + \qquad \text{alkali metal aluminum hydride}$$

starting material

$$\xrightarrow{\text{reduction}} \qquad R-CH_2-CH_2-CH_2-N\!=\!\!=\!B$$

final product

where R and B are organic radicals.  The reaction involved is commonly known as a reduction reaction.  In the <u>Albertson</u> opinion, the invention is also described as:

$$A \ + \ B \ \longrightarrow \ X$$

where both A and X were new and unobvious and B was a well known reducing agent.

    5.   <u>Prior art in Albertson</u>

Albertson's process was rejected over a prior patent to Speeter and two journal articles authored by Rice and Rice. The CCPA describes the prior art as follows:

> The references need not be discussed in
> detail because they relate to considerably
> different compounds [vis-a-vis Albertson's
> starting material] and are relied on only
> because each one shows the process step of
> reduction with lithium aluminum hydride as
> the reducing agent.

332 F.2d at 380, 141 USPQ at 731.  In essence what the prior

- 14 -

art collectively taught was that a first compound having the group:



and otherwise different from Albertson's starting material, can be reduced to a second compound having the group:

$$-CH_2-$$

by reacting the first compound with lithium aluminum hydride (an alkali metal aluminum hydride).

> 6. **Analysis of Albertson**
>
> a. **Similarity of the steps of the claimed process to that of the prior art**

Albertson's manipulative step is identical in all respects to those of the prior art. In fact, there is but a single manipulative step in the Albertson process, viz., reacting (a) Albertson's starting material with (b) an alkali metal aluminum hydride, or in the words of the opinion, A with B.

The prior art's single manipulative step is the same, viz., reacting (a) starting material with the group:



with (b) a reducing agent to produce a final product having a group with the formula $-CH_2-$.

- 15 -

   b.    General applicability of the
         prior art process to a variety
         of materials

   The prior art processes were applicable to a wide variety

of compounds having the



group.  Albertson claimed and the prior art described a

process which can be shown generally as follows:



                    +    alkali metal        ⟶        —CH₂—
                         aluminum hydride

starting material                                   final product

   c.    Similarity of the products
         and/or reactants to those of
         the prior art

   The Albertson opinion reveals that the Albertson and prior

art starting materials were different.

   d.    Evidence of unexpected results
         or uncertainty of results

   The Albertson process and the prior art processes

proceeded along similar lines.  There was no evidence that

Albertson's yield was unexpectedly better than the yields of

the prior art.  Nor were any particular process parameters

(i.e., temperature, pressure, reaction time, solvent, etc.)

recited in Albertson's claim.

   The CCPA noted that Albertson uses a well known reducing

agent which will reduce any compound having the characteristic

reducible group.  The change that takes place by reduction was

not shown to have been unexpectedly great.  Both Albertson and

- 16 -

the prior art described the use of lithium aluminum halide to reduce a carbonyl group (referred to as a keto group by the CCPA in the <u>Albertson</u> opinion)

$$\overset{\displaystyle O}{\underset{\displaystyle -C-}{\parallel}}$$

to a hydrocarbon group ($-CH_2-$). The CCPA goes on to note that even though no one ever made Albertson's starting material, the court was not satisfied that it would have been unobvious to reduce Albertson's starting material with a standard reducing agent.

       7.   <u>Pleuddemann's Invention</u>

Pleuddemann invented a method of using a new and unobvious starting material (a silane coupling agent) to bond (1) a polymerizable material having aliphatic unsaturation to (2) a mineral filler to make a new and unobvious final product (a solid composite).

A polymerizable material having aliphatic unsaturation means a polymerizable material having the following group:

$$-CH = CH_2$$

The surfaces of the mineral fillers useful in Pleuddemann's invention have hydroxyl groups, <u>viz</u>., groups with the formula

$$-OH$$

To bond the polymerizable material to the filler, Pleuddemann used a silane coupling agent having the formula:

- 17 -

$$CH_2\!=\!\!CH\!-\!CO\!-\!CH_2CH_2\!-\!N\!-\!C\!-\!N\!-\!CH_2CH_2CH_2\!-\!Si\!-\!OCH_3$$

(with $O$ above $CO$, $O$ below the first carbon, $H$ below each $N$, the central $C$ bearing $O$ above, and the $Si$ bearing $OCH_3$ above and $OCH_3$ below)

**Pleuddemann's silane coupling agent**

Pleuddemann's process is a two-step process.   The polymerizable material, silane coupling agent, and filler are first mixed.   Thereafter, they are polymerized to form a final product.   Pleuddemann's invention works because the $-Si-OCH_3$ on the right side of the formula reacts with the $-OH$ on the filler to form the following connection:

$$-Si-O-filler.$$

The $CH_2\!=\!\!CH-$ on the left side of Pleuddemann's silane coupling agent reacts with the $CH_2\!=\!\!CH-$ on the polymerizable material to form the following:

```
                        |
polymerizable material—CH
                        |
                       CH2
                        |
polymerizable material—CH
                        |
                       CH2
                        |
                       CH—silane coupling agent
                        |
                       CH2
                        |
polymerizable material—CH
                        |
                       CH2
                        |
```

The polymerizable material bonded through the silane coupling agent to the mineral filler can be represented as follows:

- 18 -

```
polymerizable material—CH
                         |
                         CH₂
polymerizable material—CH
                         |
                         CH₂
                         |
                         CH—silane coupling agent—Si—O—filler
                         |
                         CH₂
polymerizable material—CH
                         |
                         CH₂
```

### 8.   Pleuddemann Prior Art

The prior art applied in the <u>Pleuddemann</u> case was a prior patent issued to Pleuddemann.  To avoid confusion, reference will be made to the "prior art."  The prior art, like Pleuddemann, concerned bonding of polymerizable materials having a —CH═CH₂ group to a mineral filler having an —OH group through a silane coupling agent.  The prior art silane coupling agent had the following formula:

$$CH_2═CH—CO—CH_2CH_2CH_2—Si—OCH_3$$

with $OCH_3$ above and $OCH_3$ below the Si, and $O$ below the CO.

Prior art silane coupling agent

The prior art process involves the same two manipulative steps as Pleuddemann's process and couples the filler to the

- 19 -

polymerizable material through the silane coupling agent in the same way.

### 9. Analysis of Pleuddemann

#### a. Similarity of the steps of the claimed process to that of the prior art

Pleuddemann's manipulative steps are identical in all respects to those of the prior art. Both Pleuddemann and the prior art mix a polymerizable material, a silane coupling agent, and a mineral filler and then polymerize.

#### b. General applicability of the prior art process to a variety of materials

The process described by the prior art can be applied to a variety of polymerizable materials, silane coupling agents, and mineral fillers. The keys are that (1) the polymerizable material has a $-CH=CH_2$ group, (2) the filler has $-OH$ groups, and (3) the silane coupling agent has a $-CH=CH_2$ group on one end and an $-Si-OCH_3$ group on the other end.

It should be recognized that the extent to which any particular silane coupling agent may bond a given polymerizable material to a given mineral filler may be a function of the precise silane coupling agent used. In fact, Pleuddemann maintained that his silane coupling agent provides improved bonding. PTO found that claims to the final product of a mineral filler bonded to a polymerizable material through Pleuddemann's silane coupling agent were patentable in the same application that contained claims directed to the process.

- 20 -

Pleuddemann's silane coupling agent was the subject of a separately issued patent.

### c. Similarity of the products and/or reactants to those of the prior art

The silane coupling agents used by Pleuddemann and the prior art are different.  Their formulae are illustrated below:

$$CH_2{=}CH{-}\overset{\displaystyle O}{\underset{\displaystyle O}{C}}{-}CH_2CH_2{-}\underset{\displaystyle H}{N}{-}\overset{\displaystyle O}{C}{-}\underset{\displaystyle H}{N}{-}CH_2CH_2CH_2{-}\underset{\displaystyle OCH_3}{\overset{\displaystyle OCH_3}{Si}}{-}OCH_3$$

**Pleuddemann's silane coupling agent**

$$CH_2{=}CH{-}\underset{\displaystyle O}{C}O{-}CH_2CH_2CH_2{-}\underset{\displaystyle OCH_3}{\overset{\displaystyle OCH_3}{Si}}{-}OCH_3$$

**Prior art silane coupling agent**

Similarities and differences are readily apparent.  Both have a

$$CH_2{=}CH{-}\underset{\displaystyle O}{C}{-}O{-}CH_2{-}CH_2{-}$$

group on the left side and an

$$-Si-OCH_3$$

group on the right side.  Both are "silanes" due to the presence of —Si—O groups.  However, as the formulae show, a difference exists in the atoms which connect the

$$CH_2{=}CH{-}\underset{\displaystyle O}{C}{-}O{-}CH_2{-}CH_2{-}$$

group on the left to the —Si—OCH$_3$ group on the right.

Obviously, the polymerizable material, silane coupling agent, and mineral filler composite made by Pleuddemann differ from the prior art composite in the same manner as Pleuddemann's silane differs from the prior art silane.

### d.   Evidence of unexpected results or uncertainty of results

Pleuddemann's process involves the same steps and proceeds along the same lines as the process of the prior art.  There was no evidence that Pleuddemann's process was faster or took place at a lower temperature.  In fact, no process conditions (e.g., temperature, pressure) are recited in Pleuddemann's claims.  There was no evidence that Pleuddemann's process would not have been expected to work; in fact, both the Pleuddemann and prior art processes proceed in accordance with the manner in which a silane coupling agent would have been expected to bond a polymerizable material and a mineral filler--a predictable result.

Pleuddemann "modified" the prior art process by using a new and unobvious silane coupling agent (as opposed to the prior art's coupling agent) in an otherwise conventional process for bonding polymerizable materials to mineral fillers. Pleuddemann's silane coupling agent was not part of the prior art.  This Court noted:

> the board's hindsight comparison of the
> functioning of the new [silane coupling agent]
> compounds with the functioning of the [silane

- 22 -

coupling agent] compounds of the prior art was
legal error.  It uses appellant's specification
teaching as though it were prior art in order to
make claims to methods of bonding/priming using
his admittedly novel compounds appear to be
obvious.

910 F.2d at 828, 15 USPQ2d at 1742.  This Court also observed
that the Board's approach:

involves, it seems to us, the same flaw we found
in Kuehl[4] in that it presumes appellant's new
group of silane compounds to be prior art.

Id. at 827-28, 15 USPQ2d at 1742.  Unexplained in Pleuddemann
is what precise facts are present in Pleuddemann which are not
also present in Durden or Albertson so as to cause a different
result to have been reached.  The rationale applied in each
case is equally applicable to all three cases.  Thus,
facially, it can be argued that Durden and Albertson involved
the same impermissible "hindsight" and the same "flaw" which
was present in Pleuddemann.  On the other hand, it can be
argued that Pleuddemann involved application of conventional
process techniques to make a new and unobvious product just as
Durden and Albertson involved conventional process techniques
to make a new and unobvious product.  For these reasons, we
cannot reconcile Pleuddemann with Durden and/or Albertson.

--------------------

4     In re Kuehl, 475 F.2d 658, 177 USPQ 250 (CCPA 1973).

- 23 -

B.    The Board correctly determined that
      Albertson and Durden control this appeal

The Board held that several cases, including Albertson and
particularly Durden, were controlling in this appeal (A6).  The
Board was correct, and on that basis its decision should be
affirmed.

Decisions of the CCPA are binding precedent until
overruled by the Federal Circuit sitting in banc.  South Corp.
v. United States, 690 F.2d 1368, 215 USPQ 657 (Fed. Cir.
1982).  That Albertson continues to be viable precedent,
despite a partial demise in Kuehl,[5] is readily apparent from
Durden, where Albertson's viability is reaffirmed in clear
terms, 763 F.2d at 1409, 226 USPQ at 361, despite urging by the
Durden Board minority that Albertson had been overruled (A16,

_____

[5]    According to Kuehl, 475 F.2d at 664, 177 USPQ at
255:  "the principal opinion in Larsen [In re Larsen, 292 F.2d
531, 130 USPQ 209 (CCPA 1961), cert. denied sub nom. Larsen v.
Ladd, 370 U.S. 936 (1962)] also appears to have erroneously
approached the § 103 obviousness question by asking whether
'given the idea of the compound' (our emphasis) the process for
making it is obvious (see MPEP § 706.03(q)).  To this extent
[i.e., assuming a novel and unobvious starting material to be
part of the prior art], at least, Larsen and its progeny,
Hoeksema [In re Hoeksema, 332 F.2d 374, 141 USPQ 733 (CCPA
1964)] and Albertson, are inconsistent with the statutory
standards of § 103."

- 24 -

n.3).[6]  Like the processes in Durden and Albertson, and unlike the process in Kuehl, the process involved in this case is predictable.  It is well known that an amine and an acid can be reacted to form an amide, as shown by the references relied upon by the Board, including particularly Cook.

Inasmuch as a predictable process is involved in this appeal, the Board correctly determined that the matter was controlled, inter alia, by Albertson and Durden.  Hence, the Board did not err in applying relevant precedent.

Applicants erroneously contend (Br14) that Durden was nothing more that a "Socrates' Moot Courtroom."  Counsel for applicants made the same argument on a previous occasion. See Wegner, "Much Ado About Durden," 71 J. Pat. & Tm. Off. Soc'y 785, 799-802 (Oct. 1989).  We view applicants as contending that there was no case or controversy in Durden, thereby implying that the Federal Circuit rendered an advisory opinion.  We cannot agree.  In Durden, PTO refused to grant a patent based on a Board decision; Durden sought a patent. There was a concrete dispute on the issue of obviousness and the Federal Circuit's Durden opinion was not an advisory opinion.

---

[6]    The author of the Durden Board minority opinion is the author of the opinion on appeal.

C.    Apart from controlling precedent, the
      Board's decision is correct under a
      Graham v. John Deere analysis

Assuming the Court cannot affirm on the basis of Albertson and Durden, we nevertheless submit that the Board's decision is correct.

In various parts of their brief, applicants accuse the Durden merits panel, and the PTO generally, of avoiding a Graham v. John Deere Co., 383 U.S. 1 (1966), analysis in evaluating "obvious process" rejections.  Applicants' accusation overlooks what the examiner and the Board did in this case.  A review of the examiner's answer and the Board's opinion will reveal that the Graham factors were considered.

1.    Scope and content of the prior art

The examiner found (A119) that all of the references teach acylation of the amine to form cephalosporin [cephem] compounds.  The Board acknowledged the examiner's finding (A5).  The examiner addressed the scope and content of each reference upon which he relied (A119-120).  Cook, which the examiner found to be the most relevant prior art (A120), was found to describe the conventional technique for reacting acids and amines to make cephems.

2.    Differences between the prior art
      and claimed subject matter

The examiner and the Board recognized the difference between the claimed subject matter and the prior art.  See A4 ["wherein . . . the A portion differs"] and A120 ["the only difference between what is being claimed and the prior art is

- 26 -

the selection of a <u>slightly</u> different acylation agent," i.e.,
acid] (emphasis by examiner).

       3.    <u>The level of skill in the art</u>

As is often the case in appeals from PTO, there is no
direct "testimony" on the level of ordinary skill in the art.
Applicants, of course, were free to place such testimony in the
record had they been so inclined.  37 CFR § 1.132.
Nevertheless, the prior art provides ample relevant evidence
of the level of ordinary skill in the art.  <u>In re Oelrich</u>,
579 F.2d 86, 91, 198 USPQ 210, 214 (CCPA 1978) (absent direct
evidence of level of the skill in the art, the level is
evaluated "solely on the cold words of the literature" and PTO
must usually evaluate the level of ordinary skill solely on the
cold words of the literature).  <u>See also</u> <u>Chore-Time Equipment</u>
<u>v. Cumberland</u>, 713 F.2d 774, 779 n.2, 218 USPQ 673, 676 n.2
(Fed. Cir. 1983) (invention may be obvious without findings on
level of skill where the prior art itself reflects an
appropriate level and a need for expert testimony has not been
shown), and <u>Litton Industrial Products, Inc. v. Solid State</u>
<u>Systems, Corp.</u>, 755 F.2d 158, 163-64, 225 USPQ 34, 38 (Fed.
Cir. 1985) (a specific finding on the level of ordinary skill
in the art is not required where the prior art itself reflects
an appropriate level).

The literature makes it absolutely clear, as both the
examiner and the Board recognized, that one skilled in the art

would have understood that cephems are made by reacting a class of acids with a class of amines.

4. **The prior art and the level of skill in the art render the claimed subject matter, as a whole, obvious notwithstanding the difference between the prior art and the claimed subject matter**

Given the prior art and the level of skill, the Board properly concluded that the claimed subject, as a whole, would have been obvious.

Applicants' process for making cephems involves a conventional technique for making cephems. Like others before them, applicants "react" an acid with an amine. This was the conventional technique used to make cephems. Applicants' reaction, like the reaction of the prior art, proceeds along predictable lines. The examiner noted (A123):

> Appellants have _not_ argued that the claimed
> process is in any way superior nor has any
> evidence been submitted to demonstrate any
> alleged _advantage_ for the claimed process.
> (emphasis by examiner).

There are no particular process parameters, such as a particular temperature or pressure, or a recitation of a particular solvent. Nor have applicants shown that use of their new acid results in an unexpectedly greater yield than would result using prior art processes for making cephems.

- 28 -

D.    Applicants' arguments do not show
      any error on the part of the Board

While it may or may not be argument since it appears in the statement of case portion of their brief, applicants note that their novel and unobvious acid has both an acid group (—COOH) and an amine group (—NH$_2$). Likewise, applicants correctly point out that the amine used in their process has both an acid and amino group. We refer the Court to Equation 1, supra page 4, where the structural formulae of applicants' amine and acid are shown and where it is apparent that both have acid and amine groups (R$^1$ may be an amino substituted group). Applicants maintain (Br3) that as part of their invention they discovered that the amino group on their amine reacts with the acid group on their acid and that the amino group on their acid does not react with the acid group on their amine. Applicants' specification reveals that there may be cases where the amino group of their amine may not always react with the acid group of their acid. If the "wrong" amino group would react with the "wrong" acid group, the wrong amino group is "protected" from reaction with the acid group (A25, last two lines to A26, line 16). See also A24, Formula XIV, wherein R$^1$ can be a chemically protected amino, thereby leaving the —COOH group on the [A] type compound of Formula XIV free to react only with the amino group on the [B] amine and not with the protected amino group; the protective amino group on the type [A] compound of Formula XIV is chemically blocked from reacting with the —COOH of the [B] amine compound. Applicants

- 29 -

explain how the protective amino group is subsequently "unprotected" (A32, lines 7-13).  We call attention to applicants' claim 10, which deals with the use of protected amines (A225).  The prior art Cook patent contains essentially the same teaching (A157, col. 20, lines 5-11) to ensure that the amino groups on the [A] type acid compound (A153, Formula IV in col. 12) do not react with acid groups on the [B] type amine compound (A154, Formula III in col. 13).  Hence, applicants' argument that their amine and acid have both amino and acid groups, thereby implying that their reaction is unpredictable (because one would not know what amine group will react with what acid group) is believed to be without merit. The Cook patent shows that one skilled in the art would "protect" any amine group (or acid group for that matter, <u>see</u> A154, col. 13, lines 35-40--note carboxyl blocking group) when one skilled in the art would not want that group to participate in a reaction.  The Cook patent supports the examiner's position (A122) that "[s]killed chemists are well aware of protecting 'amino' groups and subsequent removal, if necessary. The argument would suggest a problem where <u>none</u> is seen to exist" (emphasis by examiner).

Applicants correctly point out (Br4) that there are several methods for making their cephems.  <u>See</u> A31 through A41, wherein methods (a) through (g) are described.  The Board provided a cogent answer (A6-7) to applicants' argument.  The fact that there are different methods for preparing a cephem

does not make any one method patentable.  Each method must be
evaluated on its merits.  All, some, or none of the methods
may be patentable.  In this case, the Cook patent renders the
presently claimed method unpatentable even if other methods
described by applicants might be patentable (a matter upon
which we express no views).

In the statement of the case portion of their brief,
applicants mention an argument they made below.  The argument
was that four prior art references teach away from the
direction taken by applicants (Br4).  They also mention a
Jorda declaration filed in proceedings before PTO.  The Board
made findings with respect to, and provided an answer for,
applicants' argument (A9-10).  We find no argument in
applicants' principal brief pointing out why the Board erred
in being unpersuaded by applicants' "teaching away" argument.
Furthermore, applicants do not explain in their brief in this
Court why the Cook patent does not support the Board's decision
notwithstanding the other four prior art references.

Applicants argue that there is no motivation to use their
particular novel and unobvious acid to make their new and
unobvious cephem (Br3-5, 9-10).  In particular, applicants
state that "there is not the slightest _motivation_ shown from
the prior art in any reference that would lead one of ordinary
skill in the art to use [their novel amine]" (Br9, emphasis by
applicants).  _First_, the argument misses the point, because
cephems are conventionally made by reacting acids with amines.

- 31 -

The fact is that applicants' process would have been obvious, absent some unexpected result.  It would have been obvious to combine any acid with any amine by reacting the acid with the amine if the reaction product of the acid and the amine would have been expected to produce a cephem.  Second, and perhaps more important, applicants' "no motivation" argument overlooks, and does not come to grips with, the examiner's finding (A120-121) that the acids Cook describes are generic to the novel acid used by applicants.  Both applicants and Cook react an acid with an amine to make a cephem, and both applicants' cephems and those of Cook are antibiotics.  Hence, it would have been obvious to combine any acid within the scope of Cook's patent with known amines to make cephems for the purpose of making an antibiotic.  Cook provides motivation to do so.

Applicants cite and rely on In re Mancy, 499 F.2d 1289, 182 USPQ 303 (CCPA 1974), and In re Kuehl, supra.  These cases differ factually from Durden or Albertson.  Mancy used a novel starting material to make daunorubicin, a known compound.  The CCPA, in reversing, said that "the process of producing the antibiotic by culturing Streptomyces bifurcus would still be unobvious to those of ordinary skill in the art for the simple reason that the microorganism is unknown to them."  499 F.2d at 1293, 182 USPQ at 305.  But the starting material used by Durden and Albertson was also "unknown to them."  The same is true in Kuehl where Kuehl's crystalline aluminosilicate was

"unknown to them."  Unlike Durden or Albertson, however, the
products produced by Mancy and Kuehl were known products.

Applicants' argument (Br10) that Mancy and Kuehl are
binding precedent compelling reversal overlooks factual
distinctions involved.  Mancy and Kuehl discovered a new way
of making an old material.  This case (as well as Durden and
Albertson) involves an old technique (reacting an acid with an
amine) to make a new product.  Hence, Mancy and Kuehl are not
controlling under South Corp. v. United States, 690 F.2d 1368,
215 USPQ 657 (Fed. Cir. 1982), or In re Gosteli, 872 F.2d 1008,
10 USPQ2d 1614 (Fed. Cir.), reh'g in banc denied, No. 88-1611,
1989 U.A.App. LEXIS 7522 (Fed. Cir. May 18, 1989).

Applicants also rely on what they refer to as a "general
statement" (Br16) in this Court's in banc decision in In re
Dillon, 919 F.2d 688, 16 USPQ2d 1897 (Fed. Cir. 1990), cert.
denied sub nom. Dillon v. Manbeck, 111 S. Ct. 1682 (1991).
We have two responses to applicants' argument.  First, the
statement quoted by applicants (Br16-17) is dicta, because it
represents the views of only six of the twelve judges
participating in Dillon.  Second, nothing in the quoted
statement says that the rejection sustained by the Board in
this case is wrong.  It may be, as pointed out by the Dillon
plurality opinion, that Durden provides no basis for rejecting
all process claims involving old process steps; it is equally
true, however, that Dillon does not compel allowance of all
such process claims.

- 33 -

## CONCLUSION

The decision of the Board was correct and should be affirmed.

Respectfully submitted,

August 24, 1992

*Fred McKelvey*

FRED E. McKELVEY
Solicitor

P.O. Box 15667
Arlington, Virginia  22215
703-305-9035

Attorney for the Commissioner
of Patents and Trademarks

- 34 -

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 1992, I caused two copies of the foregoing BRIEF FOR APPELLEE COMMISSIONER OF PATENTS AND TRADEMARKS to be hand delivered to the offices of:

Harold C. Wegner, Esq.
WEGNER, CANTOR, MUELLER & PLAYER
Suite 300
1233 - 20th Street, N.W.
Washington, D.C.  20036

*Fred McKelvey*

FRED E. McKELVEY
Solicitor
P.O. Box 15667
Arlington, Virginia  22215
703-305-9035