# PLAINTIFF'S EXHIBIT 7

FEDERAL TRADE COMMISSION

# To Promote Innovation:
## The Proper Balance of Competition and Patent Law and Policy

### A Report by the Federal Trade Commission
### October 2003





# FEDERAL TRADE COMMISSION

| | |
|---|---|
| TIMOTHY J. MURIS | Chairman |
| MOZELLE W. THOMPSON | Commissioner |
| ORSON SWINDLE | Commissioner |
| THOMAS B. LEARY | Commissioner |
| PAMELA JONES HARBOUR | Commissioner |
| | |
| Susan A. Creighton | Director, Bureau of Competition |
| J. Howard Beales III | Director, Bureau of Consumer Protection |
| Luke Froeb | Director, Bureau of Economics |
| William E. Kovacic | General Counsel |
| Anna H. Davis | Director, Office of Congressional Relations |
| Rosemarie A. Straight | Executive Director |

Report Contributors

Susan S. DeSanti, Deputy General Counsel for Policy Studies, Office of the General Counsel
William E. Cohen, Assistant General Counsel for Policy Studies, Office of the General Counsel
Gail F. Levine, Deputy Assistant General Counsel for Policy Studies, Office of the General Counsel
Hillary J. Greene, Project Director for Intellectual Property, Office of the General Counsel
Matthew Bye, Attorney, Policy Studies, Office of General Counsel
Michael S. Wroblewski, Assistant General Counsel for Policy Studies, Office of the General Counsel
Robin Moore, formerly Attorney, Policy Studies, Office of General Counsel
Michael Barnett, formerly Attorney, Policy Studies, Office of General Counsel
Nicole Gorham, Legal Assistant, Policy Studies, Office of General Counsel
Cecile Kohrs, Legal Assistant, Policy Studies, Office of General Counsel
David Scheffman, formerly Director, Bureau of Economics
Mark Frankena, Associate Director for Competition Analysis, Bureau of Economics
Roy Levy, Economist, Economic Policy Analysis, Bureau of Economics
Alden F. Abbott, Assistant Director for Policy and Evaluation, Bureau of Competition
Suzanne Michel, Special Counsel for Intellectual Property, Bureau of Competition
Paige Pidano, formerly Legal Assistant, Bureau of Competition
Karina Lubell, formerly Legal Assistant, Bureau of Competition

Inquiries concerning this report should be directed to:

Susan S. DeSanti, Deputy General Counsel for Policy Studies, Office of the General Counsel
(202) 326-3190 or sdesanti@ftc.gov

**CHAPTER 3**  **BUSINESS TESTIMONY: CURRENT INNOVATION LANDSCAPE IN SELECTED INDUSTRIES**

I. SUMMARY .................................................................. 1

II. THE PHARMACEUTICAL INDUSTRY ........................................ 4

    A. Introduction ........................................................ 4

    B. Industry Description ................................................ 4
        1. Discrete Research and Development for NCEs ...................... 4
        2. The Demanding Nature of the NCE Development Process ............. 6
        3. The Implications of Clinical Trials for Effective Patent Term of NCEs .. 7
        4. Incremental Innovation for the Development of IMDs ............... 8

    C. The Role of Patents In Spurring Pharmaceutical Innovation ................. 9

    D. The Role of Competition in Spurring Pharmaceutical Innovation ........... 10

    E. The FTC's Pharmaceutical Industry Enforcement Actions and Generic Drug Study ......................................................... 12

    F. Conclusion ........................................................ 14

III. THE BIOTECHNOLOGY INDUSTRY ........................................ 15

    A. Introduction ....................................................... 15

    B. Industry Description ............................................... 15

    C. The Role of Competition in Spurring Biotechnology Innovation ............ 17

    D. The Implications of Patent Protection for Innovation ..................... 17
        1. The Role of Patents in Spurring Innovation in the Biotechnology Industry .................................................... 17
            a. Patentability Encourages Investment in R&D ............... 17
            b. The Role of Patent Disclosures in Fostering Biotechnology Innovation ......................................... 18
            c. Patenting of Biotechnology Research Tools ................ 18
        2. The Quality of Biotechnology Patents ........................... 20
        3. The Mechanisms Available for Challenging Questionable Patents .... 21
            a. Challenging Questionable Patents Through Litigation ........ 21
            b. Challenging Questionable Patents Through Reexamination Procedures ........................................ 22

|   |   |   |   |   |
|---|---|---|---|---|
|   |   |   | c. | Challenging Questionable Patents Through a New Opposition System .................................................. 23 |
|   |   | 4. |   | The Potential for Patents to Impede Innovation in the Biotechnology Industry ........................................................... 23 |
|   |   |   | a. | The Development of an Anticommons .................... 24 |
|   |   |   | b. | Access to Existing Technologies Needed for Follow-On Innovation ........................................ 25 |
|   | E. | Licensing Practices for Biotechnology Research Tools ............... 26 |
|   |   | 1. | Reach-Through License Agreements ........................... 26 |
|   |   | 2. | Patent Pools .................................................. 27 |
|   |   | 3. | Non-Exclusive Licensing of Patented Research Tools ............. 28 |
|   | F. | Conclusion ............................................................ 29 |
| IV. | THE COMPUTER HARDWARE INDUSTRIES, INCLUDING SEMICONDUCTORS ................................................... 30 |
|   | A. | Introduction ......................................................... 30 |
|   | B. | Industry Description ................................................. 30 |
|   | C. | The Role of Competition in Spurring Computer Hardware Innovation ....... 31 |
|   | D. | Alternative Means of Fostering Innovation ............................ 32 |
|   | E. | The Implications of Patent Protection for Innovation ..................... 33 |
|   |   | 1. | The Role of Patents in Spurring Innovation ..................... 33 |
|   |   | 2. | The Potential for Patents to Impede Innovation .................... 34 |
|   |   |   | a. | Patent Thickets in the Computer Hardware Industries ........ 34 |
|   |   |   | b. | The Potential for Patent Thickets to Harm Innovation ........ 36 |
|   |   |   | c. | The Strategic Use of Patents in Licensing Negotiations ....... 37 |
|   | F. | Tools to Navigate the Patent Thicket .................................... 41 |
|   |   | 1. | Cross-Licensing .............................................. 41 |
|   |   | 2. | Patent Pools .................................................. 42 |
|   |   | 3. | Standard-Setting ............................................. 43 |
|   | G. | Conclusion ............................................................ 43 |
| V. | THE SOFTWARE AND INTERNET INDUSTRIES ............................ 44 |
|   | A. | Introduction ......................................................... 44 |
|   | B. | Industry Description ................................................. 44 |

| | | | |
|---|---|---|---|
| C. | | The Role of Competition in Spurring Software and Internet Innovation . . . . . . . 46 | |
| D. | | Alternative Means of Fostering Innovation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46 | |
| | 1. | Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46 | |
| | 2. | Open Source Software . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47 | |
| E. | | The Implications of Patent Protection for Innovation . . . . . . . . . . . . . . . . . . . . 48 | |
| | 1. | The Role of Patents in Spurring Innovation in the Software and Internet Industries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48 | |
| | | a. | The Role of Patents in Preventing Free Riding and Encouraging Investment in Innovation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48 |
| | | b. | The Role of Patents in Fostering Innovation Through Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49 |
| | | c. | The Role of Patents in Fostering Design-Around Innovation . . . 50 |
| | 2. | The Potential for Patents to Impede Innovation in the Software and Internet Industries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 | |
| | | a. | Patents May Impede Independent Follow-On Innovation . . . . . . 50 |
| | | b. | Patents May Increase the Costs of Entry . . . . . . . . . . . . . . . . . . 51 |
| | | c. | Avoiding Patent Infringement Is Costly and Uncertain . . . . . . . . 51 |
| | | d. | Questionable Patents Create Uncertainty and Hinder Innovation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53 |
| F. | | Licensing Strategies to Navigate the Patent Thicket . . . . . . . . . . . . . . . . . . . . . 55 | |
| G. | | Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55 | |

## CHAPTER 3    BUSINESS TESTIMONY: CURRENT INNOVATION LANDSCAPE IN SELECTED INDUSTRIES

### I.    SUMMARY

Over six days of Hearings, business representatives from four high-tech industries discussed the drivers of innovation in their industries. Representatives from the pharmaceutical, biotechnology, Internet, and computer hardware and software industries described their real-world experience with how patents and competition affect incentives to innovate. Their discussions confirmed many of the principles summarized in Chapter 2 and sometimes shed additional light and offered new perspectives on the topics. They highlighted both the benefits and costs of current patent and antitrust policies applied in their industries. This chapter discusses the diverse views presented by the panelists, and also incorporates the results of business surveys and other industry-specific scholarship.

The panelists identified various attributes that characterized innovation in the different industries. Panelists discussed whether innovation in their industries tends to be discrete or cumulative, building incrementally on prior discoveries. Panelists also addressed sources and amounts of capital required for entry, barriers to entry, the extent to which industries are vertically integrated, and difficulties in commercializing new products. They raised issues of fixed cost recovery, alternative appropriability mechanisms, and relationships between initial and follow-on innovation, adding business insights and practical experience to the analysis of Chapter 2. According to both panelists and academics, factors such as these shape the role of competition and patents in spurring or discouraging innovation in their industries.

Pharmaceutical and biotechnology representatives testified that strong patent protection is essential to innovation in their industries. Business representatives characterized innovation in these industries as costly and unpredictable, requiring significant amounts of pioneering research to discover and test new drug products. By preventing rival firms from free riding on discoveries, patents allow pharmaceutical firms to recoup the substantial capital investments made to discover, test, and obtain regulatory approval of new drug products. Biotech representatives emphasized that patent protection is critical to attract the capital necessary to fund this high-risk investment. Indeed, firms believed that the biotech industry would not exist but for patents. One concern involved patents on the research tools used to assist in the discovery of new drug products. Biotech representatives expressed concern that such patents could obstruct the commercialization of new products, thereby hindering follow-on innovation. To date, however, evidence suggests that such problems have not emerged.

Pharmaceutical and biotech representatives testified that they use patent information disclosures required by the patent statutes to direct their research and development (R&D) into areas not claimed by the patents. Representatives from generic pharmaceutical firms discussed how patent disclosures guide their efforts to "design-around" patents, so that they can develop

non-infringing generic versions of brand-name drug products.

By contrast, computer hardware and software industry representatives generally emphasized competition to develop more advanced technologies as a driver of innovation in these rapidly changing industries. These representatives, particularly those from the software industry, described an innovation process that is generally significantly less costly than in the pharmaceutical and biotech industries, and they spoke of a product life cycle that is generally much shorter. Some software representatives observed that copyrights or open source code policies facilitate the incremental and dynamic nature of software innovation. They discounted the value of patent disclosures, because they do not require the disclosure of a software product's underlying source code.

Computer hardware manufacturers noted that they often use trade secrets, rather than patents, to protect their inventions, because it is difficult to discover whether a rival firm has infringed a patented manufacturing invention. Computer hardware manufacturers generally would rather keep the invention secret than publicly disclose it and risk third party misappropriation of patent rights that they will be unable to discover. By contrast, computer hardware firms that specialize solely in hardware design and have no manufacturing responsibilities valued patent protection as a way to raise venture capital.

Representatives from both the computer hardware and software industries observed that firms in their industries are obtaining patents for defensive purposes at rapidly increasing rates. They explained that the increased likelihood of firms holding overlapping intellectual property rights creates a "patent thicket" that they must clear away to commercialize new technology. They discussed how patent thickets divert funds away from R&D, make it difficult to commercialize new products, and raise uncertainty and investment risks. Some computer hardware and software representatives highlighted their growing concern that companies operating in a patent thicket are increasingly vulnerable to threats to enjoin their production from non-practicing entities that hold patents necessary to make the manufacturer's product.

A global concern that representatives from each of the four industries described was that poor patent quality (*e.g.*, a patent for which there is invalidating prior art, or a patent broader than was enabled) can blunt incentives to innovate. They described the costly nature of litigation to invalidate these patents, both in terms of dollars and resources diverted from R&D. They also discussed how a timely, less costly mechanism to review poor quality patents would enhance innovation in their industries.

These representatives also described how each industry has developed licensing practices to extract value from their patents or, in some cases, to obviate some of the problems raised by patent thickets. They raised concerns that uncertainty about the parameters of antitrust enforcement may be hindering the use of certain methods to extract patent value. For example, biotech

2

representatives noted that antitrust concerns have contributed to uncertainty about the propriety of using reach-through royalty provisions in research tool licenses.

Firms in the computer hardware and software industries indicated that antitrust concerns may be inhibiting joint discussions of licensing terms during the standard-setting process. They noted that antitrust has traditionally been suspicious of joint discussions of licensing terms arising prior to the adoption of a standard. Some panelists suggested, however, that such conduct is necessary for the efficient establishment of new standards because some companies are using patents strategically.

> **Box 3-1.** *Independent Inventors and the FTC's Invention Promotion Cases*
>
> One cross-industry concern raised by a specific sub-group was the vulnerability of independent inventors to fraudulent practices as they seek patents and offer licenses on those patents. This problem has been, and continues to be, a matter of FTC concern. Two panelists representing the independent invention community mentioned the defrauding of inventors by invention promotion firms. *See* Udell 2/28 at 568-69 ("the FTC has done a magnificent job of not only educating inventors, but also getting the scam organizations that have been bleeding inventors for decades out of the pockets of the poor inventors in America."); Hayes-Rines 3/19 at 61-62 (urging enhanced FTC enforcement efforts).
>
> In 1997, the FTC launched a consumer education program and a law-enforcement sweep entitled "Project Mousetrap" because a "number of firms in the invention promotion industry are perpetrating a massive fraud" against independent inventors. As a result of this sweep and other enforcement actions, the Commission brought eight cases against invention promoters during the 1990s. The complaints have named 41 defendants, consisting of 21 companies and 20 individuals. In some cases, the Commission alleged that the defendants represented that they would obtain patents for their customers' inventions without clarifying that these would be design patents, which typically have less commercial value than utility patents. The Commission generally alleged that the defendants represented that their research and marketing services were likely to secure profitable licenses for their customers' inventions. The Commission further alleged that, in fact, the defendants were rarely successful at securing licensing agreements, and that the few licenses that the defendants did secure seldom resulted in appreciable income for the inventors.
>
> In six cases, the Commission obtained consent orders that required the defendants to pay consumer redress and to make affirmative disclosures to prospective customers about the promoters' past success rates. One case is still in litigation and the eighth case was dismissed after the U.S. Attorney's office filed criminal charges. More recently, the Commission has expanded its consumer education program, in cooperation with the PTO, to include rights available to inventors under the American Inventors Protection Act of 1999. Further details on the Commission's consumer education efforts and enforcement actions are *available at* http://www.ftc.gov/bcp/conline/edcams/invention/ and http://www.ftc.gov/opa/1997/07/mouse.htm.

## II. THE PHARMACEUTICAL INDUSTRY

### A. Introduction

Representatives from the pharmaceutical industry stated that patent protection is indispensable in promoting pharmaceutical innovation for drug products containing new chemical entities. The sunk cost of engaging in research projects aimed toward the development of these drugs is extremely high. By preventing rival firms from free riding on the innovating firms' discoveries, patents can enable pharmaceutical firms to cover their fixed costs and regain the capital they invest in R&D efforts. Moreover, the patenting process requires disclosure of the underlying invention covered by the patent, potentially encouraging further innovation. Generic drug companies report they use disclosed patents as a basis on which to "invent-around" patented, brand-name products in order to develop generic variations.

The panelists who represented pharmaceutical firms or organizations at the Hearings were Robert A. Armitage, representing Eli Lilly and Company; Monte R. Browder, representing Ivax Corporation; David Coffin-Beach, representing Torpharm, Inc.; Gregory J. Glover, Counsel to Pharmaceutical Research and Manufacturers of America; Nancy J. Linck, representing Guilford Pharmaceuticals; and Ross Oehler, representing Aventis Pharmaceuticals Inc. One scholar, Edward A. Snyder, from the University of Chicago, and one attorney, Rochelle K. Seide, from Baker Botts, LLP, also participated in a business perspective panel on the pharmaceutical industry.

### B. Industry Description

R&D in the pharmaceutical industry generally produces two main types of innovation: (1) discrete innovation, which means, in general terms, that the invention might be improved, but does not point the way to wide-ranging, subsequent discoveries of new chemical entities (NCEs);[1] and (2) incremental innovation, which describes the development of improvements to existing drug products, often referred to as product line-extensions.[2] Obviously, innovation can occur at many points along the continuum, from discrete to incremental, but these categories are useful in identifying certain characteristics associated with innovation in the pharmaceutical industry.

#### 1. Discrete Research and Development for NCEs

Discrete R&D in the pharmaceutical industry focuses on the discovery and development of new chemical or molecular

---

[1] *See* Robert P. Merges & Richard R. Nelson, *On the Complex Economics of Patent Scope*, 90 COLUM. L. REV. 839, 880 (1990) (discussing types of innovation); *FTC/DOJ Hearings on Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy, Mark Lemley Testimony Feb. 25, 2002*, at page 37 (hereinafter, citations to transcripts of these Hearings state the speaker's last name, the date of testimony, and relevant page(s)); Richard C. Levin, *Testimony of Richard C. Levin, President, Yale University* (2/6/02), at http://www.ftc.gov/os/comments/intelpropertycomments/levinrichardc.htm (hereinafter R. Levin (stmt)). *But cf.* Browder 3/19 at 174 (noting the potential need for progression from generic compound to specific compound to unique formulation).

[2] For an overview of the different types of pharmaceutical patents, *see* Box 3-2.

4

entities to make small molecule drug products.[3] The discovery of a chemical molecule that is both efficacious and safe for human usage can result in a totally new drug product. Such discoveries typically require significant amounts of pioneering research, and both fixed costs and risks of failing to develop a marketable product, consequently, are very high. Brand-name companies spend a substantial amount in development costs over the course of 10 to 15 years to bring a product involving an NCE to market from the initial research stage.[4] The brand-name companies' trade association reports that most newly marketed drugs do not cover their average development costs.[5] Brand-name companies typically rely on a small number of "blockbuster" drugs to recoup

> **Box 3-2.** *Pharmaceutical Patents*
>
> Pharmaceutical patents are issued for four different categories: drug substance, method of use, formulation, and process. Drug substance patents cover the compound or active ingredient in the drug product, such as fluoxetine hydrochloride, which is the active ingredient in Prozac. Method of use patents cover the use of the product to treat certain health problems, such as depression or asthma. Formulation patents cover the physical composition or delivery mechanism of the drug product, such as an extended release tablet or capsule. Process patents generally cover the procedure used to make the active ingredient. For further details on pharmaceutical patents, *see* Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* (July 2002) (hereinafter, FTC, *Generic Drug Study*), at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf.

their overall investment in innovation, including R&D costs for failed products.[6]

Relatively few patents are required to protect a product with an NCE.[7] One panelist noted that an actual drug product can be based on between four and 15 patents.[8] The low number of patents contained in a pharmaceutical product

---

[3] This contrasts with the biotechnology industry, which focuses instead on cells and large biological molecules (such as DNA and proteins). *See* Beier 2/26 at 248.

[4] *See* Gregory J. Glover, *Competition in the Pharmaceutical Marketplace* (3/19/02) 3 (stating that the average cost to develop a new drug is $802 million), at http://www.ftc.gov/opp/intellect/020319gregoryjglover.pdf (hereinafter Glover (stmt)); Armitage 3/19 at 127-28; *see also* Bureau of Economics Staff Report, Federal Trade Commission, *The Pharmaceutical Industry: A Discussion of Competitive and Antitrust Issues in an Environment of Change* (Mar. 1999) (discussing development risk), available at http://www.ftc.gov/reports/pharmaceutical/drugrep.pdf (hereinafter BE Staff Report, *The Pharmaceutical Industry*); Arthur D. Little, *Examining the Relationship Between Market-Based Pricing and Bio-Pharmaceutical Innovation* (Public Comment) 3, at http://www.ftc.gov/os/comments/intelpropertycomments/littlearthurd2.pdf).

[5] *See* Pharmaceutical Research and Manufacturers of America, *Delivering on the Promise of Pharmaceutical Innovation: The Need to Maintain Strong and Predictable Intellectual Property Rights* (Public Comment) 9, at http://www.ftc.gov/os/comments/intelpropertycomments/phrma020422.pdf (hereinafter PhRMA (stmt)); *see also* Glover (stmt) 4; Armitage 3/19 at 129; BE Staff Report, *The Pharmaceutical Industry* (discussing market risk).

[6] *See* The National Institute for Health Care Management, *Changing Patterns Of Pharmaceutical Innovation* 4 (2002), at http://www.nihcm.org/innovations.pdf (hereinafter *NIHCM Innovation Report*); IMS Health, *IMS HEALTH Data Reveal Dramatic Growth in Megabrands*, at http://secure.imshealth.com/public/structure/dispcontent/1,2779,1362-1362-143992,00.html; PhRMA (stmt) 11.

[7] One panelist defined discrete product industries as those that require relatively few patents to protect a product, and complex product industries as those that require a relatively large number. *See* Cohen 2/20 at 30 and Wesley M. Cohen, *Patents: Their Effectiveness and Role* (2/20/02) (slides) at 13, at http://www.ftc.gov/opp/intellect/cohen.pdf.

[8] *See* Browder 3/19 at 174.

means that, as panelists noted, the development of patent thickets is generally not a concern.[9] Although brand-name companies may compete with each other in the same therapeutic class, such as anti-depressants or blood-pressure-lowering drugs, and may seek to obtain a number of patents in a particular area to ensure freedom to operate, such behavior has not given rise to so many overlapping sets of patent rights as to hinder the commercialization of new technologies.[10] From 1989 to 2000, the Food and Drug Administration (FDA) approved 1,035 New Drug Applications (NDAs), 361 of which were for NCEs.[11] The remaining 674 NDAs that FDA approved during this period were incrementally modified drugs (IMDs).[12]

## 2. The Demanding Nature of the NCE Development Process

Panelists provided an overview of the two-stage process to determine whether an NCE is safe and efficacious to market – a process that is time-consuming, uncertain, and expensive.[13] The first stage involves the identification of chemical compounds that might treat an indication or disease.[14] In general, the brand-name companies' trade association reported, "only 20 in 5,000 compounds that are screened enter preclinical testing," which involves laboratory and animal testing.[15]

The second stage begins when the company sponsoring the drug submits an NDA to the FDA. Three phases of clinical testing then follow, which the drug-sponsoring company undertakes and the FDA's Center for Drug Evaluation and Research oversees. Brand-name companies conduct Phase I clinical studies on healthy human beings to determine side effects and gather preliminary evidence of effectiveness. Phase II studies "are designed to obtain data on the effectiveness of the drug for a particular indication or indications in patients with the disease or condition."[16] Phase III studies are expanded controlled and uncontrolled trials and can involve thousands of patients. These clinical trials are often very resource and time-intensive.[17]

---

[9] *See* Glover (stmt) 8.

A patent thicket is a "dense web of overlapping intellectual property rights that a company must hack its way through in order to actually commercialize new technology." Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting*, in 1 INNOVATION POLICY AND THE ECONOMY 119, 120 (Adam Jaffe et al. eds., 2001) (hereinafter *Navigating the Patent Thicket*).

[10] *See* Glover (stmt) 6, 8; Armitage 3/19 at 230.

[11] *See NIHCM Innovation Report* at 3.

[12] *See NIHCM Innovation Report* at 3. IMDs are drugs which rely on an active ingredient present in a drug already approved for the U.S. market, or a closely related chemical derivative of such an ingredient, that has been modified by the manufacturer. *Id.* at 5.

---

[13] *See* Armitage 3/19 at 127-28.

[14] *See id.* "Indication" means disease, illness, or disorder.

[15] *See* Glover (stmt) 3; Armitage 3/19 at 127.

[16] Tufts Center for the Study of Drug Development, *How New Drugs Move through the Development and Approval Process* (2001), *at* http://csdd.tufts.edu/NewsEvents/RecentNews.asp?newsid=4.

[17] *See* Glover (stmt) 3.

6

3. **The Implications of Clinical Trials for Effective Patent Term of NCEs**

The time-consuming nature of clinical trials to evaluate a drug product's safety and efficacy may limit the length of effective patent term that brand-name companies can realize. Panelists testified that brand-name companies seek to obtain patents early in the R&D process – usually before clinical trials have commenced.[18] One panelist stated that the initial patent(s) to be issued for a totally new drug product are on the drug substance (*i.e.*, the NCE or molecule).[19] This panelist contended that drug substance patents are typically the most valuable for the brand-name company, because they are much more difficult for potential competitors (including generic companies) to design around than formulation or method of use patents.[20]

In the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act, Congress provided for restoration of a portion of the patent term that elapses while clinical trials and FDA review are under way.[21] The Hatch-Waxman Amendments can restore patent term up to a maximum of five years, depending on how long clinical trials and FDA review take. Total effective patent term may not exceed more than 14 years from the date of FDA approval.[22] Pharmaceutical companies report, however, that by the time clinical trials are complete and a drug product is ready to market, the effective patent life for a drug patent – even with patent term restoration – is typically about 11 years,[23] substantially shorter than the 20-year statutory patent term.[24] Congress also has provided other market exclusivity periods for brand-name

---

[18] *See* Glover 3/19 at 172-74; Armitage 3/19 at 176-77.

[19] *See* Armitage 3/19 at 178.

[20] *See id.*; McCurdy 3/20 at 36-37.

[21] Drug Price Competition and Patent Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended 21 U.S.C. § 355 (1994)).

[22] 35 U.S.C. § 156 (c)(3). Another approach to restoring the patent term that elapses during FDA review would be to reduce FDA approval time. One study has found that reductions in regulatory approval times are somewhat more effective in increasing cash flow for a brand-name company, because such reductions add years to the less heavily discounted beginning of the product life cycle, rather than the end. *See* James W. Hughes et al., *"Napsterizing" Pharmaceuticals: Access, Innovation, and Consumer Welfare* (Public Comment) 8-9, *at* http://www.ftc.gov/os/comments/intelpropertycomments/snydermoorehughes.pdf.

[23] *See* PhRMA (stmt) 9-10 (stating that "the [average] effective patent life for drugs introduced from 1984-1995 that received patent term restoration, including such restoration, was only about 11 years" and *citing* Sheila R. Shulman et al., *Patent Term Restoration The Impact of the Waxman-Hatch Act on New Drugs and Biologics Approved 1984-1995*, 2 J. BIOLAW AND BUS. 63, 66 (1999)); *see also* Linck 4/9 at 97; Browder 3/19 at 174-75; Seide 3/19 at 176; Armitage 3/19 at 176-77. *But see* NIHCM Foundation Issue Brief, *Prescription Drugs and Intellectual Property Protection: Finding the Right Balance Between Access and Innovation* 1, 3 (Aug. 2000) (arguing that the effective patent term has increased by at least 50% since the passage of the Hatch-Waxman Amendments), *at* http://www.nihcm.org/prescription.pdf.

[24] A patent's term is 20 years from the date of *filing* the application. Due to the time-consuming nature of the patent examination process, *most* patents are unlikely to have an effective patent term of 19 or 20 years. *See* 35 U.S.C. § 154(a)(2), *as amended* by the Uruguay Round Agreements Act of 1994, Pub. L. No. 103-465, which changed patent term from 17 years measured from date of a patent's issuance to 20 years measured from date of filing the patent application.

companies.[25]

> **Box 3-3.** *Generic Drug Entry Prior to Patent Expiration: An FTC Study*
>
> In light of the questions its various generic drug investigations raised, the Commission began an industry-wide study of generic drug competition in October 2000. The Generic Drug Study focused solely on the procedures used to facilitate generic drug entry *prior to* expiration of the patent(s) that protect the brand-name drug product. The Commission issued nearly 80 special orders - pursuant to Section 6(b) of the FTC Act - to brand-name companies and to generic drug manufacturers, seeking information about certain practices. The Commission staff compiled the information received to provide a factual description of how the 180-day marketing exclusivity and 30-month stay provisions affect the timing of generic entry prior to patent expiration. Based on this data, the Commission made two primary recommendations concerning the 30-month stay provision and the 180-day exclusivity to mitigate the possibility of abuse that deters more generic drugs from becoming available. The Generic Drug Study is *available at* http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf.

### 4. Incremental Innovation for the Development of IMDs

The other main type of innovation in the pharmaceutical industry consists of enhancing known chemical entities by formulating new dosage forms or additional methods of use for existing chemical entities. This type of innovation is generally described as "incremental," which, in general terms, means that "today's advances build on and interact with many other features of existing technology."[26] In the pharmaceutical industry, incremental innovation generally falls into one of three categories. The modified product may use a new formulation, such as a transdermal patch instead of a pill, may combine two previously approved active ingredients, or may use a new salt or esther, which is a more purified form of the original chemical entity.[27] Several panelists suggested that brand-name companies have responded to effective patent term reduction and the increasing cost of discovering and developing NCEs by implementing product life-cycle management, including the use of IMDs.[28] Some have noted that IMDs "provide a high return on investment."[29]

Participants in the Hearings expressed differing views about the benefits of these modified drugs. Some testified that IMDs benefit consumers by providing more convenient dosing or "superior therapeutic

---

[25] For example, the safety and efficacy data for a product may not be relied upon by another company for five years if the product contains an NCE and for three years if the product involves a new use of an existing compound. 21 U.S.C. § 355(c)(3)(D)(ii). A drug product also can obtain an additional six months of market exclusivity if it conducts studies showing the product is safe and effective for children. 21 U.S.C. § 355a.

[26] *See* Merges & Nelson, 90 COLUM. L. REV. at 881.

[27] *See NIHCM Innovation Report* at 5; Armitage 3/19 at 217.

[28] *See* Linck 4/9 at 97-98; Aventis Pharmaceuticals Inc., *Comments of Dr. Nahed Ahmed, Vice President, Productivity, Portfolio & Project Management Drug Innovation & Approval Aventis Pharmaceuticals Inc.* (Public Comment) 3-4 (contending that there are strong economic incentives for brand-name companies to implement IMDs, because they are "safer, faster, and more cost effective for the development as an incremental improvement rather than an original product."), *at* http://www.ftc.gov/os/comments/intelpropertycomments/aventis.pdf (hereinafter Aventis (stmt)); Armitage 3/19 at 216-218; Snyder 3/19 at 224; *NIHCM Innovation Report* at 3.

[29] *NIHCM Innovation Report* at 4; *see also* Aventis (stmt) 4.

properties than the original formulation,"[30] or by serving certain patient populations better than the original product.[31] The brand-name companies' trade association stated that if physicians and consumers choose IMDs in preference to generic alternatives of the original brand-name product, the modified drug is warranted.[32] In contrast, a generic drug manufacturer suggested that IMDs might be a tactic employed by brand-name companies "to extend patent monopolies beyond the patent expiry of the new chemical entity . . . by a matter of years, not days or weeks or months."[33] This panelist also argued that the PTO issues too many questionable patents, which create a gridlock of patent litigation in the district court system and thereby delay generic entry.[34] The FTC's Generic Drug Study found that over time, for blockbuster products, brand name companies are suing for infringement on more patents, and those suits take longer on average than suits involving a single patent.[35] Others have reported that "the FDA view[s] the vast majority of IMDs as providing no significant clinical improvement."[36]

## C. The Role of Patents In Spurring Pharmaceutical Innovation

Panelists reported that patent protection promotes innovation in the pharmaceutical industry by creating incentives for brand-name companies to innovate, and by disclosing inventions, thereby encouraging generic companies to innovate by designing around brand-name company patents.

Participants in the Hearings overwhelmingly expressed the view that patent rights for pharmaceuticals are essential for brand-name companies to prevent free riding and recoup their significant investments in research and development of NCEs.[37] One panelist noted that patents are particularly important in the pharmaceutical industry, because the Hatch-Waxman Amendments permit generic applicants to rely on the brand-name company's proprietary data demonstrating the safety and efficacy of the brand-name drug product.[38]

---

[30] Glover (stmt) 7.

[31] See Snyder 3/19 at 224.

[32] See PhRMA (stmt) 29-30; see also Glover (stmt) 7.

[33] Coffin-Beach 3/19 at 201-05, 212-213 (suggesting that brand-name companies time their incremental modifications to maximize their product's franchise, for example, by waiting 10 years to develop a sustained-release version of an NCE).

[34] Coffin-Beach 3/19 at 204-205.

[35] See FTC, Generic Drug Study at 47-48.

[36] NIHCM Innovation Report at 7; see also Coffin-Beach 3/19 at 201-05 (stating that IMDs may have "questionable therapeutic merit.").

[37] See PhRMA (stmt) 10-13; Glover (stmt) 2, 4 (describing the cost of new drug development and generic entry); Linck 4/9 at 48-49; Armitage 3/19 at 165; see supra Ch. 2(B)(1)(b) (discussing economic studies on the role of patents in protecting against free riding in different industries).

[38] See Armitage 3/19 at 133, 165. The FDA considered retesting of generic drugs to be wasteful if the underlying drug is safe and effective. Moreover, such retesting is unethical because it requires that some sick patients take placebos and be denied treatment known to be

9

Patent law requires applicants to disclose the inventions for which they seek patents. The purpose of the disclosure obligation is to foster further innovation by enabling a person skilled in the particular art to learn from another's invention.[39] This disclosure obligation is a trade-off for obtaining the right to exclude others from making, using, offering for sale or selling an invention.[40] Several panelists observed that the disclosure requirement fosters innovation in the pharmaceutical industry by enabling both brand-name and generic companies to discern the development plans and scientific development of rival companies.[41] One panelist reported that patent literature is an important source of information on technological advances for the pharmaceutical industry, whereas scientific literature, much of which is enabled by patents, is more important in the biotechnology industry.[42]

One way in which a generic company can compete with a particular brand-name product prior to the expiration of the patents that cover the drug product is to design around those patents.[43] Representatives of generic companies observed that the process of designing around brand-name patents can give rise to innovation.[44] In some circumstances a generic company may obtain a patent for its design-around innovations.[45]

## D.   The Role of Competition in Spurring Pharmaceutical Innovation

Panelists described competition among brand-name companies and the role of the Hatch-Waxman Amendments in fostering competition and innovation in the pharmaceutical industry. One panelist observed that the granting of a pharmaceutical patent does not necessarily confer a "monopoly on the treatment of any specific disease;" brand-name companies may compete with each other in the same therapeutic class, such as drugs that reduce cholesterol.[46] Moreover, according to the brand-name companies' trade association, competition among brand-name companies is increasing, because the period of market exclusivity between the introduction of breakthrough medicine and competing innovators has been consistently shrinking

---

effective. *See* H.R. REP. No. 98-857, Part I at 16 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2649. The ability of other companies to rely on that data and develop bioequivalent generic versions of NCEs at much lower costs significantly reduces the profits for the branded product. One panelist stated that once a certain drug has a generic counterpart, the result is a "more rapid decline in the pioneer share of the market" because pharmacy benefit managers and formulary managers require that physicians and patients use generic drugs, as opposed to the more expensive branded drugs. *See* Glover 3/19 at 171.

[39] *See supra* Ch. 2(I)(A)(3).

[40] Rogan 2/6 at 21.

[41] *See* Coffin-Beach 3/19 at 212; Glover 3/19 at 224-25; Seide 3/19 at 226; Browder 3/19 at 238; Oehler 2/26 at 319.

[42] *See* Blackburn 2/26 at 319-20.

[43] For further details, *see* FTC, *Generic Drug Study*. For discussion of design-around innovation by brand-name companies, *see* Armitage 3/19 at 230.

[44] *See, e.g.,* Browder 3/19 at 228.

[45] *See* Coffin-Beach 3/19 at 225.

[46] *See* Glover (stmt) 6. *But see NIHCM Innovation Report* at 3 (suggesting that price competition among several new drugs products in a therapeutic class is limited.).

since 1965.[47] None of the panelists believed, however, that competition alone could generate sufficient innovation in the pharmaceutical industry.[48]

One of the unique aspects of the pharmaceutical industry is how the regulatory structure governing the approval of new brand-name and generic drug products has spurred additional competition and innovation. In this case, the Hatch-Waxman Amendments sought to balance incentives for continued innovation by research-based pharmaceutical companies and opportunities for market entry by generic drug manufacturers. The streamlined approval process gives generic drug applicants the opportunity to obtain FDA approval of their generic drug products prior to patent expiration.[49] By removing obstacles to generic competition, the Hatch-Waxman Amendments "stimulated the development of a generic pharmaceutical industry in the United States. Since the law's passage, the generic industry's share of the prescription drug market has jumped from less than 20 percent to almost 50 percent today."[50] The Hatch-Waxman Amendments have fostered significant price competition in those markets with generic entry.[51] The generic competition spurred by Hatch-Waxman has forced brand-name firms to come up with new products to replenish their revenue streams.[52] Brand-name companies often have introduced IMDs for which they can seek patent protection to lessen the impact of this generic competition.[53]

Congress also encouraged generic

---

[47] See Glover (stmt) 7; PhRMA (stmt) 28. But see Sal Ricciardi, *Comments Re: Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy Public Hearings, Spring and Summer, 2002* (Public Comment) 10 (discussing restraints on secondary market competition), at http://www.ftc.gov/os/comments/intelpropertycomments/pda.pdf.

[48] Panelists disagreed on the extent to which innovation would occur in the pharmaceutical industry absent patent protection, although all believed that it would decline markedly. Professor Snyder, who has conducted research into this particular issue, cited findings indicating that in the absence of patent protection for pharmaceuticals, innovation would decrease by approximately 60%. Armitage disagreed with Snyder, asserting that the absence of patents would eliminate innovation in the pharmaceutical industry. *Compare* Snyder 3/19 at 170 *with* Armitage 3/19 at 180.

[49] Brand-name companies must provide the FDA with information regarding patents that cover their drug products, which the FDA then lists in a publication commonly known as the "Orange Book." *See* 21 U.S.C. § 355(j)(7)(A) and FTC, *Generic Drug Study* at Ch. 3. Generic drug companies who seek FDA approval prior to patent expiration must give notice to brand-name companies stating that the listed patents are invalid or not infringed by the generic product.

[50] *See* Glover (stmt) 7; *see also* Ashoke Bhattacharjya, *FTC Health Care Workshop: Panel on Branded and Generic Pharmaceuticals* 5 (stmt presented at the FTC's Healthcare Workshop Sept. 10, 2002), at http://www.ftc.gov/ogc/healthcare/bhatta.pdf; FTC, *Generic Drug Study* at (i) (identifying these figures as shares of prescriptions filled).

[51] Studies indicate that the first generic typically enters the market at 70 to 80 percent of the price of the corresponding brand and rapidly secures as much as a two-thirds market share. *See, e.g.*, Congressional Budget Office, *How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry* 28 (July 1998), at http://www.cbo.gov/showdoc.cfm?index=655&sequence=0; DAVID REIFFEN & MICHAEL R. WARD, GENERIC DRUG INDUSTRY DYNAMICS (Federal Trade Commission Bureau of Econ. Working Paper No. 248, 2002), at http://www.ftc.gov/be/econwork.htm; *see also* BE Staff Report, *The Pharmaceutical Industry*.

[52] *See, e.g.*, Glover 3/19 at 146 (noting that "even major companies must develop a blockbuster every two to three years or face massive financial contraction").

[53] Browder 3/9 at 227-28.

entry by granting 180 days of marketing exclusivity to the first generic applicant to file an application for a generic drug product that does not infringe the brand-name product or that challenges the validity of the brand-name company's patents.[54] The 180-day exclusivity period increases the economic incentives for a generic company to be the first to file, because the generic applicant has the potential to reap the reward of marketing the only generic product (and, thus, to charge a higher price until more generic products enter). Through this 180-day provision, the Amendments provide an increased incentive for companies to challenge patents and develop alternatives to patented drugs.[55] Indeed, one generic panelist reported that competition among generic companies for the 180 days of exclusivity has become "acute."[56]

Once a brand-name company is notified of the filing of such a generic application, it has a 45-day window in which to sue the generic applicant for patent infringement. The initiation of the patent infringement suit triggers a 30-month stay of FDA approval of the generic drug application. According to the legislative history, the stay allows for the commencement of a lawsuit and takes into account the patent owner's rights while still encouraging generic entry.[57]

### E.  The FTC's Pharmaceutical Industry Enforcement Actions and Generic Drug Study

The Commission has pursued numerous antitrust enforcement actions affecting both brand-name and generic drug manufacturers when it had reason to believe that a company abused its patent rights in violation of the antitrust laws. The Commission has addressed conduct that it alleged would have the effect of delaying generic entry, including certain patent settlement agreements between brand-name companies and generic applicants,[58] a brand-name company's acquisition of an exclusive license to a particular patent,[59] the purported

---

[54] For a fuller discussion of the effect of the 180-day marketing exclusivity provision on competition, *see* FTC, *Generic Drug Study* at Ch. 3.

[55] *See Granutec, Inc. v. Shalala*, 139 F.3d 889, 891 (4th Cir. 1998).

[56] Coffin-Beach 3/19 at 239.

[57] H. REP. NO. 98-857, at 27 (1984).

[58] *Abbott Laboratories,* No. C-3945 (FTC May 22, 2000) (consent order), *available at* http://www.ftc.gov/os/2000/05/c3945.do.htm. *Geneva Pharmaceuticals,* No. C-3946 (FTC May 22, 2000) (consent order), *available at* http://www.ftc.gov/os/2000/05/c3946.do.htm. *Hoechst/Andrx,* No. 9293 (FTC May 8, 2001) (consent order), *available at* http://www.ftc.gov/os/2001/05/hoechstdo.htm. In another matter, *Schering-Plough,* the Commission resolved all claims against one of three respondents, American Home Products (AHP), by issuing a final consent order. *Schering-Plough Corp.*, No. 9297 (FTC Apr. 2, 2002) (consent order as to AHP), *available at* http://www.ftc.gov/os/2002/04/scheringplough_do.htm.

The case against the other two respondents is in litigation before the Commission. *See Schering-Plough Corp.*, No. 9297 (FTC July 2, 2002) (Initial Decision), *available at* http://www.ftc.gov/os/2002/07/scheringinitialdecisionp1.pdf.

[59] *Biovail Corp.*, No. C-4060 (FTC Oct. 2, 2002) (consent order), *available at* http://www.ftc.gov/os/2002/10/biovaildo.pdf.

12

use of sham litigation,[60] and an agreement between generic drug manufacturers.[61] It also has addressed conduct that the Commission contended would eliminate a potential competitor for an NCE in the merger context.[62]

Over the past few years the Commission also has observed through its investigations, law enforcement actions, and Generic Drug Study that some brand-name and generic drug manufacturers may have "gamed" the 180-day marketing exclusivity and the 30-month stay provisions, attempting to restrict competition beyond what the Hatch-Waxman Amendments intended.[63] The Commission has undertaken two main types of enforcement activities in this area. It has addressed patent settlement agreements between brand-name companies and generic applicants that the Commission alleged had delayed the entry of one or more generic applicants through manipulation of the 180-day exclusivity period.[64] It also has addressed allegations that individual brand-name manufacturers have delayed generic competition through the use of improper Orange Book listings[65] that trigger the Hatch-Waxman provision prohibiting the FDA from approving a generic applicant for 30 months.[66]

Brand-name companies previously could obtain additional 30-month stays by obtaining additional patents that claimed their brand-name products. There were opportunities for "gaming" the 30-month stay because the FDA does not oversee whether these additional patents meet the requirements for listing with the FDA, and there is no private right of action for a court to make such a determination. Not surprisingly, given the amount of revenue at stake, the FTC found in its Generic Drug Study that some brand-name companies have "gamed" the 30-month stay provision, and that it had the potential to be "gamed" in the future, absent reform.[67] The FDA changed its rule to prevent brand-name companies from obtaining additional 30-month stays. This rule change was based

---

[60] *Bristol-Myers Squibb*, No. C-4076 (FTC Mar. 7, 2003) (consent order), *available at* http://www.ftc.gov/os/2003/03/bristolmyersconsent.pdf.

[61] *Biovail Corp. and Elan Corp. PLC*, No. C-4057 (FTC Aug. 20, 2002) (consent order), *available at* http://www.ftc.gov/os/2002/06/biovailelando.pdf.

[62] *In the Matter of Glaxo Wellcome plc, and SmtihKline Beecham PLC*, No. C-3990 (FTC Jan. 31, 2001) (consent order) (requiring divestiture of certain intellectual property rights on NCEs), *available at* http://www.ftc.gov/os/2001/01/glaxosmithklinedo.pdf.

[63] For further details on the Generic Drug Study *see* Box 3-3.

[64] *Abbott Laboratories*, No. C-3945 (FTC May 22, 2000) (consent order), *available at* http://www.ftc.gov/os/2000/05/c3945.do.htm. *Geneva Pharmaceuticals*, No. C-3946 (FTC May 22, 2000) (consent order), *available at* http://www.ftc.gov/os/2000/05/c3946.do.htm.

[65] The Commission first raised concerns about the potential anticompetitive impact of improper Orange Book listings in *American Bioscience, Inc. v. Bristol-Myers Squibb Co.*, No. CV-00-08577 (C.D. Cal. Sept. 7, 2000). *See* Brief of Amicus Curiae Federal Trade Commission, *Am. Bioscience, Inc. v. Bristol Myers Squibb Co.*, 2000 U.S. Dist. LEXIS 21067 (No. CV-00-08577), *available at* http://www.ftc.gov/os/2000/09/amicusbrief.pdf.

[66] *Biovail Corp.*, No. C-4060 (FTC Oct. 2, 2002) (consent order), *available at* http://www.ftc.gov/os/2002/10/biovaildo.pdf; *Bristol-Myers Squibb*, No. C-4076 (FTC Mar. 7, 2003) (consent order), *available at* http://www.ftc.gov/os/2003/03/bristolmyersconsent.pdf.

[67] *See* FTC, *Generic Drug Study at* (ii)-(iv) and Ch. 3.

largely on the FTC's recommendation.[68]

### F. Conclusion

Representatives from the pharmaceutical industry emphasized that patents are critical for promoting pharmaceutical innovation of NCEs. Brand-name companies depend on patents to recoup their substantial investment in the discrete innovation that leads to the development of new drug products. Also, brand-name companies make and patent incremental improvements to their products to manage them on a life-cycle basis. Panelists differed as to the extent to which such IMDs benefit consumers.

Competition in the pharmaceutical industry occurs in two primary ways: between brand-name companies that have products in the same therapeutic class and between brand-name and generic companies. Competition between and among brand-name companies and generics can foster innovation, as well as other benefits of competition. Patent disclosure requirements can enable brand-name and generic competitors to design around some patents covering brand-name drug products in order to bring competing products to market. The Commission has brought enforcement actions in the pharmaceutical industry to protect competition, including incentives to innovate.

The innovation that the patent system spurs for the discovery and commercialization of NCEs in the pharmaceutical industry in many ways showcases the patent system's benefits. Such innovation entails the high fixed research costs, relative ease of imitation, and free riding problems that patent protection effectively manages. Fewer patent thicket issues arise in the pharmaceutical context than in industries where innovation is less discrete and individual products are covered by many patents. Subsequent sections examine how the roles of patents and competition vary in industries that exhibit different characteristics.

---

[68] *See* Applications for FDA Approval to Market a New Drug; Patent Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying That a Patent Claiming a Drug is Invalid or Will Not be Infringed, 68 Fed. Reg. 36,675 (2003) (to be codified at 21 C.F.R. § 314).