# Defendant's Exhibit 15

Appeals 2006-1443 and 2006-1465                    Docket No. 371672800200

~~Reexamination Control Nos. 90/004,950 and 90/005,200~~

CERTIFICATE OF MAILING BY "EXPRESS MAIL"

1          Express Mail Label No.: EM011890030US          Date of Deposit: April 3, 1998

I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service
2          Appellants make a point in the Appeal Brief, and at oral argument, that the
under 37 C.F.R. § 1.10 on the date indicated above and is addressed to: Assistant Commissioner for Patents, Washington, D.C. 20231.

3          Examiner ~~has "combined"~~ several Ochiai patents to make ~~the double patenting rejecting.~~
                                                                    Yvonna M. Staben

4          Tr.15:12-17.
                    IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

5          We do not think the Examiner combined several Ochiai patents to make the

6    rejection. However, given the rationale upon which we have affirmed, we find it
In the application of:

7          unnecessary in this case to resolve any issue of whether two or more patents owned by a
          U.S. Patent No: 5,583,216

8    patentee may be "combined" to support a double patenting rejection. We will leave that
Inventors: Ochiai                                         REQUEST FOR REEXAMINATION

9    issue owned by the patentee. We leave that issue for another day.
Issued: December 10, 1996

For:       METHOD FOR THE MANUFACTURE          ORDER
          OF CEPHEMS

          Upon consideration of the record indicated above and for the reasons given, it is
          ASSIGNEE: TAKEDA CHEMICAL
          INDUSTRIES, LTD., OSAKA, JAPAN

## REQUEST FOR REEXAMINATION

Box REEXAM
Assistant Commissioner for Patents
Washington, D.C.  20231

Dear Sir:

          The undersigned, as Third Party Requestor, requests reexamination of claims 1-5 of US
Patent No. 5,583,216 (" '216 Patent ") under 35 U.S.C. 302-307 and 37 C.F.R. 1.510.  The '216
patent was issued on December 10, 1996 to the inventors, Ochiai et al, on an application filed
January 8, 1990.

          A Statement (as required by 37 CFR 1.510(b)(1)) pointing out each substantial new
question of patentability follows in this Request, as does an identification (under 37 CFR

pa-237581                              --1 of 15--

1.510(b)(2)) of each claim for which examination is requested and a detailed explanation of the pertinence and manner of applying the cited patents and publications to every claim for which re-examination is requested. As required by 37 CFR 1.510(b)(3), copies of the pertinent patents and prior art relied upon are included. A cut-up specification and claims of the '216 patent (37 CFR 1.510(b)(4)), and certificate of service to the Patent Owners (understood to be Takeda Chemical Industries, Ltd., Osaka, Japan) through outside counsel (Foley and Lardner of Washington, D.C.) follows (37 CFR 1.510(b)(5)). The fee for requesting re-examination under 37 CFR 1.20(c) is also enclosed.

## I.    Summary of Request for Re-examination

This Request for Reexamination is very straightforward. The basic issue is this: process claims 1-5 of the '216 patent (Attachment 1) are not patentable under the doctrine of judicial double patenting over the claims of commonly-owned and commonly-invented US Patent No. 4,298,606 (the " '606 Patent " - Attachment 2) or US patent No. 4.098,888 (the " '888 Patent " -- Attachment 3)[1] in combination with the claims of commonly-owned and commonly-invented US Patent No. 4,203,899 (the " '899 Patent " - Attachment 4) and further in view of certain chemical literature references discussed below.

First, some background: the Patentees have had issued to them over the years, various patents claiming cephem compounds. Patentees have also had issued to them a patent claiming certain starting materials (acylating agents) useful in making those product cephem compounds claimed in the '604 and '888 patents. Recently, in 1996, Patentees had issued to them the '216 Patent claiming a one-step process patent linking the claimed acylating agent starting materials (from the '899 patent claims) to the various claimed product cephem compounds (from the '606 or '888 patent claims) by a single process step -- i.e., "introducing an acyl group of the formula ... into .. [an admittedly old] molecule..." Using the '216 Patent, the Patent Owner is able,

---

[1] US Patent Nos. 4, 912,212, issued March 27, 1990 and 4,973,684, issued November 27, 1990, also claim cephem compounds within the scope of the product produced by the '216 Patent process. These patents were terminally disclaimed by the Patent Owner over the '888 Patent.

under the aegis of 35 USC 271(g)[2], to prevent until the year 2013, the importation, sale, and use of the product cephem compounds claimed in the earlier patents. This is an unwarranted extension of the patent monopoly and in some cases revives already expired patent rights.

## II.    Background of Law

Prior to considering the factual arguments below in Section III, Requestor wishes to address a few points regarding the law relating to reexamination, the law relating to judicial double patenting, and some general background material relating specifically to the '216 Patent.

### 1.    Judicial Double Patenting

Judicial Double Patenting has existed as a basis for finding unpatentability for many years. In a double patenting rejection, the concern is simply this: does a subsequent patent or patent application claim an invention which was earlier disclosed and claimed in an earlier patent? Again and again, the Court of Appeals for the Federal Circuit has specified: "only the claims [in the later patent or application] are compared in a rejection for [judicial] double patenting."[3] Only those later claims reciting a "patentable distinction" over the earlier patented claims are appropriately patentable in view of a judicial double patenting rejection.[4] Some have argued in the past that "cross-readability" between the earlier and later claim sets is a prerequisite for a proper judicial double patenting rejection. The courts have discarded this argument as inappropriate. Further, prior art (as that concept is defined in 35 USC 102) may be considered along with the earlier claims to support such a judicial double patenting rejection.[5]

---

[2] 35 USC 271(g) provides, in pertinent part, that whoever "without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent…"

[3] See, In re Bartfeld, 925 F.2d 1450, 1453, 17 USPQ2d 1885, 1888 (Fed. Cir. 1991)

[4] See, In re Ockert, 245 F.2d 467, 114 USPQ 330 (CCPA 1957)

[5] Id, 245 F.2d at 469, 114 USPQ at 332.

--3 of 15--

2.    In re Ochiai

Requestor recognizes that the '216 patent was issued by the USPTO only after extensive prosecution and appeal through the U. S. Court of Appeals for the Federal Circuit. See, In re Ochiai[6] (Attachment 5) and Ex parte Ochiai.[7]   In re Ochiai is well known for its discussion of the so-called In re Durden[8] fact situations. The question considered both in Durden and in Ochiai may be summarized as this: during the ex parte prosecution of claims dealing with a process, under 35 USC 103, how much weight should the PTO give to the patentability of the products and starting materials of that process?

Obviously, although the technological analyses used in those two cases and in this Request are similar, the legal question raised in this Request is fundamentally different -- it is a Request made under the basis of judicial double patenting, not under 35 USC 103. The existing legal analysis made by the Court and by the PTO is consequently not applicable to the questions raised here.   The Court, nevertheless, has provided some technological "blazemarks" in In re Ochiai which may be instructional here.   The Court centered its analysis on the absence of either a product or a feedstock in assessing the patentability of the process claims on appeal.   In stark contrast, in the analysis under judicial double patenting presented in this Request, the very products and feedstocks required by the process claims of the '216 Patent are found variously in the claims of the '606 patent, the '888 patent, and the '899 patent.

3.    Judicial Double Patenting in Reexamination Proceedings

The Federal Circuit has recently made it clear that an obviousness-type double patenting question is a legitimate basis for a reexamination proceeding under 35 U.S.C. § 303(a).  The

---

[6] In re Ochiai, 713 F.3d 1565, 37 USPQ2d 1127 (Fed. Cir. 1995).

[7] Ex parte Ochiai, 24 USPQ2d 1265 (Bd. of Pat. App. and Intf.  1992)

[8] In re Durden, 763 F.2d 1406, 226 USPQ 359 (Fed. Cir. 1985)

--4 of 15--

pa-237581

Court specifically held in In re Lonardo[9] that the reexamination statute does not prohibit the PTO from considering references other than "prior art patents or printed publications." The Court carefully considered the language of the reexamination statute and its legislative history and concluded that a question of judicial double patenting may be considered by the PTO during reexamination. This is consistent with Section 804 of the Manual of Patent Examining Procedure (MPEP), which says "[a] double patenting issue may arise…in a reexamination proceeding."

One might argue that because of a relationship under 35 USC 120 between a parent patent and the later patent to be reexamined and that since the later PTO Examiner knew of the relationship, it would be appropriate to presume that the Examiner had considered the prior parent patent for "all purposes," presumably including judicial double patenting, and that the prior patent should not be considered again in the reexamination proceeding. That argument would be wrong. The Federal Circuit has held in In re Portola Packaging, Inc.[10] that prior art patents which had been previously been considered by an Examiner during ex parte prosecution could not form the basis of a Request for Reexamination. However, there is no evidence in the file-wrapper prosecution history of the '216 Patent suggesting that the Patentees (then-applicants) specifically disclosed to the PTO Examiner or in any way discussed the myriad of prior patents or applications in the context of judicial double-patenting.[11] Furthermore, to assume that the PTO Examiner considered those prior patents and applications would necessitate overturning In re Lonordo. The Portola Packaging decision was certainly considered by the

---

[9] In re Lonardo, 119 F.2d 960, 964, 43 USPQ2d 1262, 1266 (Fed. Cir. 1997)

[10] In re Portola Packaging, Inc., 110 F.3d 786, 42 USPQ2d 1295 (Fed. Cir. 1997)

[11] It may also be instructive that the relationship of the '899 patent to the '216 patent under consideration here, is not even disclosed in the "Related U.S. Application Data" portion of the '216 patent.

--5 of 15--

Lonardo Court since: a.) Judge Lourie wrote both opinions, b.) there is but a three month time span between the two decisions, and c.) Judge Newman specifically mentions the Portola Packaging case in her dissent in Lonardo.[12]

    4.    Applicability of 35 USC 121

The Requestor also wishes to address whether 35 USC 121 protects the Patent Owner from patentability challenges under the doctrine of judicial double patenting.

The application of a judicial double patenting rejection in a later patent or application is not appropriate when the PTO has made a restriction requirement under 35 USC 121 in that earlier patent. However, the PTO made no restriction requirement in any of the earlier patents or applications and certainly not in the '216 Patent. Consequently, the Patentee and Patent Owner do not, in this instance, enjoy the prophylaxis of 35 USC 121.

To the extent the prior applications were available, Requestor reviewed each such application for a restriction requirement between a cephem product and a process of making such a product. No such requirement was found. Attachment 6 includes a) a family tree of the '216 Patent outlining the pertinent facts relating to each of the applications in that family, b) a photocopy of each application's file wrapper cover in which a restriction requirement is found, and c) a copy of each such restriction requirement in the series.[13]

---

[12] Such a practice would be in keeping with other similar practices in the PTO. For instance in FMC Corp. v. Hennessy Industries, Inc., 5 USPQ2d 1272 (Fed. Cir. 1987), the Federal Circuit rejected an assertion that the examiner was aware of the prior art at issue because it was cited by the examiner in an earlier patent. "[T]he duty of candor requires 'more than an assumption that the examiner will recall something from a previous application.'" Id. at 1276 (quoting the district court, 2 USPQ2d 1479, 1489 (N.D. Ill. 1986)). Since the present Request similarly deals with a previous (parent) application, the reasoning of the court in FMC Corp. is more applicable than that in In re Portola Packaging.

[13] Attachment 6B1 shows the file wrapper cover and the Restriction Requirement (Paper No. 2) of serial No. 900,233; Attachment 6B2 shows the file wrapper cover and the Restriction

Furthermore, it is not appropriate now to make a determination that a restriction requirement could have been made in an earlier application. One of the Federal Circuit's predecessor courts faced just such a question in deciding a double patenting question.[14] In deciding that such a nunc pro tunc decision was not appropriate, the CCPA cited a still-earlier case saying that "[35 USC 121] is clearly limited to cases in which there has been an actual requirement for restriction, and we find no basis for extending it to this case where such a requirement was not made."[15]

One final but serendipitous point: the Lonardo case discussed above involved a reexamination proceeding having judicial double patenting rejections. The rejections in Lonardo factually involved two patents under reexamination -- one claiming a method of using a device -- which were rejected over earlier patent claims reciting a device. The Court upheld the propriety of the rejection despite the fact that the reexamined patent and the prior patent included claimed inventions from different classes of patentable subject matter.

## 5. Equity

Although the following is not within the purview of the PTO to decide, it should be pointed out that the Patent Owner has had ample opportunity to include and prosecute process claims in the extensive series of applications in this family of patents. The British priority document (GB 24611/1975), filed more than 20 years ago, included a number of process claims. Attachment 7 shows the claims in that British priority document. Those process claims were not introduced into any of the Patent Owner's US applications. The Patent Owner has not protected

---

Requirement (Paper No. 10) of serial No. 07/462,492 -- Pat. No. 5,583,216; Attachment 6B3 shows the file wrapper cover and the Restriction Requirement (Paper No. 2) of serial No. 642,356 -- Pat. No. 4,098,888.

[14] In re Ockert, supra, 245 F.2d at 468, 114 USPQ at 332

[15] In re Russell, 239 F.2d 387, 389, 112 USPQ 58, 59 (CCPA 1956) .

the process technology (and specifically the consequent product technology under 35 USC 271(g)) during that time, since no restriction requirement was provoked. As a result, the Patent Owner should not be permitted to extend the monopoly in the manner attempted.

### 6. Summary

This Request for Reexamination states legally appropriate bases for granting the Request. The factual basis for the judicial double patenting is discussed below.

III.    Explanation of Pertinence and Manner of Applying the Cited Documents to Claims 1-5 of the '216 Patent

Third Party Requestor requests that claims 1-5 of the '216 Patent be rejected under the judicially created doctrine of obviousness-type double patenting as unpatentable over the claims of the '888 Patent (Attachment 3) or the claims of the '606 Patent (Attachment 2) each reciting the cephem products optionally in view of the '899 Patent (Attachment 4) reciting the thiazolyacetic acid compound starting materials and further in view of one or more of Chauvette (Attachment 8), Gottstein (Attachment 9), Dolfini (Attachment 10), or Fieser (Attachment 11). Each of the latter references from the chemical literature show the other starting material -- a cephalosporin -- and procedures for acylating the cephalosporin.

1.    Patent For Which Reexamination is Requested
      Summary of the '216 Patent

The '216 patent is the patent for which reexamination is requested. Requestor requests that claims 1-5 of the '216 Patent be reexamined on the factual bases specified below. The '216 patent was issued on December 10, 1996 from an application filed in the United States on January 8, 1990. Through a series of continuations, divisions and continuation-in-parts, the '216 patent claims priority under 35 U.S.C. 119 and 120 ultimately back to a Japanese patent

--8 of 15--

application having Ser. No. 49-146567, which priority document was filed on December 19, 1974. Claims 1-5 of the '216 patent are directed to a process for preparing cephem derivatives.

    a.    Claim 1

Claim 1 of the '216 patent is obvious over either claim 1 of the '888 patent or claim 1 of the '606 patent (if necessary) in view of the claims of the '899 patent and in view of Chauvette or Gottstein .

Claim 1 of the '216 patent is directed to a process for preparing cephem compound **1**. The claim requires that the cephem compound be substituted as follows: $R^3$ is hydrogen or methoxy; $R^4$ is hydrogen or a residue of a nucleophilic compound (e.g. OAc); $R^5$ is hydroxyl or a protected hydroxyl; and $R^8$ is hydrogen or halogen. The claim further requires that **1** be prepared by introducing an acyl compound, represented by the incomplete structure **2**, into the amino group of compound **3**. Claim 1 does not contain any limitations on the acylation method by which **2** is introduced into **3**.

The '888 patent was issued on July 4, 1978 from Ser. No. 642,356, which application was filed on December 19, 1975. Claim 1 of the '888 patent includes a variety of cephem derivatives, including compound **1**, where $R^4$ is defined as a subspecies of nucleophilic compounds: heterocyclic thios. Cephem **4** is an example of a compound included in claim 1.

--9 of 15--

4

The '899 patent was issued on May 20, 1980 as a division of the '888 patent. Claim 1 of the '899 patent includes the thiazolyl acetic acids and acid derivatives of compound **5** used as acylating agents in the '216 patent process claims. Compound **5** is the <u>same</u> as the '216 patent's acylating agent, Compound **2**, except for the inclusion of generic substituent W, which substituent completes the as-depicted structural formula. Substituent W may be a hydroxyl (acid), $C_{1-4}$ alkoxyl (ester), halogen (acyl halide), or OM wherein M is an alkali metal (acid salt).

5

The '606 patent was issued on November 3, 1981 as a division of Ser. No. 900,233, which was filed on April 26, 1978. The '233 application was a continuation-in-part of the '888 patent. Claim 1 of the '606 patent includes cephems of compound **1**, where $R^8$ is hydrogen, $R^5$ is hydroxy or lower alkoxy and $R^4$ is hydrogen or acetoxy. Cephem **6** is an example of a compound included in claim 1.

6

Chauvette was published in 1962. This reference discloses a process for synthesizing

--10 of 15--

cephem derivatives. The process is described in the first sentence of the second paragraph and involves the reaction of acid chlorides or mixed anhydrides with the amino group of compound 9. Compound 9 is a species of amine 3, specifically where $R^3$ is hydrogen and $R^4$ is acetate. According to sentence three of the second paragraph, the cephem derivatives were isolated variously as free acids, sodium salts, or potassium salts. Chauvette's Table I presents a variety of compounds that were made using the Chauvette process, including the '216 patent's cephem compound 7, which is listed on line 8 of Table I.

Gottstein was published in 1971. This reference also discloses a process for synthesizing cephem derivatives. The process involves the direct acylation of compound 9 with an S-carboxymethyl dithiocarbamate-carboxylic mixed anhydride (Experimental Section, Method A). Gottstein further illustrates the process by describing the preparation of cephem 10, which was isolated as the sodium salt. Gottstein lists cephem 10 as "compound 14" in the second paragraph of the Experimental Section.

Claim 1 of the '216 patent is obvious over either claim 1 of the '888 patent or claim 1 of the '606 patent (optionally) in view of the claims of the '899 patent and in view of Chauvette or Gottstein. Chauvette and Gottstein teach a process for preparing cephem derivatives, where an acyl group is introduced into the amino group of compound 9. Given Chauvette or Gottstein, one of ordinary skill in the art would perceive compound 1 as a combination of acyl compound 2

--11 of 15--

and amine **3**. The two references, in view of claim 1 of either the '888 or '606 patent, suggest the preparation of compound **1** through the introduction of compound **2** into the amino group of compound **3**.

Alternatively, Claim 1 of the '216 patent is also obvious over Chauvette or Gottstein in view of claim 1 of the '899 patent. As stated above, Chauvette and Gottstein teach that a preferred process for making cephem derivatives involves the introduction of an acyl group into an amino group. Claim 1 of the '899 patent includes reactive acid derivatives of acyl compound **2**. One of ordinary skill in the art would have been motivated, therefore, to combine the method of Chauvette or Gottstein with claim 1 of the '899 patent to prepare cephem compound **1** through the introduction of acyl group **2** into the amino group of **3**.

### b.    Claim 2

Claim 2 is dependent upon claim 1. It introduces the further limitation that $R^3$ and $R^8$ of formulas **1**, **2** and **3** are hydrogen.

Claim 2 of the '216 patent is obvious over either claim 1 of the '888 patent or claim 1 of the '606 patent (optionally) in view of the claims of the '899 patent and in view of Chauvette or Gottstein. Claims 1 of each of the '888 and '606 patents include cephem compounds of formula **1**, where $R^3$ and $R^8$ are hydrogen. Claim 1 of the '899 patent includes acid derivatives and reactive acid derivatives of compound **2**, where $R^8$ is hydrogen. Chauvette and Gottstein disclose amine **9**, which is compound **3** where $R^3$ is hydrogen and $R^4$ is acetate. For the reasons given in the preceding section, therefore, claim 2 is similarly obvious over the cited art.

### c.    Claim 3

Claim 3 is dependent upon claim 1. It introduces the further limitation that the acylation process for the preparation of cephem **1** must include the reaction of amine **3** with acid **11**. The substituents of **11** are defined as for acyl compound **2**, except that $R^1$ can be an amino group, or a salt or reactive derivative of the amino group.

--12 of 15--

Fieser was published in 1967. This reference discloses a process in which a reagent, dicyclohexylcarbodiimide (DCC), mediates the introduction of an acyl group into an amino group using an acid of the acyl group. The first full paragraph on page 233 describes the reaction of an acid with an amino group of an amino acid. The second paragraph on page 233 describes the reaction of carboxylic acids with the amino group of D-glucosamine.

Claim 3 of the '216 patent is obvious over Chauvette or Gottstein in view of claim 1 of either the '888 or '606 patents and further in view of Fieser. Claim 3 is also obvious over Chauvette or Gottstein in view of claim 1 of the '899 patent and further in view of Fieser. As discussed in the section on claim 1 of the '216 patent, the combination of the cited references renders the preparation of cephem **1** through the introduction of **2** into the amino group of **3** obvious. Fieser describes a process for introducing an acyl group into an amino group, where an acid is reacted with an amine. One of ordinary skill in the art, therefore, would have been motivated to combine the acylation method of Fieser with the other references to arrive at a process where the acid **11** is reacted with amine **3** to provide cephem **1**.

d.    Claim 4

Claim 4 is dependent upon claim 3. It introduces the further limitation that $R^1$ of compound **11** is an amino group.

Claim 1 of both the '888 and '606 patents includes compounds of formula **1** where $R^1$ is an amino group. Claim 1 of the '899 patent includes acid **5** ($R^1$ is amino), where W is hydroxyl. For the reasons provided in the section on claim 3, therefore, claim 4 of the '216 patent is similarly obvious over Chauvette or Dolfini in view of claim 1 of either the '888 or '606 patents

--13 of 15--

pa-237581

and further in view of Fieser. It is also obvious over Chauvette or Dolfini in view of claim 1 of the '899 patent and further in view of Fieser.

e.    Claim 5

Claim 5 is dependent upon claim 3. It introduces the further limitations that $R^1$ of compound **11** is a protected amino and the protective group is removed to provide a free amino group after **2** is reacted with amine **3**.

Dolfini was published in 1971. This reference discloses a process where an acyl group containing a protected amine is introduced into the amino group of **9** and the amine is subsequently deprotected. The last paragraph of the Experimental Section describes the process for the production of **12**, which is "compound II" in Dolfini. The first step of the process is the reaction of D-2-[N-(*tert*-butoxycarbonyl)amino]-2-(1,4-cyclohexadienyl)-acetic acid with isobutyl chloroformate to form a mixed anhydride (**13**). This step is described in detail in the first and second sentences of the experimental procedure for "compound IX." The second step of the process is the reaction of the mixed anhydride with compound **9**. This step is described by analogy from the third to the eleventh sentence of the experimental procedure for "compound IX." The final step of the process is the removal of the *tert*-butoxycarbonyl protecting group from the amino group of the cyclohexadienyl acetic acid group. This step is described, again by analogy, in the experimental procedure for "compound III."

Claim 5 of the '216 patent is obvious over the combination of claim 1 of either the '888 or '606 patents optionally in view of claim 1 of the '899 patent and Chauvette or Gottstein in view of Fieser and further in view of Dolfini. As discussed in the section on claim 3 of the '216

--14 of 15--

patent, the combination of the cited references renders the preparation of cephem **1** through the reaction of **11** with amine **3** obvious. Dolfini describes the introduction of an acyl group containing a protected amino group into compound **9** and the subsequent deprotection of the amino group. One of ordinary skill in the art would have been motivated, therefore, to combine the protection-deprotection step described by Dolfini with the other references to arrive at the process of claim 5.

### IV. Conclusion

The undersigned Third Party Requestor requests that the PTO determine that a substantial new question of patentability has been raised by this Request for Reexamination and further requests that claims 1-5 of the '216 Patent be found to be unpatentable over the claims of co-owned '888 or '606 patents and claim 1 of the '899 patent for the reasons discussed above.

Respectfully submitted,

Date: April 3, 1998          By: _____

E. Thomas Wheelock
Registration No. 28,825

Morrison & Foerster LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5739
Facsimile: 650.494.0792

Enclosures: Index with Attachments 1-11

It is certified that a copy of this request has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c). The name and address of the party served and the date of service are:

Harold C. Wegner
Foley & Lardner
Washington Harbour, Suite 500
3000 K Street, N.W.
Washington, D.C. 20007-5109

Date Of Service: April 3, 1998          Signature: _____

E. Thomas Wheelock

--15 of 15--

pa-237581

# **I N D E X**

1. U.S. Patent No. 5,583,216 by Ochiai et al. issued Dec. 10, 1996 titled METHODS FOR THE MANUFACTURE OF CEPHEMS.

2. U.S. Patent No. 4,298,606 by Ochiai et al. issued Nov. 3, 1981 titled THIAZOLYLACETAMIDO COMPOUNDS.

3. U.S. Patent No. 4,098,888 by Ochiai et al. issued Jul. 4, 1978 titled THIAZOLYLACETAMIDO CEPHALOSPORIN TYPE COMPOUNDS.

4. U.S. Patent No. 4,203,899 by Ochiai et al. issued May 20, 1980 titled THIAZOLYLACETAMIDO COMPOUNDS.

5. *In re Ochiai*, 37 USPQ2d 1127 (Fed. Cir. 1995).

6A. Family Tree Of '216 Patent.

6B1. File wrapper cover and the Restriction Requirement (Paper No. 2) of serial No. 900,233.

6B2. File wrapper cover and the Restriction Requirement (Paper No. 10) of serial No. 07/462,492 -- Pat. No. 5,583,216.

6B3. File wrapper cover and the Restriction Requirement (Paper No. 2) of serial No. 642,356 -- Pat. No. 4,098,888.

7. Claims in British priority document GB 24611/1975.

8. *J. Am. Chem. Soc.*, 84, 3401 (1962), "Chemistry Of Cephalosporin Antibiotics , II. Preparation Of A New Class Of Antibiotics And The Relation Of Structure To Activity" by Chauvette et al. [includes referenced *J. Am. Chem. Soc.*, 84, 3400 (1962), "Chemistry Of Cephalosporin Antibiotics , I. 7-Aminocephalosporanic Acid From Cephalosporin C" by Morin et al.]

9. *J. Med. Chem.* (1971), Vol. 14, No. 8, p. 770-772, "β-Lactam Antimicrobial Agents Which Possess Antifungal Activity" by Gottstein et al.

10. *J. Med. Chem.* (1971), Vol. 14, No 2, p. 117-119, "A New class Of Semisynthetic Penicillins And Cephalosporins Derived From D-2-(1,4-Cyclohexadienyl)glycine" by Dolfini et al.

11. Reagents For Organic Synthesis; p. 231-236, Louis F. Fieser and Mary Fieser; copyright 1967 by John Wiley And Sons, Inc