# Defendant's Exhibit 18



$ Re-exam.

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Attorney Docket Nos. 087147-0265 & 087147-0416**

| | |
|---|---|
| Reexamination No. 90/004,950 | Reexamination No. 90/005,200 |
| Date Filed: April 3, 1998 | Filed: December 22, 1998 |
| U.S. Patent No. 5,583,216 | Group Art Unit: 1624 |
| Issued: December 10, 1996 | Examiner: Emily Bernhardt |
| Entitled:   METHODS FOR THE MANUFACTURE OF CEPHEMS | |

## TRANSMITTAL OF APPEAL BRIEF (37 C.F.R. 41.37)

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


Sir:

Enclosed are two copies of an APPEAL BRIEF which follows the Notice of Appeal of

July 8, 2005.

This application is on behalf of a

☐    Small Entity        ☒    Large Entity

Pursuant to 37 C.F.R. 41.20(b)(2), the fee for filing the Appeal Brief is:

☐    $250.00 (Small Entity)

☒    $500.00 (Large Entity)

TOTAL FEE DUE:

Notice of Appeal Fee  $500.00

09/07/2005 JPREDDIE 00000001 90004950

Extension Fee (if any) $0.00      01 FC:1402                    500.00 OP

Total Fee Due      $500.00

☒    Enclosed is a check for $500.00 to cover the above fees.


002.1456173.1

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

The Board and the Examiners are hereby noticed that a demonstrative will be submitted for oral arguments. The demonstrative will be substantially based on the Exhibit titled "Restriction Requirement" in the appendix of the appeal brief. Its approximate size will be an easel-sized poster. Due to its size, it will not be filed until shortly before oral argument (if necessary) or at a time set by the Board or the Examiners.

The Commissioner is hereby authorized to charge any additional fees which may be required regarding this application under 37 C.F.R. §§ 1.16-1.17 or 37 C.F.R. §§ 41.20, or credit any overpayment, to Deposit Account No. 19-0741. Should no proper payment be enclosed herewith, as by a check being in the wrong amount, unsigned, post-dated, otherwise improper or informal or even entirely missing, the Commissioner is authorized to charge the unpaid amount to Deposit Account No. 19-0741.

Please direct all correspondence to the undersigned attorney or agent at the address indicated below.

Respectfully submitted,

September 2, 2005

FOLEY & LARDNER LLP
Customer Number 22428
3000 K St., N.W.
Washington, DC 20007
ph (202)672-5300

Harold C. Wegner
Registration No. 25,258    *Reg No 35,264*

Stephen B. Maebius
Registration No. 35,264

-2-

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

## CERTIFICATE OF SERVICE

The undersigned certifies that on _____ 09-02-2005 _____,

service of a true and complete copy of the Transmittal of Appeal Brief (37 C.F.R. § 41.37) was

made upon E. Thomas Wheelock, attorney for the Third Party Requester, by depositing the same

in the United States mail in an envelope properly addressed to E. Thomas Wheelock, Morrison &

Foerster, 755 Page Mill Road, Palo Alto, California  94304-1018, with sufficient first class

postage affixed.

Sean A. Passino

002.1456173.1

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**In re merged reexaminations of U.S. Pat. No. 5,583,216, issued December 10, 1996**

Attorney Docket Nos. 087147-0265        087147-0416

Reexamination No. 90/004,950            Reexamination No. 90/005,200

Date Filed: April 3, 1998               Filed: December 22, 1998

U.S. Patent No. 5,583,216               Group Art Unit: 1624

Issued: December 10, 1996               Primary Examiner: Ms. Emily Bernhardt

Entitled:     METHODS FOR THE MANUFACTURE OF CEPHEMS

MS Appeal Brief
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## APPEAL BRIEF UNDER 37 C.F.R. § 41.37

This is an appeal under 35 U.S.C. § 134 from the Final Rejection of claims 1-5 (all the original claims in the patent as granted), dated May 11, 2005. The sole independent claim–claim 1 is the focus of the appeal; claims 2-5 stand with claim 1. A Notice of Appeal was timely filed on July 8, 2005.

This brief is accompanied with the required fee under 37 C.F.R. § 41.20(b)(2) of $500.00.

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

# TABLE OF CONTENTS

I.      REAL PARTY IN INTEREST ................................................................................3

II.     RELATED APPEALS AND INTERFERENCES .................................................4

III.    STATUS OF CLAIMS ........................................................................................6

IV.     STATUS OF AMENDMENTS .............................................................................7

V.      SUMMARY OF CLAIMED SUBJECT MATTER ..............................................8

VI.     GROUNDS OF REJECTION ..............................................................................10
        A.      Double Patenting as an "Obvious" Invention .............................................10
        B.      Double Patenting under a *Schneller* Theory ................................................10

VII.    ARGUMENT ......................................................................................................11
        A.      Obviousness Double Patenting .................................................................11
                1.      Independent and Distinct Inventions *In Actual Fact* .......................11
                2.      *Geneva* is Irrelevant ...................................................................21
                3.      An Eight Part Mosaic of Eight (8) References is not Obvious ........22
                4.      A Mosaic Combination of Multiple References Doesn't Work .......33
        B.      A *Schneller*-esque Double Patenting Rejection ..........................................36
                1.      *Marks* Renders *Schneller* Non-Precedential ....................................36
                2.      Claims were Promptly Sought under a *Retroactive* New Law .........38

VIII.   CONCLUSION ...................................................................................................41

CLAIMS APPENDIX ....................................................................................................42

EVIDENCE APPENDIX .................................................................................................45

RELATED PROCEEDINGS ..........................................................................................48

BdR 12(b) APPENDIX ...................................................................................................49

EXHIBIT–RESTRICTION REQUIREMENT ..................................................................50

CERTIFICATE OF SERVICE ........................................................................................51

2

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

## I.    REAL PARTY IN INTEREST

[37 C.F.R. § 41.37(c)(1)(i)]

Takeda Pharmaceutical Company Limited (formerly known as Takeda Chemical
Industries, Ltd.) is the assignee and the real party in interest.

002.1456941.1

3

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

## II.    RELATED APPEALS AND INTERFERENCES
[37 C.F.R. § 41.37(c)(1)(ii)]

The only appeal decisions relevant to this case are found in the file of the patent (No. 5,583,216, "Ochiai") in the merged reexaminations, *Ex parte Ochiai*, 1992 WL 296517, 24 U.S.P.Q.2d 1265 (Bd. App. & Int. 1992) and *In re Ochiai*, 71 F.3d 1565, 37 U.S.P.Q.2d 1127 (Fed. Cir. 1995). Both decisions are in the BdR 37(c)(1)(x) appendix.[1]

Assignee filed a brief *amicus curiae* in *Symbol Tech Inc. v. Lemelson Med., Educ. & Res. Found. Tech.* (Fed. Cir. No. 04-1451, filed November 2, 2004).[2] A copy of this brief is in the BdR 37(c)(1)(x) appendix, too.

This case concerns the merged reexaminations of the patent issuing from 07/462,492, filed January 8, 1990, now U.S. Pat. No. 5,583,216, which is a continuation of 07/203,410, filed June 7, 1988, now U.S. Pat. No. 4,973,684, which is a continuation of 07/203,409, filed June 7, 1988, now U.S. Pat. No. 4,912,212, which is a division of 06/674,364, filed November 26, 1984, now abandoned, which is a continuation of 06/191,934, filed September 29, 1980, now abandoned, which is a continuation-in-part of 06/071,032, filed August 28, 1979, now U.S. Pat. No. 4,298,606, which is a division of 05/900,233, filed April 26, 1978, now abandoned, which is a continuation-in-part of

---

[1] In *parent* applications of the patent there were appeals that never resulted in a decision by the Board of Patent Appeals and Interferences; none focused upon double patenting, the pending issues here.

[2] The filing is acknowledged in the Final Rejection at p. 2. The lack of a statement about the brief is because it would be improper under 37 C.F.R. § 1.555(a); *Manual of Patent Examining Procedure* ("M.P.E.P.") M.P.E.P. § 2280, *Information Material To Patentability in Reexamination Proceeding*, 2200-112 (8 ed., Rev. 2, May 2004) ("Any discussion of the information disclosed relating to patentability issues in the reexamination would be improper.") The purpose of the brief *amicus curiae* was to alert the Federal Circuit that it should reach any decision as to "prosecution laches" limited to the factual context of the *Symbol* case and not to any issues involved with *ex parte* procurement under the present appeal.

4

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

05/642,356, filed December 19, 1975, now U.S. Pat. No. 4,098,888.  Other family members claim the benefit of various family members.

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

### III.    STATUS OF CLAIMS

[37 C.F.R. § 41.37(c)(1)(iii)]

Claims 1-5–all claims of the instant Ochiai patent–stand rejected and are appealed. Claims 1-5 remain before the Office in the form as granted in the original Ochiai patent.

For purposes of appeal, Appellants focus their attention on claim 1, i.e., all claims stand or fall with their argument as to claim 1.

6

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

## IV.    STATUS OF AMENDMENTS

[37 C.F.R. § 41.37(c)(1)(iv)]

None.  (No amendment was offered after final rejection; no claims were added, amended or canceled.)

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

## V.    SUMMARY OF CLAIMED SUBJECT MATTER

[37 C.F.R. § 41.37(c)(1)(v)]

Ochiai's claimed invention is one of plural independent and distinct methods for making cephem compounds. *See, e.g.,* Restriction Requirement in the file history of the present Ochiai patent, Serial No. 462,492, Paper No. 10.  The instantly claimed invention has already been authoritatively held to be both novel and nonobvious by the Court of Appeals for the Federal Circuit:  "[I]t would not have been obvious to those of ordinary skill in the art to choose the particular acid . . . as an acylating agent for the known amine. . . ." *Ochiai,* 71 F.3d at 1569-70, 37 U.S.P.Q.2d at 1131.

Independent claim 1 reads:  A process for preparing a cephem compound of the formula:

wherein $R^3$ is hydrogen or methoxy, $R^4$ is hydrogen or a residue of a nucleophilic compound, $R^5$ is hydroxyl or a protected hydroxyl, and $R^8$ is hydrogen or a halogen, or a pharmaceutically acceptable salt or ester thereof, which comprises introducing an acyl group of the formula:

8

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

wherein $R^5$ and $R^8$ are as defined above into the amino group of the molecule of the formula:

wherein $R^3$ and $R^4$ are as defined above or a salt or ester thereof (e.g., Ochiai, U.S. Patent No. 5,583,216 at col. 1, ll. 22-56).

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

## VI.   GROUNDS OF REJECTION

[37 C.F.R. § 41.37(c)(1)(vi)]

### A.   Double Patenting as an "Obvious" Invention

Claims 1-5 stand rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over each of the claims of Ochiai *et al.* U.S. patent nos. 4,298,606 ("Ochiai '606"), 4,098,888, ("Ochiai '888") and 4,203,899 ("Ochiai '899") in view of Robert R. Chauvette, et al., 84 J. Am. Chem. Soc. 3401-02 (1962) ("Chauvette"); William J. Gottstein, et al., 14 J. Med. Chem. 770-72 ("Gottstein" not "Goldstein"); U.S. Patent No. 4,020,058 ("Cocker"); Louis F. Fieser et al., *Reagents for Organic Synthesis*, 231-36 (John Wiley & Sons, Inc., 1967) ("Fieser"); and Joseph E. Dolfini, et al., *A New Class of Semisynthetic Penicillins and Cephalosporins Derived from D-2-(1,4-Cyclohexadienyl)glycine*, 14 J. Med. Chem. 117-19 (1971) ("Dolfini").

### B.   Double Patenting under a *Schneller* Theory

Claims 1-5 stand rejected under the judicially created doctrine of nonstatutory double patenting over the claims of Ochiai '888 or Ochiai '606.

## VII.   ARGUMENT

[37 C.F.R. § 41.37(c)(1)(vii)]

There are two sets of rejections in the outstanding final rejection. The first–
Rejection (A)–deals with Obviousness-Type Double Patenting. The second–Rejection
(B)–deals with a *Schneller*-based double patenting.

### A.   Obviousness Double Patenting

#### 1.   Independent and Distinct Inventions *In Actual Fact*

As per § a, and as graphically shown in the attached exhibit, *RESTRICTION
REQUIREMENT*–and confirming the restriction requirement in that exhibit–it is
unquestioned that the method of making is independent and distinct from the final
products; as per § b, unquestionable plural, independent and distinct uses exist for
the starting material.

The present case is keyed to a demonstration that the claimed invention is *in
actual fact* independent and distinct from the prior patented inventions–as governed by a
long series of cases culminating with *Phillips Petroleum Co. v. U.S. Steel Corp.*, 604
F.Supp. 555, 225 U.S.P.Q. 1149 (D.Del. 1985), *subs. proc. sub nom U.S. Steel Corp. v.
Phillips Petroleum Co.*, 865 F.2d 1247, 9 U.S.P.Q.2d 1461 (Fed. Cir. 1989).

##### a.   Independent and Distinct Status from the Final Product

The invention is an *independent and distinct method of making* cephem products
of the Ochiai '888 and '606 patents. Factual evidence establishes that the claimed
method is only <u>one</u> of plural independent and distinct methods of making the Ochiai final
products. Additionally, a starting material of the method of making is claimed in Ochiai
patent '899; it clearly has plural, independent and distinct uses beyond that of the claimed
method.

Quite clearly, unlike the classic situations of domination where a claim to a
method of use is found invalid for double patenting over a claim to the product of that
method, because the principal use of that product is in the claimed method of the later-

11

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

granted patent, here, we have an entirely different situation: *the claimed method of the instant patent is not essential to making the products of the earlier-granted patents. There is true independent and distinct status.* The *chemistry* and other evidence of record–including corroborating statements from Primary Examiner Rizzo–are considered in detail.

Even if one were, *arguendo,* to disregard the clear basis for an independent and distinct status of the claimed method as establishing freedom from double patenting, if one enters the *merits* of the *chemical combination* that is suggested in the outstanding final rejection, one has nothing more than a bizarre picture puzzle of a mosaic of ill-fitting pieces–square pegs for round holes. The combination of references and claims set forth in the outstanding final rejection thus makes absolutely no sense from a standpoint of either chemistry or patent law.

Two premises undergird the outstanding final rejection: The first premise is that the claimed Ochiai method is the only way "to make ultimately all the products of Ochiai's invention including those covered by [Ochiai '888 and Ochiai '606.]" Final Rejection, p. 3. The second premise is that Ochiai '899 teaches that the "compounds in [Ochiai '899's] claims . . . sole described purpose is as reactants in said process [of the presently rejected claims of the Ochiai patent.]" Final Rejection, p. 3.

Claim 1 is an *original* claim in the application as filed fifteen years ago to a novel and unobvious *method for making* important cephem antibiotic compounds–as held in 1995 in the Federal Circuit *In re Ochiai* decision *supra.* The *method of making* of the instant claim is independent and distinct from the product, *per se,* under the classic principles for *method of making* claims in the *Phillips* case: the expert evidence–a verified showing under 37 C.F.R. § 1.132–and the chemistry are consistent with Primary Examiner Rizzo's original restriction requirement on a related issue. No claim is made for the *statutory shield* of 35 U.S.C. § 121, but, rather, it has been conclusively established that the cephem products of the earlier patents can be made by one or more

12

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

methods that are *independent and distinct* from the claimed invention. A parallel analysis of independent usage applies for a starting material patent.

### (1)    1952 Codification of Existing Division Practice

The present process claims are an independent and distinct invention from the compounds of each claim of Ochiai '888, Ochiai '606, and Ochiai '899. The wording of 35 U.S.C. § 121 and the implementing regulations were to track the then existing practice at the time of enactment of the 1952 Patent Act. The governing case law dealing with the distinction between a claim to a product and a method for making a product is found in *In re Cady*:

> [T]he legal precedents are uniformly to the effect that "double patenting is not sustainable when the product can be fabricated by processes other than that secured by the issued process patent," and this doubtless was the basis upon which division was required in the instant case. *Providence Rubber Co. v. Goodyear*, 9 Wall. (76 U. S.) 788, 19 L. Ed. 566; *Seymour v. Osborne*, 11 Wall. (78 U. S.) 516, 20 L. Ed. 33; *Leeds & Catlin Co. v. Victor Talking Machine Co.*, 213 U. S. 301, 29 S. Ct. 495, 53 L. Ed. 805; *United States ex rel. Steinmetz v. Allen*, 192 U.S. 543, 24 S. Ct. 416, 48 L. Ed. 555.
>
> In *General Electric Co. v. P. R. Mallory & Co., Inc.*, 298 F. 579, 584, the Circuit Court of Appeals of the Second Circuit said: "That double patenting exists here * * * is a new point of law. It rests on the fact that Just's original American application contained disclosure of several processes by which a single result—i. e., the tungsten filament of the patent in suit—could be attained. The Office required division; the issue of the patent at bar was delayed * * * but one divisional application, covering one process only, became No. 878,463 in 1908, four years before the master patent for the product came out of the Office; hence it is said double patenting resulted. There would be force in the argument, if there were but one process, and the only possible result thereof was the single product; but the more philosophical way to view the question is to ask whether the two patents (878,463 and 1,018,502) cover the same invention, when properly construed. *Thomson, etc., v. Elmira, etc., Co.*, 71 F. 396, 18 C. C. A. 145. They do not; one being only for a process of making, and the other for the thing made, with disclosure of another process."

*In re Cady*, 77 F.2d 106, 109, 25 U.S.P.Q. 345, 348 (CCPA 1935).

*Cady* was recognized by the PTO itself contemporaneous with the enactment of the 1952 Patent Act; this is seen from the Board's interpretation of *Cady* in the *Zoss* case. *Ex parte Zoss*, 1957 WL 7217, 114 U.S.P.Q. 309 (Bd. Pat. App. & Int. 1956). *Cady* is codified in M.P.E.P. § 806.05(f), *Process of Making and Product Made—Distinctness*, p. 800-45 (Rev. 2, May 2004), that states that "[a] process of making and a product made by the process can be shown to be distinct inventions if either or both of the following can be shown:  (A) that the process *as claimed* is not an obvious process of making the product and the process as *claimed* can be used to make other and different products; or (B) that the product *as claimed* can be made by another and materially different process." (Emphasis in original.)

Independent of whatever constraints have been placed on the scope of nonstatutory double patenting by the PTO through legislative rules and *Manual* guidance, the double patenting rejection, here, also fails to meet the judicial constraints on the scope of a double patenting rejection. Thus, even if, *arguendo*, there were no legislative rule to constrain the outstanding rejection in this case, judicial precedent demonstrates that the rejection should fail as well.

### (2)   Rule of the *Phillips* Case

The law is perhaps best considered in *Phillips Petroleum.*  The Federal Circuit saw the issue as being so cut and dried that it affirmed the trial court with the passing observation that as to several issues including double patenting, "[w]e find none [of the arguments] persuasive of error in the district court's disposition of any of those issues and *none of sufficient import* to require discussion here of that disposition." *U.S. Steel*, 865 F.2d at 1253, 9 U.S.P.Q.2d at 1466; emphasis added; footnote deleted.

As explained in *Phillips Petroleum*, "a charge of double patenting will not be sustained if the product can be made by processes other than that secured by the issued process patent or the process can produce other products not protected by the product claim." *Phillips Petroleum*, 604 F.Supp. at 562, 225 U.S.P.Q. at 1154 (citing *In re Taylor*,

14

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

360 F.2d 232, 235-36, [149 U.S.P.Q. 615 not cited by court] (CCPA 1966); *In re Cady*, 77

F.2d 106, 109 [25 U.S.P.Q. 345 not cited by court] (CCPA 1935)).

> [Furthermore, the] argument raised before the Patent Office Board of
> Appeals in Hogan was that Phillips' patent for the product of
> poly(4-methyl-1-pentene) was duplicative of the process claims contained
> in Phillips' '721 patent. The Board reasoned that the product claims could
> not be subject to a double patenting rejection over the patented process
> claims because "(1) the claimed polymer could equally well be prepared by
> other means, such as by the catalysts taught by Natta and Haven, and (2)
> different statutory classes are involved."

*Phillips Petroleum*, 604 F.Supp. at 559, n. 23; 225 U.S.P.Q. at 1151.

> The same principles are elucidated in the *General Foods* case:

> It cannot be said—though it often is, incorrectly, by the uninitiated—that a
> part of a claim is "claimed" subject matter. For example, a claim to a
> process comprising the step A followed by step B followed by step C
> defines, as a matter of law, only the A-B-C process and one cannot properly
> speak of any single step as being "claimed," for it is not; all that is claimed
> is the process consisting of the combination of all three steps. Such a
> claim, therefore, creates no patent right or monopoly in step A, no right to
> prevent others from using step A apart from the combination of steps
> A-B-C. Step A is not "patented."

> Another way of stating the legal truism is that patent claims, being
> definitions which must be read as a whole, do not "claim" or cover or
> protect all that their words may disclose. Even though the claim to the
> A-B-C combination of steps contains a detailed description of step A, that
> does not give the patentee any patent right in step A and it is legally
> incorrect to say that step A is "patented."

> These legal rules about construing claims are repeated here because
> the law of double patenting is concerned only with what patents claim.
> "Double patenting," therefore, involves an inquiry into what, if anything,
> has been claimed twice.

*General Foods Corp. v. Studiengeschaft Kohle mbH*, 927 F.2d 1272, 1274-75, 23

U.S.P.Q.2d 1839, 1840 (Fed. Cir. 1992) (quoting *Motion Picture Patents Co. v.*

*Universal Film Mfg. Co.*, 243 U.S. 502, 510 (1917)).

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

### (3)    PTO Support for the *Phillips* Rule

It is well settled that a proper restriction requirement is made *only* where the division of inventions relates to mutually patentably independent and distinct subject matter. The history of this practice is traced to the 1952 Patent Act that made the issue of restriction entirely procedural. Since it would be wrong to invoke the provisions of 35 U.S.C. § 121 to bar a restriction requirement where there is no patentable distinctness, it follows necessarily that one of the criteria for imposition of a restriction requirement is patentable distinctness between inventions.

It furthermore follows that where, as here, the patent applicant has voluntarily *fully complied* with maintaining a line of demarcation of subject matter in compliance with the policy of the PTO, then the patent applicant has voluntarily defined mutually patentably distinct subject matter.

### (4)    Primary Examiner Rizzo Complied with PTO Policy

The present case demonstrates precisely such a following of PTO practice as the Primary Examiner himself, Mr. Rizzo, where he established on the record that there are at least two (2) independent and distinct processes for making the 7-[(α-oxyimino-α-aminothiazol-4-yl)acetamido]cephems, based upon the Primary Examiner's restriction requirement between these two methods.

Therefore, with two different inventions capable of being used to make the 7-[(α-oxyimino-α-aminothiazol-4-yl)acetamido]cephems, the method-of-use instantly claimed in patentably independent and distinct from the product 7-[(α-oxyimino-α-aminothiazol-4-yl)acetamido]cephems.

Additionally, the Declaration of Dr. Wuest (see *supra* ¶ 50) makes it absolutely clear that there are other *independent and distinct methods* for making the products of the reference Ochiai patent claims that do *not* in any way, shape or form require the use of the instant invention.

16

### (5)    Absence of Post-*Phillips* Case Law

The *Phillips* case stands isolated today because of the circumstances that have existed over the past forty-plus years in the wake of the *Larsen* case that essentially made it impossible for patent applicants to gain "method of making" claims in the setting of *Larsen* and *Durden* and the numerous cases at the court and the Board in the intervening twenty-five years. *In re Larson*, 292 F.2d 531, 130 U.S.P.Q. 209 (CCPA 1961); *In re Durden*, 763 F.2d 1406, 226 U.S.P.Q. 359 (Fed. Cir. 1985). Applicants simply did not present such claims, and there was no incentive to challenge a *Larsen* or *Durden* rejection, because claims of this nature were not of value until the amendment that created 35 U.S.C. § 271(g). Immediately after the Federal Circuit decision in *In re Ochiai, supra,* the PTO eliminated the need for separate patents for method claims due to its progressive implementation of "Ochiai guidelines," cited in *Changes To Implement the Patent Business Goals,* 63 FR 53498, 53521 (1990) ("If the claims to the product are determined to be allowable over the prior art, the PTO will also examine (permit joinder of) the corresponding process of making claims or the corresponding process of using claims (if the application contains claims to the process of using or making the product) that depend from or otherwise include all the limitations of the product claims that are allowable over the prior art. *See Guidance on Treatment of Product and Process Claims in light of In re Ochiai, In re Brouwer, and 35 U.S.C. 103(b),* 1184 *Off. Gaz. Pat.* Office 86 (March 26, 1996).")

### b.    Independent and Distinct Status from the Starting Material

According to Primary Examiner Rizzo's original restriction requirement in a parent prosecution (file history of Ochiai '888, serial no. 642,356, Paper 2, p. 2 and modified in Paper 4, p. 2), the compounds of Ochiai '899 have achieved a separate status in the art and were held to be patentably independent and distinct from the cephem compound of Ochiai '888 or Ochiai '606 under 35 U.S.C. § 121. More to the point, the compounds of Ochiai '899 manifestly have plural uses independent and distinct from the presently claimed method of Ochiai.

17

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

Indeed, in the original parent application, the restriction requirement set forth "claims 18-20 drawn to aminothiazole(s)" as nonelected Group VI and claims 15-17 as linking claims that were held nonelected and later made the subject of what became Ochiai '899.[3] Serial No. 642,356, Paper 2, p. 2. Furthermore, years later, prior art was cited that shows the compounds of Ochiai '899, which can be used as starting materials for making a cephem compound, can also be used for making entirely different series of antibiotics, namely, penicillins. *See* Serial No. 897,239, *Citation of Prior Art,* January 23, 1986, citing Minoru Hatanaka et al., *Synthetic Penicillins. Heterocyclic Analogs of Ampicillin. Structure-Activity Relationships,* 16 J. Med. Chem., 978-84 (1973) ("Hatanaka"), Hatanaka, *supra,* discloses, *inter alia,* compound (**10b**), i.e., ethyl-α-oximino-2-methylthiazole-4-acetate:

---

[3] Claims leading up to Ochiai '899 were prosecuted in Serial No. 897,239 the file history of Ochiai '899; they were initially rejected as obvious over, *inter alia,* Guillot *et al.* U.S. Patent No. 3,755,347, which, according to Examiner Turnipseed, "disclose[s] compounds analogous to those of the instant claims." Serial No. 897,239, Paper no. 4, Part III, p. 2, September 18, 1978. Guillot *et al.* discloses "compounds [which] have been found to have exceptional herbicidal properties. For this purpose, they find widespread application for inhibiting the growth or even destroying of all kinds of plants, pests, such as weeds, brushwood and undesirable shrubbery." Guillot *et al.*, col. 3, lines 49-53; *see also* col. 1, ll. 11-14 (disclosing "the use of such thiazole derivatives as a pesticide and/or a herbicide"). In response, the claims were distinguished, *inter alia,* on the basis that "the compounds instantly claimed . . . are, in addition, designed for use in a completely different manner than are the compounds disclosed in said references." Serial No. 897,239, response filed January 17, 1979, paragraph bridging pages 9-10. Clearly, the important point is that, contrary to what the present Examiners merely alleged, Examiner Turnipseed stated that the compounds of Ochiai '899 were capable of being used in a process other than a process of making a cephem compound.

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

Hatanaka, *supra*, p. 982, col. 2, ll. *5-et seq.* and compound (**10a**), i.e., ethyl-α-oximino-4-thiazolylacetate

Hatanaka, *supra*, p. 982, col. 2, ll. 20-*et seq.*

The esters (**10a**)-(**10b**) were converted to the corresponding amino acids: α-amino-4-thiazolylacetic acid (**16**); and

α-amino-2-methylthiazole-4-acetic acid (**17**)

19

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

Hatanaka, *supra*, p. 980, Tbl. 1; p. 982, col. 2, ll. 36-*et seq.* These acids (**16**)-(**17**) were converted to ampicillin analogs (**38**)-(**39**):

in which R is -H (**38**) or -CH₃ (**39**). Hatanaka, *supra*, p. 981, Tbl. II; p. 983, col. 2, second before last full paragraph-*et seq.*

Clearly, contrary to what the rejection has merely alleged, the present claims of Ochiai would not prevent one from using the compounds of Ochiai '899 to make ampicillin analogs analogous to those of Hatanaka, *supra*.

Because it was shown that the present process claims are patentable over the compounds of each claim of Ochiai '899, and because it was just established that the compounds of each claim of Ochiai '899 may be used in at least two other processes other than the process of the present Ochiai patent, the present process of the Ochiai patent is patentably distinct from the compounds of Ochiai '899. Thus, the present rejection should be reversed.

In summary, the only evidence of record shows that the presently claimed process is patentably distinct from both the compounds of each claim of Ochiai '899 and the compounds of each claim of either Ochiai '888 and/or Ochiai '666. Clearly, under these facts, the present rejection cannot stand and must be reversed as a matter of law.

20

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

### 2. *Geneva* is Irrelevant

*Geneva Pharmaceuticals* deals with the failure to demonstrate "consonance"; it has nothing to do with an *actual* independent and distinct status.

*Phillips, supra,* is in contradistinction to any argument of a *constructive* shield such was involved in the trump card of the rejection, *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 68 U.S.P.Q.2d 1865 (Fed. Cir. 2003). Unlike the present situation where there are *in actual fact* independent and distinct inventions, *Geneva* involved a composition claim totally blocking a prior patented pharmaceutical use–the complete *antithesis* of two inventions standing in an independent and distinct relationship.[4]  Most important from a standpoint of patent law, there was no legal controversy as to whether the inventions were *in fact* independent and distinct.  Rather, the patentee sought to hide behind the shield of a *constructive* § 121 status of independent and distinct inventions because of a restriction requirement. *Geneva Pharm.,* 349 F.3d at 1377; 68 U.S.P.Q.2d at 1868 ("GSK contends that ... 35 U.S.C. § 121 should shield the 2000/01 patents against nonstatutory double patenting over the '720 patent."). The *holding* was that there was a lack of "consonance" with the restriction requirement that destroys the statutory shield under *Gerber Garment.*[5]  *Geneva* is hardly a trump card but is surely a busted flush.

---

[4] Claim 1 of a patent invalidated in *Geneva* was drawn to "[a] pharmaceutical *composition* ... which comprises β-lactamase inhibitory amount of a pharmaceutically acceptable salt of clavulanic acid * * *." *Geneva Pharm.,* 349 F.3d at 1876; 68 U.S.P.Q. at 1867 (emphasis added) (*see* the '380 patent). The expired 'reference patent is to a "[a] method of effecting β-lactamase inhibition * * * which comprises administering * * * β-lactamase inhibitory amount of clavulanic acid * * *." *Geneva Pharm.,* 349 F.3d at 1876; 68 U.S.P.Q. at 1867 (*see* the '720 patent). In order to practice the method of the expired patent ("administering * * * clavulanic acid") it is *necessary* to administer an embodiment of the later patent in suit (a "*composition* * * * compris[ing] * * * clavulanic acid").

[5] For "consonance" to apply, the patent applicant "must have limited the claims in its divisional application to the non-elected invention...." *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.,* 916 F.2d 683, 688, 16 U.S.P.Q.2d 1436, 1440 (Fed. Cir. 1990).

21

### 3.    An Eight Part Mosaic of Eight (8) References is not Obvious

Even assuming, *arguendo,* that one looks past the established case law of *Phillips* and proceeds to an "obviousness" analysis, the square pegs of the eight (8) references–the claims of three patents and the teachings of five literature references–simply don't fit into the round hole for a rejection. A mosaic combination for *obviousness* under § 103 is generally flawed; *a fortiori,* for double patenting–where *claims alone* are determinative, the mosaic fails.

To understand the fallacy of the mosaic combination of references one must first assume, *arguendo,* that in a double patenting rejection to a *method* one may combine the "teachings" of the *claims* of three different patents–a point which is considered a *non sequitur.* But, for purposes of the present discussion, it is assumed, *arguendo,* that there can be an eight way combination of references where the claims from three *non-prior art patents* are used in the combination. (Obviously, the underlying specification from such patents clearly *cannot* be used in a double patenting rejection.)

### a.    No Suggestion of the Claimed Invention

Even assuming, *arguendo,* that one disregards the fact that the inventions in question are independent and distinct to thereby bar a double patenting rejection, even if one *does* take a peek at the structures of the claims of the product patents in the combination of references, such a peek at the structures, alone, does not give a clue to the method of manufacture involved in the present case. As explained by the Board,

> [w]hen an examiner makes an obviousness-type double patenting rejection, the examiner may use the patent's specification as a dictionary to determine the meaning of terms in the patent's claims. *See In re Vogel,* 422 F.2d 438, 441, 164 U.S.P.Q. 619, 621-22 (CCPA 1970). *The disclosure of the patent, however, may not be used as though it were prior art. See General Foods Corp. v. Studiengesellschaft Kohle mbH,* 972 F.2d 1272, 1281, 23 U.S.P.Q.2d 1839, 1846 (Fed. Cir. 1992).

*Ex parte Sharma,* 1997 WL 1940094 at 1 (Bd. Pat. App & Int. 1997) (emphasis added). Thus, one can only use the *claims*–and not the "teachings" or underlying specification– from commonly owned but non-prior art patents–for a double patenting rejection.

22

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

Assuming, *arguendo,* that the invention here were in a field of "simple" chemistry where one could "connect the dots" of different structures without regard to the underlying chemistry (a point returned to later that is refuted by the declaration evidence under 37 C.F.R. § 1.132), the combination fails to render the invention obvious: to highlight the essential failing of the references, there is absolutely no hint nor suggestion in any of the prior art references that a process should be conducted that introduces an acyl group of the formula:

Thiazolyl

The use of this unique group is just as unobvious to the combination of references, here, as it was vis-a-vis the combination of references where the Primary Examiner had sought to deny the original claims on the basis of obviousness. Referring to the *same invention* as here, the Federal Circuit found that the selection of the instant thiazolyl starting material is unobvious over the prior art. Clearly, neither the prior art cited in the proceedings leading up to *Ochiai* nor the prior art relied upon here in any way provides any suggestion whatsoever to lead to the use of the instant thiazolyl reactant. As the Federal Circuit pointed out in its opinion in *Ochiai,*

> [t]he process invention Ochiai . . . specifically requires use of none other than its new, nonobvious acid as one of the starting materials. One having no knowledge of this acid could hardly find it obvious to make any cephem using this acid as an acylating agent, much less the particular cephem. . . . In other words, it would not have been obvious to those of ordinary skill in the art to choose the particular acid . . . as an acylating agent for the known amine for the simple reason that the particular acid was unknown but for Ochiai's disclosure in [his] application. As one of our

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

predecessor courts had occasion to observe, in a case involving a highly
analogous set of facts, 'one cannot choose from the unknown.'

*Ochiai,* 71 F.3d at 1569-70, 37 U.S.P.Q.2d at 1131 (quoting *In re Mancy,* 499 F.2d 1289,
1293, 182 U.S.P.Q. 303, 306 (CCPA 1974) (footnote omitted)).

The Declaration of Professor Wuest–which is included in the Appeal Brief as an
exhibit–considers in detail how a person of ordinary skill in the art would not have had a
reasonable expectation of success in an attempt to introduce an unprotected or a protected
2-amino-thiazole into the amino group of a 7-aminocephalosporanic acid ("7-ACA").
Specifically, Professor Wuest outlined in ¶¶ 13-29 numerous references that would lead
one of ordinary skill to expect that unprotected 2-aminothiazoles would be subject to one
or more side reactions, such as self-condensation. Professor Wuest second considered
that a person of ordinary skill in the art, using ordinary experimentation, could use an
unprotected 2-aminothiazole to carry out the presently claimed process, where that person
would rely solely upon the Ochiai '888 patent *disclosure*–which, of course, goes beyond
the use of a patent in double patenting other than as a dictionary. Wuest shows that the
claimed process would not have been obvious to a person of ordinary skill in the art.

*If armed with the synthetic methods disclosed in the '888 patent's working*
*examples and the balance of the disclosure (which of course is not permitted for a double*
*patenting inquiry),* and also with the permitted general knowledge of organic chemistry, a
person of ordinary skill would have at his disposal at least two synthetic routes by which
to combine an unsubstituted 2-aminothiazole and a 7-ACA to arrive at the desired
cephem compound final products. The first scenario envisages the reaction between a 7-
ACA and a 2-aminothiazole in which the acyl group is present as an acid halide and the
2-amino group is protected with a proton (i.e., $-NH_3^+$). Consequently, this 2-
aminothiazole cannot self-condense because the amino nitrogen is positively charged,
and is thus no longer nucleophilic; additionally, no tautomerism with the aromatic
thiazole ring is possible, which might otherwise render the thiazole nitrogen nucleophilic.

24

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

The '888 patent specification describes the use of acid halides as the reactive acyl group in a 2-aminothiazole, col. 6, line 66, and the use of a proton as a protecting group for the 2-amino substituent. Col 4, lines 35-36. Furthermore, many of the working examples of the '888 patent also describe the use of acid halide starting materials. *See, e.g.*, Examples 1, 6, 11, and 43. This amidation reaction is depicted graphically as shown below:

(1)

This reaction is performed in pyridine, which is an example of any number of common solvents useful for this reaction. *See* col. 7, lines 1-5 of the '888 patent. Pyridine functions as a polar solvent in which both the 7-ACA and 2-aminothiazole are soluble. Second, pyridine functions as a base, in whose presence "this reaction may proceed more advantageously. . . ." *See* col. 7, lines 8-12 of the '888 patent. Pyridine not only neutralizes the acid HX ultimately liberated in the reaction of Equation 1, but also initially neutralizes the protonated 2-amino group of the 2-aminothiazole in an equilibrium, thereby yielding a transient unprotected 2-aminothiazole:

25

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

$$\left[\;H_2N\text{—thiazole—}R^8,\;\; R^5N\text{=, C=O, X}\;\right]^{+} X^{-} + \text{pyridine} \;\rightleftharpoons\; H_2N\text{—thiazole—}R^8 + \left[\text{pyridinium}\right]^{+} X^{-} \quad (2)$$

Finally, a person who is skilled in the chemical arts knows that pyridine, even in catalytic amounts, readily activates carbonyl groups in acid halides. Thus for 2-aminothiazole, pyridine may add to the carbonyl carbon, thereby providing an highly activated carbonyl group that reacts readily with nucleophiles such as amines (Equation 3):

$$\left[\; \text{activated intermediate} \;\right]^{+} X^{-} \quad (3)$$

$$\overset{\displaystyle R\ddot{N}H_2}{\text{amine nucleophile}}$$

One of skill in the art knows that acid-base reactions, such as that depicted in equation 2, occur much more rapidly than nucleophilic addition reactions, such as the amidation depicted in equation 3. Thus, a proton-protected 2-aminothiazole would likely become neutralized and then react with a 7-ACA before any possible self-condensation of the 2-aminothiazole could occur. However, in order to further ensure that the claimed process would be carried out, a person of ordinary skill in the art would judiciously tailor the order of addition of these reagents. Accordingly, such a person would slowly add a dilute pyridine solution of a proton-protected 2-aminothiazole to a more concentrated pyridine solution of a 7-ACA under the mild conditions taught in the '888 patent (*i.e.*, cool or room temperature; col. 7, lines 15-17). In this manner, the proton-protected 2-

26

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

aminothiazole would be neutralized to its unprotected free amine form, whose carbonyl group would be simultaneously activated, and then react with an initial excess of 7-ACA, thereby affording little to no opportunity for the protected 2-aminothiazole to react with itself in a self-condensation reaction.

Another scenario in which an unprotected 2-aminothiazole can be used in the claimed process is the reaction between a 7-ACA and a 2-aminothiazole bearing an ester as the acyl group (Equation 4):

(4)

The '888 patent describes esters as suitable reactive acyl derivatives. *See* col. 6, line 67. While the 2-aminothiazole may be generally subject to self-condensation by virtue of its unprotected 2-amino group, a person of skill in the art would be able to select such esters which would be relatively inert toward nucleophilic attack by the 2-amino group on the 2-aminothiazole, and thereby prevent such self-condensation. To illustrate, it is well known in the art that amino substituents bound to aromatic rings, such as the 2-amino

27

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

group on a 2-aminothiazole, are less nucleophilic (*i.e.*, reactive) than amino substituents bound to aliphatic groups, such as the 7-amino group on a 7-ACA. Thus, in the course of ordinary experimentation, a person of skill in the art would be able to select those esters which would react slowly, if at all, with the 2-amino group on a 2-aminothiazole, and react more rapidly with the 7-amino group on a 7-ACA to yield the desired cephem compound. Moreover, as discussed in the first scenario above, the slow addition of such a 2-aminothiazole to a solution of a 7-ACA would ensure that the 2-aminothiazole could react with nothing but 7-ACA, and thereby afford further insurance against any self-condensation of the 2-aminothiazole.

To be sure, the rejection has *admitted* that the picture puzzle approach to hindsight reconstruction of the claimed invention through the citation of the claims of Ochiai's granted patents does not work; but this, if anything, has made the combination more bizarre–by reliance on five (5) prior art teaching references, yet these "teaching" references teach nothing of relevance. The rejection masks the insignificance of these prior art references by merely giving their blanket citation and relying upon the reasons of record, which were clearly deficient. As noted in the response to the previous office action, "[t]he Primary Examiner admitted [in her nonfinal rejection of July 22, 2004,] that 'none of the [secondary] references [that were cited in this rejection] expressly teach modifying prior art reactants in these references to arrive at instant reactant employed to make corresponding 2-$NH_2$-thiazolyl cephem final products having a (protected or unprotected) hydroxyimino group on the carbon alpha to thiazole ring.' Office action [dated July 22, 2004,] at 3-4. In other words, the Primary Examiner admitted that there would have been no motivation to do what she proposed to do in this rejection." The silence in the outstanding Final Rejection about this statement speaks volumes.

### b.    Plural Methods are Established on the Record

The first premise of the rejection–that only the instant Ochiai method is available to make the previously patented compounds–is manifestly contrary to the record. There

28

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

is no averment as to any specific compound that cannot be produced by methods outside the scope of the Ochiai method; only general assertions are presented.[6]

There are three forms of evidence of record which contradict the conclusion of the outstanding final rejection which for simplicity, are identified as "evidence (A)" and "evidence (B)."

> (A)    the restriction requirement made during the prosecution of Application No. 07/462,492, the application that made the Ochiai '216 patent whose claims are presently reexamined. Paper no. 10, May 23, 1991 at 2; and

> (B)    the Declaration of Dr. James D. Wuest under 37 C.F.R. § 1.132 filed in the present merged reexaminations December 2, 1999 at ¶ 50.

As explained more fully below, the evidence (A)-(B) supports the position that *all* of the compounds recited in the present claims of the Ochiai patent may be made by at least one distinct process from that presently claimed.

In agreement with Primary Examiner Rizzo who was responsible for the relevant prosecution of the application leading up to the patent and the parent application, *all* of the compounds recited in the present claims of the Ochiai patent may be made by at least one distinct process from that presently claimed. Moreover, it is clear from evidence (B) that Dr. Wuest gave his reasoned opinion that *all* of the compounds recited in the present claims of the Ochiai patent may be made by at least one distinct process from that

---

[6] For example, it is stated that "the additional processes described[, claimed, and restricted from the application that produced the present Ochiai patent] . . . make some additional final products. But the process in the US '216 is the sole process relied on to make ultimately all the products of Ochiai's invention including those covered by [Ochiai '888 and Ochiai '606]. . . ." Final Office action at p. 3, ¶ 2. Similarly, elsewhere in the rejection, it is concluded that "[n]o such independent process is seen in the Ochiai disclosure but rather reliance on the amidation process of the US '216 as a starting point for making all final products." Final Office action at p. 4, 5 lines from the bottom; *see also* p. 6, lines 9-10 ("In other words, all instant final products are ultimately made via the claimed amidation process of US '216.").

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

presently claimed.   Collectively, evidences (A)-(B) are shown schematically in the attached exhibit, *RESTRICTION REQUIREMENT.*

In evidence (A), Primary Examiner Rizzo made a restriction requirement between two separate sets of method claims during the prosecution of serial no. 462,492, the application that made the Ochiai '216 patent whose claims are presently reexamined. Paper no. 10, May 23, 1991  The restriction under 35 U.S.C. § 121 divided the pending claims 6-10 and 15-18 into two groups:  Group A. Claims 6-10 [Patent Claims 1-5] *and* Group B. Claims 15-18.  Elected was Group A which resulted in the grant of the instant patent claims.

A closer examination of the restriction requirement helps clarify which cephem compounds were recited by the claims of each of Groups A-B.  The restriction requirement contains interlineations made by Examiner Rizzo, and is reproduced in graphic form below:

```
      Each group is patently distinct because there is no
necessary connection between the process of Group A and the
process of Group B.  Group A process represents an "acylation"
and Group B represents a "displacement" process. Two separate and
distinct processes  are being claimed.  Each is separately
searched, raises separate issues of patentability and will
support separate patents.  Applicants have the right to
examination of a single invention not multiple inventions.  In re
Young 81 USPQ 139.
```

Primary Examiner Rizzo thus affirmatively held that there were two separate and distinct methods capable of making the recited compounds of claims 6 and 15.

The fact that *all* compounds recited in the present claims of the Ochiai patent may be made by alternative processes was established by evidence (B), i.e., the Declaration of Dr. James D. Wuest under 37 C.F.R. § 1.132 filed in the present merged reexaminations

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

December 2, 1999 at ¶ 50. As declared by Dr. Wuest, "one of these alternatives is based on a penicillin sulfoxide starting compound, since it is well known that penicillin sulfoxide can be converted into cephem compounds [Robert B. Morin *et al., Chemistry and Biology of β-Lactam Antibiotics,* 1 Penicillins and Cephalosporins 1-*et seq.* (1982)]." Wuest Declaration *supra.* at ¶ 50. Dr. Wuest's declaration contains the following example:

where
R = Protective Group

The upper left and top middle compounds are penicillin sulfoxides. The upper right compound is a cephem compound, which may be modified to the cephem compound below it, i.e., middle right. This last step shows a displacement embraced by claim 15 of Group B from the restriction requirement.

This example shows just one general embodiment in which acetoxy at $R^4$ is displaced with a nucleophilic compound residue (B). As discussed above, Examiner Rizzo, the original Examiner for both the present Ochiai patent and the Ochiai '888 patent, stated his finding that a hydrogen at $R^4$ may be replaced by a residue of a nucleophilic compound, such as a heterothio. Serial No. 642,356, Office Action of July 12, 1976 at 2.

31

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

After the example, Dr. Wuest declares that "[a]lthough the Morin reference does not specifically disclose coupling of an amino-substituted thiazolyl compound to penicillin sulfoxide, given the examples taught in the Ochiai specification, I would expect that this reaction could be carried out." Wuest Declaration *supra*. at ¶ 50. Thus, the only evidence on the matter establishes that *all* compounds recited by the present claims of the Ochiai patent may be made by alternative processes.

Nothing in the outstanding final rejection squarely treats evidence (**B**). Instead, the rejection dismissed the alternative pathways declared by Dr. Wuest, because the Declaration of Dr. Wuest "is at best speculative," Final Office action at p. 7.

The Declaration of Dr. Wuest speaks for itself; the record lacks any opposing evidence and explanation. In particular, the Morin reference cited by Dr. Wuest contains various examples, such as Scheme 1 (from Chauvette *et al.*, 1971)–

Scheme 1

Morin, *supra*, at 2, and the structures cited by Dr. Wuest, such as compounds (**65**)-(**66**)–

(65)    +    (66)

Morin, *supra*, at 21.

Clearly, Scheme 1 shows a penicillin compound (left) being converted into a cephem compound (right), which coincidentally contains a methyl group at the 3-position on the 7-aminolephalosporanic acid ("7-ACA") (right-hand side) group (*cf.* $R^4$ is

32

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

hydrogen in claim 1 of the Ochiai patent). Furthermore, Morin states that "it was shown that the penicillin sulfoxide ester underwent an acidic rearrangement to a cephalosporin derivative (Morin *et al.*, 1963)." Morin, *supra*, at 2.

### 4.    A Mosaic Combination of Multiple References Doesn't Work

Combining a group of references to attempt a hindsight reconstruction for purposes of an *obviousness* rejection is well understood to be improper. This is true even though the entire contents of a reference can be used to determine the state of the art and to make a determination of motivation and otherwise use buried aspects of the disclosure entirely unrelated to the claimed invention. But, if it is bad to make a mosaic combination of references for purposes of *obviousness,* it is *a fortiori* even worse in the case of a double patenting rejection *where the claims alone are to be used in the reference patents and not the full disclosures of the patent.* In the present Obviousness-type Double Patenting rejection, the premise of the rejection is keyed to combining each *claim* from three patents with *disclosures* of five secondary references. Each of the patents whose claims are combined—Ochiai '888, Ochiai '606, and Ochiai '899—share a common parentage.

Both Ochiai '606 and Ochiai '888 claim a cephem compound that may result from at least two processes of making, such as the process of claim 1 of the present Ochiai patent. For example, claim 1 of Ochiai '888 recites the following structure:

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

Ochiai '899 claims a second patentably-distinct compound compared to the cephem compound of Ochiai '606 and/or Ochiai '888. For example, claim 1 of Ochiai '899 recites the following structure:

$$R^1 \quad S \quad R^8$$
$$N \quad CHCOW$$
$$R^2$$

that may be used in at least two different processes, such as the process of claims 1-5 of the present Ochiai patent.

   In other words, the rejection combined <u>two</u> sets of patentably distinct claims covering *compounds* (which may be referred to as starting material and final product) in a <u>single</u> Obviousness-type Double Patenting rejection against claims covering a *process*, a combination that is believed a case of first impression. *Cf. Ex parte Zoss*, 1957 WL 7217, 114 U.S.P.Q. 309 (BPAI 1957). The rejection urges that *Zoss* established precedent for combining the claims of multiple patents, each of which claims subject matter patentably distinct from the other, to prevent patent term extension *via* a subsequently issued patent. Final Office action at p. 5. The *Zoss* rejection, however, was not based on a combination of claims from multiple patents but was based on "each of the Zoss patents on the grounds of [Obviousness-type Double Patenting]." *Id.* at 309. The Obviousness-type Double Patenting rejection in *Zoss* was reversed, *id.* at 311; thus, this rejection seems to depart from precedent.

   The final rejection relies on five secondary references "solely applied to show that the process steps 'would be so recognized by those skilled in the art' and would thus 'not [be] seen to be drawn to a separate and patentably distinct invention.'" Final Office action at p. 5 (*citing Ex parte MacAdams*, 1978 WL 21208, 206 U.S.P.Q. 445 (BPAI 1978)). A fair reading of the records implies that, per the rejection, such a showing is all

34

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

that is legally required under the law set forth by the Board in *MacAdams, supra.* Such rationale, however, used a *per se* rule of obviousness based on an incorrect reading of *In re Larsen*, 292 F.2d 531, 130 U.S.P.Q. 209 (CCPA 1961), and maybe even both *In re Albertson*, 332 F.2d 379, 141 U.S.P.Q. 730 (CCPA 1964) and *In re Durden*, 763 F.2d 1406, 226 U.S.P.Q. 359 (Fed. Cir. 1985). Even though such *per se* rules may have been "sanctioned by the Board" in cases like *MacAdams, supra*, neither authoritative nor binding precedents have ever established *per se* rules of obviousness–as established by the Court in the *Ochiai* case that led to the instant patent under reexamination.

35

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

**B.    A *Schneller*-esque Double Patenting Rejection**

A *second* double patenting rejection is presented with the bald assertion that the Patentee filed his claims so late that there is an extension of the patent term for the prior-patented compounds of the Ochiai '888 patent. It is apparently based upon *In re Schneller*, 397 F.2d 350 158 U.S.P.Q. 210 (C.C.P.A. 1968) (Rich, J.). Similarly, Ochiai '606, U.S. Patent 4,296,606, is also stated in the rejection as alternative basis for rejection. (The *Schneller* rejection is restyled in the *Manual of Patent Examining Procedure*, M.P.E.P. § 804, as "Nonstatutory Double Patenting Rejection" of a type for which the *only* precedent is the *Schneller* case. M.P.E.P. § 804 II, B, 2. As noted in the *Manual*, "[t]he decision in In re Schneller did not establish a rule of general application and thus is limited to the particular set of facts set forth in that decision. The court in Schneller cautioned 'against the tendency to freeze into rules of general application what, at best, are statements applicable to particular fact situations.' *Schneller*, 397 F.2d at 355, 158 U.S.P.Q. at 215.")

**1.    *Marks* Renders *Schneller* Non-Precedential**

**The Supreme Court denies precedential value to the rationale of a plurality opinion where, as here, the plurality opinion lacks support for its reasoning by the majority of the court.**

Assignee in its *amicus* filing in *Symbol v. Lemelson* emphasizes that *Schneller,* as a plurality opinion with reasoning unsupported by a majority, has zero precedential worth. (The brief *amicus curiae* is included with this Appeal Brief.)

The present rejection was originally stated as a *Schneller* non-obviousness type double patenting rejection ("Schneller Rejection"). The *Schneller* Rejection was made for the first time in the merged reexaminations in paragraph 9 of the Examiner's Answer. February 8, 2002. *Schneller* is a *plurality* opinion without majority support by the *en banc* court, and thus should fall under the *Marks* rule, *Marks v. United States*, 430 U.S. 188 (1977)). Thus, "[b]ecause only two judges joined the principal opinion, while two

36

others concurred in the result, and a fifth wrote a concurring opinion, *Schneller* lacked a majority opinion." *Ex parte Metlitsky*, 2001 WL 1772314 at 1, n. 1 [no U.S.P.Q. available] (Bd. Pat. App & Int. 2001). Under the Supreme Court *Marks* rule, a plurality opinion of this type is nonprecedential because "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [the majority], the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (quoting *Marks v. United States*, 430 U.S. at 193). Thus, "if a majority agrees as to the disposition but splits as to the reasoning for this disposition, the precedential character of the decision is determined by subsequent courts under the *Marks* doctrine by looking for the 'narrowest' ground common to the earlier majority and concurring opinions." Saul Levmore, *Ruling Majorities and Reasoning Pluralities,* 3 Theoretical Inquiries L. 87, 95-96 (2002) (footnotes omitted). *Accord, see A. N. Deringer, Inc. v. United States*, 524 F.2d 1215, 1219 [no U.S.P.Q. available] (CCPA 1975); *cf. Toews v. United States*, 376 F.3d 1371, 1380 n.6 [no U.S.P.Q. available] (Fed. Cir. 2004).

Applying the rationale of *Marks*, where an *en banc* opinion does not enjoy a majority support, then the opinion beyond the specific facts is nonprecedential insofar as that point is concerned. The same would be true for a three member panel where the principal opinion is not joined by a second judge but where a second judge either concurs in the result or issues a concurring opinion following a different rationale. In the case of the predecessor CCPA, this rule was announced in *A. N. Deringer, Inc.*, 524 F.2d at 1219 [no U.S.P.Q. available]. *Cf. Toews*, 376 F.3d at 1380 n.6 [no U.S.P.Q. available].

As applied here, the plurality opinion of Judge Rich is merely dicta and not a precedential holding in *In re Schneller*, because it was not joined by at least two other judges of the five judges on the panel of the CCPA. The concurrence of Judges Worley and Kirkpatrick, which concur in the result reached by Judge Rich, is the actual holding

37

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

of *In re Schneller* under the narrowest grounds doctrine of *Marks*, 430 U.S. at 193.

Therefore, *In re Schneller* is strictly limited to its facts and cannot serve as precedent for

a distinct type of double patenting rejection, such as the present Schneller Rejection.

### 2.    Claims were Promptly Sought under a *Retroactive* New Law

**Under *Wadlinger,* precedent permits the patent community to add claims to**
***retroactively* take advantage of a newly passed law–to the extent that Congress has**
**made the law retroactive.**

A *Schneller* rejection that faults the patentee for presenting the patent application

fifteen years–a period *after* the original parent filings.    But, when the original parent was

filed, it was *impossible* to gain a meaningful pharmaceutical method of use claim because

of the flaws inherent in the patent law of the day; and, even if one were foolish enough to

have sought such a claim, one would have been met with a *per se* rejection based upon

the infamous *Durden* line of case law.    Within the one year period from the effective date

of the introduction of 35 U.S.C. § 271(g) that eliminated this flaw in the patent law, the

instant patent and its claim 1 were filed.

The Usami Declaration under 37 C.F.R. § 1.132, fully explains the timing of the

filing of the instant process claims in a diligent manner after the enactment of legislation

that for the first time made protection through such claims meaningful.    Ochiai thus

presented the instant claims promptly upon 35 U.S.C. § 271(g) opening the door to

protection of method of making claims.

The extremely pro-patentee retroactivity of the new law may perhaps best be

grasped with respect to the *Bio-Technology General Corp. v. Genentech, Inc.,* 80 F.3d

1553, 1560, 38 U.S.P.Q.2d 1321, 1326 (Fed. Cir. 1996), where claim 1 is "directed to a

method of constructing a [plasmid] * * * only constructed * * * once, in Israel in 1983,

before enactment of § 271(g).    BTG contends that the district court erred in retroactively

applying § 271(g) to conduct that was not an act of infringement when it occurred." *Id.*

*Bio-Technology General Corp.* at 1560, 38 U.S.P.Q.2d at 1326.    Surely, Congress *could*

38

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

*have* enacted its legislation prospectively to avoid such a clear retroactive reach against activity before the law was passed, yet it chose a sweeping, retroactive provision instead. Finding that the 1983 Israeli use of the invention *is* within the ambit of the retroactive scope of the law, the court said that "'[l]iability arises if 'the importation, sale, offer to sell, or use of the product occurs during the term of such process patent.' BTG clearly intends to import and sell hGH in the United States during the term of the '832 patent. This meets the statutory requirement and does not amount to a retroactive imposition of liability." *Bio-Technology General Corp.* at 1560; 38 U.S.P.Q.2d at 1326.

It is clear that where, as here, the law has been changed to open the possibility for new claim forms that had not theretofore been possible, applicants are encouraged to present such claims to the extent that t hey are not barred from doing so. This is precisely the situation that faced Rohm & Haas after the 1952 Patent Act retroactively opened up opportunities to claim a process where theretofore such a claim had not been possible. *Rohm & Haas Co. v. Roberts Chemicals, Inc.*, 245 F.2d 693, 698-99, 113 U.S.P.Q. 423, 427 (4th Cir. 1957).

The presentation of claims after a favorable change in the law has been expressly approved in *In re Wadlinger*, 496 F.2d 1200, 1207-08, 181 U.S.P.Q. 826, 832-33 (CCPA 1974), which involved the otherwise "late" filing of claims to take advantage of a change in the case law. *Wadlinger* cites with approval the *Rohm & Haas* case. There, "two specific provisions of the 1952 Patent Act * * * were new and * * * the patentee's belated reissue application was to take advantage of these new provisions. * * * '[W]e think that the validity of the [current situation in *Wadlinger*] should be construed in light of its provisions.'" *Wadlinger*, 496 F.2d at 1208, 181 U.S.P.Q. at 532-33 (quoting *Rohm & Haas, supra*).

In *Rohm & Haas*, the defendant attacked the patent by arguing that by waiting many years until after the change in the law that made process protection of the type granted, the Office should have denied the claim because the claims *could have* been

Patent
Control Nos. 90/004,950 and 90/005,200
Attorney Docket Nos. 087147-0265 & 087147-0416

originally presented: "The defendant says that the inventor could have included process claims in his original application if he had seen fit to do so and they would have been granted; and also that inventor's attorney was aware of this fact since he had successfully applied for the grant of process claims in other situations." *Rohm & Haas*, 245 F.2d at 698, 113 U.S.P.Q. at 426. Rejecting the defendant's contentions, the court first acknowledged that "[i]t is true that process claims were available at the time of the original grant and that their omission was obvious from a casual inspection of the patent, and a serious question would be presented if it were shown that intervening rights had accrued during the long interval between the grant of the original and the application for the reissued patent. But no such contingency has arisen, and the filing of the application for reissue at so late a date is explained by changes in the law which clarified the rights of the patentee." *Rohm & Haas*, 245 F.2d at 698; 113 U.S.P.Q. at 426. But, the law at the time did not permit effective process patent protection:

> This situation was materially changed by the [1952 Patent Act]. By this enactment the patent statutes and some prior case law were codified and various revisions and amendments of the law were made. The Act took effect on January 1, 1953, and was made applicable to unexpired patents granted prior to the effective date except as otherwise provided. . . ." It was to take advantage of these new provisions that Rohm and Haas made application for the process claims on October 24, 1952, shortly after the passage of the statute. The reissued patent was granted on November 24, 1953, after the effective date of the statute, and we think that the validity of the reissue should be construed in the light of its provisions.

*Rohm & Haas*, 245 F.2d at 698; 113 U.S.P.Q. at 427.

## VIII.  CONCLUSION

Wherefore, appellants Ochiai et al. pray that the Honorable Board reverse the outstanding final rejection.

Respectfully submitted,

September 2, 2005
Date

FOLEY & LARDNER LLP
3000 K St., N.W.
Washington, DC 20007
ph (202)672-5300

Harold C. Wegner
Registration No. 25,258

Stephen B. Maebius
Registration No. 35,264

---

Should additional fees be necessary in connection with the filing of this paper, or if a petition for extension of time is required for timely acceptance of same, the Commissioner is hereby authorized to charge Deposit Account No. 19-0741 for any such fees; and Patentee hereby petitions for any needed extension of time.

---

41