20 House Report No. 96-1307, 96th Cong., 2d Sess. (1980) *

[Part 1]

AMENDING THE PATENT AND TRADEMARK LAWS

September 9, 1980--Ordered to be printed

Mr. Kastenmeier, from the Committee on the Judiciary, submitted the following

REPORT

[To accompany H.R. 6933]

[Including cost estimate and comparison of the Congressional Budget Office]

The Committee on the Judiciary to whom was referred the bill (H.R. 6933) entitled: "To amend the patent and trademark laws", having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendment to the text of the bill is a complete substitute therefor and appears in italic type in the reported bill.

The title of the bill is amended to reflect the amendment to the text of the bill.

STATEMENT

The Need for the Legislation

Many analysts of the U.S. economy have warned that the roots of the current recession lie in a longer term economic malaise which arises out of a failure of American industry to keep pace with the increased productivity of foreign competitors.n1

According to the Committee for Economic Development, "the slowing of productivity improvement during the past few years parallels the discouraging decline in the rate of investment in plant and equipment."n2 The rate of investment as a proportion of GNP has averaged about one half the rate for France and Germany and about one third the rate for Japan. Further, the situation does not appear to be improving. There has been an especially significant decline in total U.S. expenditures for research and development, as measured in constant dollars since 1970.n3 Since the primary means of improving productivity lies in the creation of new technologies, the decline in expenditures for research and development is especially significant to the health of the overall economy.

Testimony presented to the Subcommittee on Courts, Civil Liberties and the Administration of Justice also indicates that the Federal Government is bearing an ever increasing share of the burden of financing basic research and development.n4 This means that the effective commercialization of government financed research is becoming an ever more important issue for those who are concerned with industrial innovation. The patent policies governing the utilization of government funded research will become even more important when the research expected to flow out of recent Congressional enactments such as the Energy Security Act of 1980n5 begins to produce usable new technologies. It is highly likely that the fuel which powers our automobiles and the boilers which heat our homes will owe part of their chemical composition or mechanical operation to patented research developed in part by government funds. At the present time U.S. companies desiring to use government funded research to develop new products and processes must confront a bewildering array of 26 different sets of agency regulations governing their rights to use such research. This bureaucratic confusion discourages efficient use of taxpayer financed research and development.

HISTORY OF THE BILL

The crisis in U.S. productivity and the governmental role in it has not gone unnoticed, however. In May of 1978 the President called for a major policy review of industrial innovation as the key to increased productivity in the United States. This White House call to action resulted in the creation of an advisory Committee of more than 150 senior

representatives from the industrial, public interest, labor, scientific, and academic communities. The work of the Advisory Committee was overseen by a cabinet level coordinating committee chaired by the Secretary of Commerce. The Committee studied all the areas in which federal government policy impacts on productivity and innovation in the private sector. These fields of inquiry included: economic and trade policy; environmental, health and safety regulations; anti-trust enforcement; federal procurement policies, and federal patent and information policies.

When the advisory committee issued its 300 page report last year, a key segment contained recommendations on government patent policy. These recommendations, in turn, were received by the President, and formed the basis of a major legislative proposal which was conveyed to the Congress. Special emphasis was placed on the role of the patent system and the patent policy regarding government funded research in promoting industrial innovation. These patent related recommendations were forwarded to the Committee on the Judiciary and are embodied in H.R. 6933 and H.R. 3806.

H.R. 6933 has three major thrusts. First, it strengthens investor confidence in the certainty of patent rights by creating a system of administrative reexamination of doubtful patents. Secondly, it strengthens the financial resources of the Patent Office to provide fast and accurate processing of patent applications by revising the fee structure of the Office. Finally, the existing melange of 26 different agency policies on vesting of patent rights in government funded research is replaced by a single, uniform national policy designed to cut down on bureaucracy and encourage private industry to utilize government funded inventions through the commitment of the risk capital necessary to develop such inventions to the point of commercial application.

H.R. 3806 embodies another recommendation of the Advisory Committee and the President. It grants jurisdiction over appeals in patent cases to a single court of appeals--ending the current legal confusion created by 11 different appellate forums, all generating different interpretations of the patent law. The new court will do a great deal to improve investors' confidence in patented technology.

In addition to the three broad areas already outlined, H.R. 6933 addresses the special needs of Universities and small businesses when they attempt to deal with Patent issues arising out of government contracts. Both of these groups lack the resources to cope with the bewildering regulatory and bureaucratic problems associated with transfer of patent rights pursuant to government contracts; and the university sector in particular is an important link to the private sector.

The Subcommittee on Courts, Civil Liberties and the Administration of Justice held seven days of hearings on H.R. 6933 and related patent law proposals. In all, over thirty witnesses from Government, the private Bar, industry, education, small business, and the judiciary offered testimony on the various legislative proposals before the subcommittee. Hearings were followed by four days of markup, during which H.R. 3806, creating a new Court of Appeals for the Federal Circuit, H.R. 6933, containing reforms in patent policy and procedures, and H.R. 6934, clarifying the law of copyright of computer programs, were reported favorably. Each bill was reported unanimously. The unanimous votes, particularly on H.R. 6933, were cast only after careful examination of the legislation in light of the criticisms made during the hearings and after consultation with members of the Committee on Science and Technology, which shares jurisdictional interest. During the course of markup H.R. 6933 was amended substantially to respond to criticisms raised during the hearing.

SUMMARY OF THE BILL

H.R. 6933, as amended, addresses four major issues. Section 1 provides for a system of administrative reexamination of patents within the patent office. This new procedure will permit any party to petition the patent office to review the efficacy of a patent, subsequent to its issuance, on the basis of new information about preexisting technology which may have escaped review at the time of the initial examination of the patent application. Reexamination will permit efficient resolution of questions about the validity of issued patents without recourse to expensive and lengthy infringement litigation. This, in turn, will promote industrial innovation by assuring the kind of certainty about patent validity which is a necessary ingredient of sound investment decisions.

The cost incurred in defensive patent litigation sometimes reaches $ 250,000 for each party, an impossible burden for many smaller firms. The result is a chilling effect on those businesses and independent inventors who have repeatedly demonstrated their ability to successfully innovate and develop new products. A new patent reexamination procedure is needed to permit the owner of a patent to have the validity of his patent tested in the Patent office where the most expert opinions exist and at a much reduced cost. Patent office reexamination will greatly reduce, if not end, the threat of legal costs being used to "blackmail" such holders into allowing patent infringements or being forced to license their patents for nominal fees.

25 Legislative History of the Process Patents Amendments Act of 1988

PROCESS PATENT AMENDMENTS ACT OF 1987

April 22, 1987.--Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. Kastenmeier, from the Committee on the Judiciary, submitted the following

REPORT

[To accompany H.R. 1931]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 1931) to amend title 35, United States Code, with respect to patented processes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Process Patent Amendments Act of 1987 ".

SEC. 2. RIGHTS OF OWNERS OF PATENTED PROCESSES.

Section 154 of title 35, United States Code, is amended by inserting after "United States", the following: "and, if the invention is a process, of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process".

SEC. 3. INFRINGEMENT FOR IMPORTATION OR SALE.

Section 271 of title 35, United States Code, is amended by adding at the end the following new subsection:

"(g) Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after--

"(1) it is materially changed by subsequent processes; or

"(2) it beocmes [sic] a minor or nonessential component of another product.".

SEC. 4. DAMAGES FOR INFRINGEMENT.

(a) Limitations and Other Remedies.--Section 287 of title 35, United States Code, is amended--

(1) in the section heading by striking "Limitation on damages" and inserting "Limitation on damages and otherr [sic] remedies";

(2) by inserting "(a)" before "Patentees"; and

(3) by adding at the end the following:

"(b)(1) An infringer under section 271(g) shall be subject to all the provisions of this title relating to damages and injunctions except to the extent those remedies are modified by this subsection or section 6 of the Process Patent Amendments Act of 1987 . The modifications of remedies provided in this subsection shall not be available to any person who--

"(A) practiced the patented process;

"(B) owns or controls, or is owned or controlled by, the person who practices the patented process; or

"(C) had knowledge before the infringement that a patented process was used to make the product the importation, use, or sale of which constitutes the infringement.

"(2) No remedies for infringement under section 271(g) of this title shall be available with respect to any product in the possession of, or in transit to, the infringer before the infringer had notice that the product was made by a process patented in the United States.

"(3) In an action brought for infringement under section 271(g), the court shall take into consideration the good faith and reasonable business practices demonstrated by the infringer and the need to restore the exclusive rights of the patentee.

"(4) For the purposes of this subsection, notice of infringement means actual knowledge, or receipt of notification, that a product was made by a patented process without authorization of the patentee. A notification shall constitute notice of infringement only if it is in writing and sets forth facts which are sufficient to establish that there is a substantial likelihood that the product was made by the infringing process. Filing an action for infringement shall constitute notice of infringement only if the pleadings or other papers filed in the action meet the requirements of a notification set forth in the preceding sentence. For the purposes of this subsection, a person who obtains a product made by a process patented in the United States in a quantity which is abnormally large in relation to the volume of business of such person or an efficient inventory level shall be rebuttably presumed to have actual knowledge that the product was made by such patented process.".

(b) Technical Amendment.--The item relating to section 287 of title 35, United States Code, in the table of sections for chapter 29 of such title is amended to read as follows:

"§ 287. Limitations on damages and other remedies; marking and notice.".

SEC. 5. PRESUMPTION IN CERTAIN INFRINGEMENT ACTIONS.

(a) Presumption That Product Made by Patented Process.--Chapter 29 of title 35, United States Code, is amended by adding at the end the following:

"**§ 295. Presumption: Product made by patented process**

"In actions alleging infringement of a process patent based on the importation, sale, or use of a product which is made from a process patented in the United States, if the court finds--

"(1) that a substantial likelihood exists that the product was made by the patented process, and

"(2) that the claimant has made a reasonable effort to determine the process actually used in the production of the product and was unable so to determine,

The product shall be presumed to have been so made, and the burden of establishing that the product was not madeby the process shall be on the party asserting that it was not so made.".

(b) Conforming Amendment.--The table of sections for chapter 29 of title 35, United States Code, is amended by adding after the item relating to section 294 the following:

"295. Presumption: Product made by patented process.".

SEC. 6. EFFECTIVE DATE.

(a) In General.--The amendments made by this Act shall apply only to products made or imported after the date of the enactment of this Act, but shall not abridge or affect the right of any person or any successor in business of such person to continue to use, sell, or import any specific product already in substantial and continuous sale or use by such person in the United States on January 1, 1987, or for which substantial preparation by such person for such sale or use was made before such date, to the extent equitable for the protection of commerical investments made or business commenced in the United States before such date.

(b) Retention of Other Remedies.--The amendments made by this Act shall not deprive a patent owner of any remedies available under subsections (a) through (f) of section 271 of title 35, United States Code, under section 337 of the Tariff Act of 1930, or under any other provision of law.

SEC. 7. REPORTS TO CONGRESS.

(a) Contents.--The Secretary of Commerce shall, not later than the end of each 1-year period described in subsection (b), report to the Congress on the effect of the amendments made by this Act on the importation of ingredients to be used for manufacturing products in the United States in those domestic industries that submit complaints to the Department of Commerce, during that 1-year period, alleging that their legitimate sources of supply have been adversely affected by the amendments made by this Act.

(b) When Submitted.--A report described in subsection (a) shall be submitted with respect to each of the five 1-year periods which occur successively beginning on the date of the enactment of this Act and ending five years after that date.

Purpose of the Legislation

The purpose of this bill is to provide meaningful protection to owners of patented processes. Under current patent law, owners of such patents have remedies for unauthorized use of the process only if the process was used in the United States. As a consequence, while a domestic manufacturer using the patented process would infringe the process patent, a foreign manufacturer who imports the product would not. There is also no remedy against parties who use or sell the product, regardless where it is made.

The value of new manufacturing techniques is reflected in the resulting products. A new process may enhance the quality of the product produced, or the new process may permit the product to be made much more economically. In some cases, for example biotechnology, the new process may be the only method of producing a new product. In all of these instances, the advantage to the process patent owner is realized by suing or selling the product, or licensing others to do so. As a consequence, the unfettered ability of others to import, sell or use a product made by the patented process, severely diminishes the value of a U.S. process patent. It also results in the loss of American jobs, particularly in new technology areas.

The only remedy available to the owner of a process patent is under sections 337 and 337a of the Tariff Act of 1930, as amended. Under section 337, the patent owner may petition the International Trade Commission (ITC) to determine that the importation of the product of a patented process constitutes an unfair trade practice, and to exclude the product from entry. This remedy requires the patent owner to establish that the product was made by the patented process and that the importation will damage an efficiently and effectively operated domestic industry, prevent the establishment of such an industry, or will restrain or monopolize trade in the United States. Even if the ITC finds a violation, the President can disapprove such determination. If the petitioner is successful, the ITC will exclude the goods from entry. Regarding goods that have already entered the United States, the ITC can issue a cease and desist order against an individual firm. However, these orders are not effective if importers of offending products can easily find alternative channels. Also, if the importation is discovered after the goods have entered commerce, the patent owner may be left with no remedy since the ITC does not have the authority to award damages to a patentee who, therefore, is not compensated for past injuries.

The laws of many other industrialized countries protect process patent owners there against unauthorized sale or use of products made by the patented process, or the importation of such products into these countries. This bill would expand the scope of our patent laws to tailor them more closely to the national laws of these countries and, thereby, provide owners of process patents in the United States the protection now available abroad to owners of foreign process patents.

Background

The issue of expanded process patent protection is one in which Congress must face serious and legitimate questions about the United States balance of trade. Enactment of this legislation would be an impressive first step in furthering the protection of United States intellectual property rights, in reducing the trade deficit, and in improving American competitiveness in the world marketplace.

This background statement is divided into three sections: (1) an analysis of current patent law; (2) a discussion of the advantages of current remedies; and (3) disadvantages of current remedies.

Protection of United States
Process Patents Under Current Law

American patent law has long recognized the validity of securing for inventors the right to exclude others from practicing an invention that consists of a method of making a product. Process patent protection has been a part of United States law since at least the 19th century.n1 Process patents extend intellectual property protection for new and useful processes, art or methods of creating an object. Since 1952 there has been an explicit statutory acknowledgment of the availability of process patent protection.n2 Process patents, however, have been granted only partial protection against acts of infringement.n3 This is so because, unlike product patents, the use of a patented process outside the United States and a subsequent importation of the product is not an act of patent infringement. The failure fully to protect American process patents harms American businesses and products results contrary to the public interest. Virtually all of our major trading partners adequately protect process patents, thus leaving American patent holders in a position to become the victims of unfair competition.

Process patent protection today is of central importance in the pharmaceutical industry, to the development of solid state electronics, for the manufacture of certain amorphous metalsn4 and, perhaps most significantly, for the biotechnology industry. For most biotech companies the best--and sometimes only--available protection for their intellectual property is a process patent.n5 Such patents are effective in securing for the inventor the right to prevent others from practicing that invention in the United States. Because such protections are limited to the territory of the United States, it is possible--if not likely--for a process patent holder to face domestic competition from persons who have used the patented process to create a product overseas and then shipped it into the United States. In these situations the patent owner cannot sue for patent infringement; rather, the owner is relegated to the United States International Trade Commission (ITC) to seek *limited non-monetary relief.*n6

The failure of American patent law to make unlawful the importation of goods made using an American process patent has deep historical roots. American patent law--like the law of other nations--does not have an extraterritorial effect.n7 To provide that American law should govern conduct that occurs in other countries would conflict with basic notions of national sovereignty. For that reason, American patent law has always required that the infringing act occur within the United States territory.n8 With respect to process patents, courts have reasoned that the only act of infringement is the act of making through the use of a patented process; therefore, there can be no infringement if that act occurs outside the United States.n9

From a public policy perspective, this rationale is not adequate because it ignores the reality that the offending act is the importation of a product made through the use of a protected process patent or its subsequent sale within the United States. There is no logical reason to exclude from the ambit of patent infringement acts associated with the abuse of a United States process as long as they occur within the reach of United States domestic law.n10 Moreover, as the President's Commission on Industrial Competitiveness has found, the failure to extend such protection diminishes the economic value of United States process patents.n11 Without domestic legal protection, competitors using the protected process may accent the limited risks of foreign production and importation in exchange for lower foreign production costs. There is no policy justification for encouraging such overseas production and concurrent violation of United States intellectual property rights.

The courts cannot solve this defect. The Congress can. The compelling nature of this policy deficiency has been evident to lenders in both the legislative and executive branches.n12

As for any policy decision, an assessment of the advantages and disadvantages of the remedies available under current law can be a fruitful endeavor.

ADVANTAGES OF CURRENT REMEDIES

Owners of intellectual property may currently seek relief before the United States International Trade Commission (ITC) under section 337 of the Tariff Act of 1930, 19 U.S.C. 1337 and 1337a .n13 The ITC may grant relief if it is shown that the responding parties have engaged in an unfair method of competition and unfair acts in the importation of articles into the United States, or their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to substantially injure or destroy an industry efficiently and economically operated in the United States.n14 The most commonly asserted unfair trade practice is alleged patent infringement. Proceedings before the ITC present patent owners with a number of opportunities for enforcement that would not ordinarily come into play in the context of a patent infringement lawsuit.n15 Among the possible advantages of bringing a case before the ITC are the fact that the agency is under a statutory deadline to conclude the case within 12 months after filing.n16 The ITC may extend this

period up to 18 months for complex cases.n17 In some cases this truncated time frame may preclude discovery opportunities and can be seen as a disadvantage. Moreover, the ITC, acting with the advice of an expert staff, must determine within 30 days after the complaint is filed whether to commence the investigation.n18

The second advantage to the ITC proceeding is the relative ease of enforcement. The ITC can issue exclusion orders which direct the Customs Service to prevent goods from coming into the United States.n19 The exclusion orders can extend to non-respondents if a pattern or practice of abuse has been shown.n20 In cases where personal jurisdiction exists, the ITC may also issue cease and desist orders.n21 Thus, with respect to some domestic purchasers of foreign-made goods, a type of injunctive relief is possible.

The third arguable advantage is that respondents in an ITC proceeding may not assert a counterclaim.n22 Other factors to consider include possible differences between the ITC and Federal district courts on questions such as patent misuse or patent validity. This difference should be slight because the reviewing court for both fora is the Court of Appeals for the Federal Circuit.

The assistance of the ITC can be viewed as an advantage or a disadvantage. The early active intervention of the ITC staff can help frame the issues and provide inexpensive expert assistance. On the other hand, such intervention is designed to reveal to each side the strengths or weaknesses of the other side's case.

There are some discovery problems in ITC proceedings in foreign countries. For example, Japan does not honor ITC requests for assistance. While the unavailability of discovery can be remedied by orders precluding the admissibility of evidence when discovery efforts have been thwarted, some foreign countries may be more likely to honor requests from Federal District Courts.

A final--and as yet unresolved problem--is that an ITC decision on patent validity may not result in the application of *res judicata* or collateral estoppel in a subsequent judicial proceeding. This limitation comes into play in the context of non-process patents when a patent holder seeks relief in addition to that provided before the ITC.

DISADVANTAGES OF CURRENT REMEDIES

The advantages of using the ITC to enforce a process patent are however, outweighed by at least four disadvantages.n23

First, and foremost, no damages may be obtained pursuant to an ITC order. For the domestic producer who has already suffered a monetary loss as a result of process patent piracy, future oriented relief is an incomplete remedy. The absence of a sufficient deterrent means that many overseas manufacturers and their domestic merchandisers are willing to absorb the risk of an ITC proceeding as a cost of doing business. Enactment of the proposed process patent legislation is the best way patent holders can expect to see a diminution in the abuse of their patents by overseas manufacturers.n24

The second major drawback is that any relief granted by the ITC can be nullified by the President for foreign policy or other reasons. Before 1985, this possibility was more likely in cases where the jurisdiction of the ITC was in question or where the remedies were harsh or overly broad.n25 For the first time in memory, President Reagan on January 4, 1985, overturned the ITC decision to exclude "grey market goods" on policy grounds.n26 Disagreeing with a written opinion by the ITC,n27 the President refused to uphold the exclusion order. Thus, there is less reason to believe that an ITC decision will be tried and decided in a neutral, judicial type of forum free from political, foreign policy or commercial considerations.

The third difficulty in an ITC proceeding for the owner of a process patent is that the statutory criteria are somewhat vague and susceptible to uncertain interpretations. In addition to showing that the respondents have imported goods using an unfair method of competition or in violation of a process patent, it is necessary to show injury to a domestic industry. The ITC has issued somewhat confusing opinions about the prerequisites to showing that a domestic industry exists.n28 It also appears difficult to show the separate requirement of "injury" if one's business is still showing a profit.n29 Assuming that the domestic industry has been injured, the complainant must also show that the industry is efficiently and economically operated. While this criterion has not yet produced anomalous results,n30 this is a trade policy issue which should be irrelevant in terms of process patent infringement and protection of intellectual property. In an ITC proceeding, complainant must show that the imports involved have either the effect to destroy or substantially injure the domestic industry or have a tendency to destroy or substantially injure the domestic industry.n31 Thus, the complainant must introduce proof concerning: (1) loss of customers; (2) decline in production, sales or profits; (3) suppressed prices; (4) decline in employment; and or (5) significant market penetration by the imports.n32 The