# DX 35
# (Part 2)

#26
JR
8/4/00

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Attorney Docket No. 087147/0265

| | |
|---|---|
| Reexamination No. 90/004,950 | Reexamination No. 90/005,200 |
| Filed: April 3, 1998 | Filed: December 22, 1998 |
| U.S. Patent No. 5,583,216 | Group Art Unit: 1611 |
| Issued: December 10, 1996 | Examiner: John M. Ford |
| Title: METHODS FOR THE MANUFACTURE OF CEPHEMS | |

## PETITION TO INVOKE COMMISSIONER'S SUPERVISORY AUTHORITY UNDER 37 C.F.R. 1.181(a)(3) OR ALTERNATIVE PETITION FOR REVIEW OF QUESTION NOT SPECIFICALLY PROVIDED FOR UNDER 37 C.F.R. 1.182

Commissioner for Patents and Trademarks
Washington, D.C. 20231

Sir:

### INTRODUCTION

In the above-captioned reexamination, the Primary Examiner has repeatedly rejected original, unamended claims in the patent under 35 U.S.C. 112 in violation of the reexamination statute, despite the patentee's repeated arguments that original, unamended claims cannot be rejected under section 112 during a reexamination.

In the outstanding Office Action, the Primary Examiner has not only rejected unamended claims (claims 1-16) under section 112, but he has done so based on the theory that a new interpretation of an unamended claim means that the claim can be treated as a new claim, thereby justifying its examination for compliance with section 112. In the interests of justice and the statutory mandate that reexaminations should be handled with "special dispatch", the patentee respectfully petitions the Commissioner to intervene and order withdrawal of these improper 112 rejections in order to reduce the issues during subsequent prosecution.

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

Though the patentee could appeal, that would require an appeal of all the outstanding
rejections together, depriving patentee of any opportunity to respond on the merits to the
Examiner's other new arguments in the outstanding Office Action and to put in additional
evidence before appeal. At the same time, though the patentee could respond yet again in the
next response directed to the Examiner to the these improper section 112 rejections, given the
history detailed below and the clear violation of the "special dispatch" requirement which has
already taken place as a result of these improper section 112 rejections, invoking the
Commissioner's supervisory authority is necessary. Dismissing this petition simply because the
patentee could address the rejections yet again in the next response would be manifestly unjust,
given the time and expense already wasted on past responses to these improper section 112
rejections and leaving the door open to a further violation of the "special dispatch" requirement
in the Primary Examiner's next Office Action.


FACTS


The instant reexamination began with a request for reexamination filed on April 3, 1998,
more than 2 years ago.

To date there have been four non-final Office Actions.

The '215 patent under reexamination issued with 5 original claims (copy attached as
Exhibit A).

In the first Office Action (copy attached as Exhibit B), claims 3-5 were not rejected under
section 112, and they were treated by the Primary Examiner as being entitled to the earliest U.S.
filing date, though they were rejected on other grounds.

In a subsequent response (partial copy attached as Exhibit C), the patentee canceled
claims 3-5 in order to rewrite them in independent form as claims 6-8 (Exhibit C at pages 1-4).
Aside from different numbers and the rewriting of claim 3 in the form of independent claim 6,
claims 6-8 were verbatim the same as original claims 3-5.

-2-

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

Yet, in a subsequent Office Action (copy attached as Exhibit D), the Examiner treated several original, unamended claims as new claims, rejecting them under section 112. In particular, claim 6 was rejected under section 112 (Exhibit D, page 6, lines 11-13), claim 8 was rejected under the fourth paragraph of section 112 (Exhibit D, page 3, last four lines of the page) and claim 1 was stated to be "so extraordinarily broad as to be indefinite" (Exhibit D, page 15, line 1).

In the patentee's subsequent response (partial copy attached as Exhibit E), patentee pointed out that original unamended claims cannot be rejected under section 112 (Exhibit E, page 28, lines 4-9 and page 33). Patentee also canceled claims 6-8 and replaced them with claims 14-16 which are identical to original claims 3-5 except for the numbers (Exhibit E, pages 1-3).

Despite the patentee's repeated prior arguments, the outstanding Office Action (copy attached as Exhibit F) now rejects claims 14-16 under section 112 (Exhibit F, page 5, lines 9-10). In addition, the outstanding Office Action (Exhibit F, page 14, sixth line from the end of the page) again repeats that the statement that "[c]laim 1 of Ochiai '216 is so extraordinarily broad as to be indefinite."

## POINTS TO BE REVIEWED

The Examiner's Actions expressly violates PTO policy and expressly ignores the "Special Dispatch" requirement of the reexamination statute. The elimination of this improperly raised 112 issue would greatly help to expedite subsequent prosecution in this reexamination to the mutual benefit of the patentee and the PTO, allowing the patentee to proceed to respond on the merits to other rejections raised by the Examiner without the burden of having to appeal all rejections now, which would also deprive patentee of any opportunity to respond on the merits to the Examiner with respect to the other rejections and to put in additional evidence.

One of the major policy reasons for limiting the scope of reexamination was that there

-3-

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

was a Congressional mandate to have expedited proceedings in reexamination. Reexamination denied is justice denied. The legislative history makes this clear. Even more importantly, the statute itself *requires* under 35 USC § 305, fourth sentence, that "[a]ll reexamination proceedings under this section * * * *will* be conducted with *special dispatch* within the Office." [emphasis added].

Here, we have a situation where an individual Primary Examiner has grossly departed from the established statutory and regulatory scheme. He has *sua sponte* expanded his jurisdiction, all without statutory authority, and all to the neglect of the statutory requirement that he, the Primary Examiner, "will * * * conduct[ ] [proceedings] with *special dispatch* * * *."

It is absolutely crystal clear that there is no support in the statute, legislative history, rules or notifications in the *Federal Register* that a reexamination of an original claim can be based upon anything other than a printed publication or patent.

Turning first to the statute, 35 USC § 302(a), first sentence, expressly states that "[a]ny person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art [appropriately] cited[.]" Not one word in the statute mentions reexamination for issues under Section 112.

It has been crystal clear since the first set of regulations were published in 1981 that non-prior art rejections are *not* to be applied to original claims of the patent. There is no disputing this point and the unequivocal interpretation of 37 CFR § 1.552(a) that until now has excluded non-prior art rejection of original claims: The "[p]atent claims will be reexamined on the basis of patents or printed publications." Only exceptionally with amended scope of protection is there a possibility to inject 35 USC § 112.

In *(Proposed) Rules to Implement Optional Inter Partes Reexamination Proceedings*, 65

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

Fed. Reg. 18154, 18176-77 (April 6, 2000), the current *ex parte* practice is further codified as
part of proposed 37 CFR § 1.552(a) that "[c]laims in an ex parte reexamination proceeding will
be examined on the basis of patents or printed publications and, *with respect to subject matter
added or deleted in the reexamination proceeding,* on the basis of the requirements of 35 U.S.C.
112." (emphasis added). The emphasized wording clearly dispels any doubt about the fact that
an original claim cannot be subject to reexamination based upon a Section 112 formalities issue.

The April 6, 2000, amendment for *ex parte* reexamination procedures was part of "Issue
5" raised for comments by the public, where the PTO leadership again said, in *Response to Issue
5*, 66 Fed. Reg. at 18157-58, noted that the Advisory Commission on Patent Law Reform: A
Report to the Secretary of Commerce, August 1992, at page 117, "found the [Patent and
Trademark] Office to be an inappropriate forum for addressing all issues of validity."

It is explicitly stated in the new text for 37 CFR § 1.552(c), first sentence, that "[i]ssues
other than those indicated in paragraphs (a) or (b) (which deals with enlargement of claim scope]
will not be resolved in a reexamination proceeding." The second sentence that follows explicitly
directs the Examiner's action: "[T]he existence of such issues will be noted by the examiner in
the next Office Action * * *." There is no further action provided for the Examiner to take in
the reexamination proceeding.

As stated by an enlarged panel of the Board in *Ex parte Horton*, 226 USPQ 697, 699-700
(1985) (Serota Henon, Craig, Keenan, McCandlish), the "rejection [of an original claim] is
clearly outside the scope of reexamination. According to 37 CFR 1.552(b), only new or
amended claims presented during a reexamination proceeding are examined for compliance with
the requirements of 35 USC §112 * * *."

The rule on limitation of reexamination finds support from an enlarged panel of the
Board, itself quoting from an *en banc* precedent of the Federal Circuit. See *Ex parte Horton*,

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

<u>FEE</u>

In accordance with the requirements of 37 C.F.R. 1.182, a check in the amount of
$ 130.00 is attached hereto.

Respectfully submitted,

<u>April 14, 2000</u>

_____
Stephen B. Maebius
Reg. No. 35,264

**FOLEY & LARDNER**
3000 K Street, N.W.
Suite 500
Washington, D.C.  20007-5109
Tel:  (202) 672-5569
Fax:  (202)672-5399



04/19/00  WED 10:26 FAX 6377    6TH FL TRIANGLE    ☑002

Attn: John Kittle, Group Director

#2 of

F/R

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Attorney Docket No. 087147/0265

| | |
|---|---|
| Reexamination No. 90/004,950 | Reexamination No. 90/005,200 |
| Filed: April 3, 1998 | Filed: December 22, 1998 |
| U.S. Patent No. 5,583,216 | Group Art Unit: 1611 |
| Issued: December 10, 1996 | Examiner: Mr. John M. Ford |
| Title: METHODS FOR THE MANUFACTURE OF CEPHEMS | |

### PETITION FOR EXTENSION OF TIME
### UNDER 37 C.F.R. 1.550(C)

Commissioner for Patents and Trademarks
Washington, D.C.  20231

APPROVED

for Two Months
Response due
June 29, 2000

Sir:

Pursuant to 37 C.F.R. 1.550(c) and M.P.E.P. § 2265, the undersigned representative of the patentee hereby petitions for a two-month extension of time to give the patentee until June 29, 2000 to file a response to the outstanding Office Action (which was mailed on February 29, 2000). M.P.E.P. § 2265 provides that petitions for extension of time in reexamination are decided by the Group Director, so this petition has been directed to the attention of the Group Director.

As explained below, there is sufficient cause to justify the extension of time and the two-month period would be reasonable in view of this sufficient cause.

## I. Numerous Issues Raised In Outstanding Office Action

The new Office Action appears to add new rejections of claims 14-16 in addition to maintaining all rejections of the prior Office Action. An entirely new theory is advanced to justify the treatment of an unamended claim as a new claim based on a difference in interpretation, interjecting a new section 112 issue into the case.

Reexamination Nos. 90/004,950 & 90/005,200
Ochiai et al., U.S. Patent No. 5,583,216

## II.  Clarification Of The Office Action Is Being Sought Through Two Petitions

The second grounds in support of this petition is that time is needed to allow the PTO to respond to two other petitions filed by the patentee requesting clarification of the outstanding Office Action.  One petition is a petition for clarification directed to the Examiner (copy enclosed).  The second petition is a petition under rules 181 and 182 directed to the Commissioner requesting clarification of certain aspects of the outstanding Office Action (copy enclosed).  In order to give the PTO time to respond and to give the patentee time to respond to the PTO's response to these petitions, a two-month extension of time is needed.

In conclusion, the patentee respectfully requests a two-month extension of time for the reasons set forth above in this Petition and/or restarting of the period for response when the Patent Office mails out the missing information requested in the Petition for Clarification.

Respectfully submitted,

April 14, 2000

Stephen B. Maebius
Reg. No. 35,264

FOLEY & LARDNER
3000 K Street, N.W.
Suite 500
Washington, D.C.  20007-5109
Tel:  (202) 672-5569
Fax:  (202)672-5399



04/19/00   WED 10:27 FAX 6377        6TH FL TRIANGLE        ☑004



Reexamination Nos. 90/004,950 & 90/005,300
Ochiai et al., U.S. Patent No. 5,583,216

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 14, 2000, service of a true and complete copy of this paper was made upon E. Thomas Wheelock, attorney for the Third Party Requester, by depositing the same in the United States mail in an envelope properly addressed to E. Thomas Wheelock, Morrison & Foerster, 755 Page Mill Road, Palo Alto, California 94304-1018, with sufficient first class postage affixed.

Stephen B. Maebius

*Reexam*
*#49*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Attorney Docket No. 087147/0265



Reexamination No. 90/004,950

Filed: April 3, 1998

U.S. Patent No. 5,583,216

Issued: December 10, 1996

Reexamination No. 90/005,200

Filed: December 22, 1998

Group Art Unit: 1624

Examiner: Ms. Emily Bernhardt

Title: **METHODS FOR THE MANUFACTURE OF CEPHEMS**

### RENEWED PETITION TO THE OFFICE OF PETITIONS
### TO RECONSIDER THE ORIGINAL PETITION
### FILED APRIL 8, 2002 , UNDER 37 C.F.R. § 1.181(a); M.P.E.P. § 1208

Commissioner for Patents and Trademarks

Washington, D.C. 20231

Sir:

Comes now your petitioners Michihiko Ochiai et al. ("Ochiai") and respectfully pray for procedural intervention in this case from the Examiner's Answer dated February 8, 2002, viz., that it be stricken from the files for each of the several reasons set forth in Part B of this petition and/or for such other action is appropriate under the circumstances.

Given that the MPEP itself expressly states that a *Schneller*-based double patenting rejection is a unique rejection that does not necessarily apply even when a regular non-statutory double patenting rejection is made, there appears to be no

justification for the PTO's denial of the original petition. Chapter 800 of the 8th Edition
of the MPEP plainly states:

> Nonstatutory double patenting *could include* a rejection *which is not the usual*
> *"obviousness-type" double patenting rejection. This type of double patenting*
> *rejection* is based on the fundamental reason to prevent unjustified timewise
> extension of the right to exclude granted by a patent no matter how the
> extension is sought. *In re Schneller*, 397 F.2d 350, 158 USPQ 210 (CCPA
> 1968). [Emphasis supplied.]

The highlighted language unmistakably shows why the Examiner's Answer violated the
PTO's own rules in raising a new grounds of rejection for the first time on appeal
without re-opening prosecution.[1] This action is particularly inexcusable given that
petitioners *repeatedly* petitioned the PTO after receiving the various Office Actions
which appeared to contain double patenting rejection(s) to try to clarify what kind of
double patenting rejection or rejections were being made. There is no mention of the
unusual *Schneller*-based double patenting rejection in any of the Office Actions leading
up to the Examiner's Answer, nor in the PTO's response to the several petitions for
clarification. It is only mentioned for the first time in the Examiner's Answer. At a
minimum, this unusual rejection should either be stricken from the Examiner's Answer
or prosecution re-opened so that the new rejection can be properly raised and addressed
in accordance with the PTO rules.

This paper is responsive to the decision to the petition filed on April 8, 2002
(herein: the "Original Petition"), that decision coming from a designee of the
Commissioner and dated July 15, 2002 ("Petition Decision") that directs Ochiai to

---

[1] The 8th Edition of the MPEP states, Chapter 1200, reads as follows:

1208.01 Prohibition Against Entry of New Ground of Rejection in Examiner's Answer

37 CFR 1.193(a)(2) prohibits the entry of a new ground of rejection in an examiner's
answer. At the time of preparing the answer to an appeal brief, however, the examiner may decide
that he or she should apply a new ground of rejection against some or all of the appealed claims.
In such an instance where a new ground of rejection is necessary, the examiner should reopen
prosecution. The examiner must obtain supervisory approval in order to reopen prosecution after
an appeal. See MPEP Section 1002.02(d).

Reexamination Nos. 90/004,950 and 90/005,200

request reconsideration within two months of that date in a paper directed to the "Office of Petitions", which is accompanied herewith.

The present posture of the case is no different from the handling of the case in the *ex parte* prosecution before the Examiner: *Never* has an action been made final in an obvious attempt to frustrate an appeal and a final decision[2] nor is the outstanding action made final – but further frustrates review of this case by virtue of making this an intermediate decision subject to reconsideration.

Here, it is perfectly obvious – as explained in more detail herein – that there is, plainly and simply, a new ground of rejection in the Examiner's Answer. It does not take a Hans Christian Andersen to see this.[3] This total and obvious violation of the *Code of Federal Regulations* clearly runs entirely counter to the regulatory scheme and the rule of law as established under the Administrative Procedure Act.

---

[2]Fortunately, this case is *not* governed by the American Inventors Protection Act of 1999 which deprives a reexamination party from a direct appeal from a non-final rejection. Thus, there have been *two* appeals in this case from non-final rejections, and *never* has there been a final rejection to date in the four years of the pendency of the reexamination proceedings

[3] *The two clever swindlers had a good laugh as they got ready to leave the city. The nobles who were to carry the train were clutching at the air. Neither dared to admit that he couldn't see the Emperor's clothes.*
*And so the Emperor walked through the city under a magnificent canopy, and all the people cried, "Oh!" and, "Ah! The Emperor's new clothes are splendid!"*
*Not one person was willing to say that he was stupid or unfit for his job. Each pretended the Emperor's clothes were a great success.*
*"But he doesn't have anything on!" cried one little child in the crowd.*
*"Just listen to the voice of the innocent!" said the father, trying to hush his child.*
*Whispers began to buzz about: "A child says the Emperor has nothing on."*
*"Yes!" cried all the people at last. "He <u>doesn't</u> have anything on!"*
*The Emperor's heart almost stopped beating. He knew the little child was right. But he thought, "The procession must go on." So he stood a little straighter and walked a bit faster. And the nobles hurried to keep up with him, carrying a train that wasn't even there.*

Reexamination Nos. 90/004,950 and 90/005,200

Clearly, the Office has no discretion to completely deviate from an appellant's due process rights under the *Code of Federal Regulations*. The court with the greatest experience in the review of agency actions involving the *Code of Federal Regulations* has uniformly held that every agency *must* follow its own published regulations. As explained in *American Portland Cement*, "[p]ublication in the Code [of Federal Regulations] is not just a matter of agency convention. The regulations governing the Code provide that it shall contain 'each Federal regulation of general applicability and legal effect.'"[4] Thus, "it is 'axiomatic that an agency must adhere to its own regulations[.]'"[5] Manifestly, "[I]t is, of course, a fundamental tenet of our legal system that the Government must follow its own regulations. Actions by an agency of the executive branch in violation of its own regulations are illegal and void."[6]

The view of the immediate reviewing court is consistent with the view of the Federal Circuit, where Judge Lourie stated that the court "strongly deplore[s] Commerce's or any other agency's failure to follow its own regulations. Such failure harms those who assume agency compliance and are prejudiced by the non-

---

Hans Christian Andersen, THE EMPEROR'S NEW CLOTHES (*quoted, U.S. v. Harrington*, 947 F.2d 956, 963-64 (D.C. Cir. 1991)(Edwards, J., concurring).
[4] *American Portland Cement Alliance v. E.P.A.*, 101 F.3d 772, 776 (D.C.Cir. 1996) (quoting 1 C.F.R. § 8.1(a) (1996), and citing *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C.Cir.1986)(Scalia, J.)).

[5] *City of Williams v. Dombeck*, 151 F.Supp.2d 9, 22 (D.D.C. 2001) (Kollar-Kotelly, J.) (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C.Cir.1986)(Scalia, J.); see also *Eugene Burger Management Corp. v. U.S. Dept., of Housing and Urban Development*, slip op. at *2, __ F.Supp.2d __, __, 2002 WL 1000254 (D.D.C. 2002)( Facciola, Mag. Judge)(citing *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C.Cir.1986)(Scalia, J.)) ("It is fundamental that an agency must follow its own regulations.").

[6] *Vander Molen v. Stetson*, 571 F.2d 617, 624 (D.C. Cir. 1977) (citing *Vitarelli v. Seaton*, 359 U.S. 535 (1959); *Service v. Dulles*, 354 U.S. 363 (1957); *Accardi v. Shaughnessy*, 347 U.S. 260 (1954)). See also Russell L. Weaver, *Chenery II: A Forty-Year Retrospective*, 40 Admin. L. Rev. 161, 207, n. 170 (1988) (citing *Vander Molen*).

Reexamination Nos. 90/004,950 and 90/005,200

compliance."[7]  This is particularly the case where an arbitrary governmental action

blocks the ability to present evidence.[8]  Additionally, stare decisis demands that the

Office follow its prior precedent that demands a withdrawal of a new ground of

rejection or other appropriate action.  As confirmed by the Federal Circuit's *en banc*

quotation of Supreme Court case law, "[t]he principle of *stare decisis* is integral to our

jurisprudence 'because it promotes the evenhanded, predictable, and consistent

development of legal principles, fosters reliance on judicial decisions, and contributes

to the actual and perceived integrity of the judicial process.'"[9]


The Original Petition states that "[f]urthermore, since — as explained [in the

Original Petition] — there are key. *admissions* through silence in the Examiner's

Answer on critical points for each of the rejections which are necessarily dispositive of

the appeal, this case should be promptly reconsidered and immediately processed for a

---

[7] *Oy v. U.S.*, 61 F.3d 866, 875-76 (Fed. Cir. 1995)(Lourie, J.).  It is recognized
that despite *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, __ U.S. __, 122
S.Ct. 1889 (2002), the controlling law of any judicial review in the District Court in
Washington, D.C. in any review of this matter may not be that of the regional circuit but
rather the Federal Circuit.  The law of the Federal Circuit is entirely consistent with that
of the D.C. Circuit in terms of the case law cited here.  *See Torrington Co. v. U.S.*, 82
F.3d 1039, 1042 (Fed. Cir. 1996)(Schall, J.) ("Commerce, like other agencies, must
follow its own regulations. *See Fort Stewart Schools v. Federal Labor Relations Auth.*,
495 U.S. 641, 654 (1990) ('It is a familiar rule of administrative law that an agency must
abide by its own regulations.'); *Saddler v. Department of the Army*, 68 F.3d 1357, 1358
(Fed. Cir. 1995) (agency 'must abide by its own regulation').  We thus must determine
whether Commerce acted in conformity with its regulation ***.")

[8] *Eugene Burger Management Corp. v. U.S. Dept., of Housing and Urban
Development*, slip op. at *2, __ F.Supp.2d __, __, 2002 WL 1000254 (D.D.C. 2002)(
Facciola, Mag. Judge) (where the action in violation of the rights of the party facing the
agency denied the opportunity to produce evidence, the court held that "the [government]
official must then afford the respondent the rights provided by [the *Code of Federal
Regulations*], i.e., the opportunity to submit documentary evidence, present witnesses and
confront the agency's witnesses.").

[9] *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), quoted in *In re Zurko*, 142 F.3d
1447, 1457 (Fed. Cir. 1998)(en banc)(Mayer, C.J.), *rev'd on other grounds sub nom
Dickinson* v. *Zurko*, 527 U.S. 150 (1999).

Reexamination Nos. 90/004,950 and 90/005,200

certificate under 35 USC § 307(a) confirming the patentability of all claims in this case:
Contrary to the "special dispatch" mandate of 35 USC § 305 for reexamination cases,
the pendency of the first reexamination file instantly involved is now more than four (4)
years — which, with the normal time for processing of an appeal to the Board,
particularly if it were to involve a remand for further processing of the issues that
would in any event *sua sponte* be considered by the Board — could take unforetold
additional time." As pointed out in the Original Petition, "[w]ith the key factual
predicates of the rejections of this case being totally undermined by the *uncontroverted*
evidence of record (as to the previously made grounds of rejection) or being *clearly
erroneous* (as to the new ground of rejection that in any event must either be stricken or
where the case must be reopened to further prosecution), the appeal here is an
unnecessary delay insofar as the interests of the public and the Office in terms of the
speedy administration of patent justice — not to mention the prejudice to a patentee that
is denied his statutory right to "special dispatch" under 35 USC § 305."[10]

## PART A:  PROCEDURAL BASIS AND TIMELINESS

**Timeliness:**  The Petition Decision accepts as timely the Original Petition, and
then sets a *new* two month deadline for filing a Request for Reconsideration (which is
the instant paper), this new deadline expiring September 15, 2002.  This paper having
been filed on or prior to that new September 15, 2002 deadline, it is timely.

The Petition Decision complains that the delay in that paper was in part
occasioned by the absence of sufficient copies of the Original Petition having been
filed.  Having tracked the movement of the file through the Office during the time after
the filing of the Original Petition, it is understood that several people may be reviewing

---

[10] As noted in the Original Petition, "Patentee has done his utmost to expedite the proceedings in
this case. This is the *second* appeal in a case where the Office has *never* even made a single final rejection:
The case has been treated as an administrative hot potato, apparently because of the name of the case and
the creation of a case law precedent in the original proceedings before the Federal Circuit. Whatever may
have been the legal importance and the issues of that case and the Federal Circuit decision, nothing therein
has anything to do with the questions raised in this reexamination — now that the attempt to have an
'Ochiai II' appeal back to the Federal Circuit has finally been terminated, with the withdrawal of the
*Durden*-like repeat rejection under 35 USC § 103(a)."

the papers herein.  In order to make it easier for the PTO, this paper is being filed as *six originals*, two for the two reexamination files and four for any others who will be reviewing this paper.

**Procedural Issues**:  This paper deals strictly with the procedural issues reflected in the Examiner's Answer where Ochiai prays for procedural relief, wherefore, this case may be decided on the merits by the Honorable Board of Appeals and Interferences *vis a vis* simply being remanded back to the Primary Examiner for reopening of prosecution and for consideration *sua sponte* by the Director of the relevant Technology Center for his consideration of one of the rejections made in the outstanding Examiner's Amendment that cannot be made without his express authorization.

The *merits* of the grounds raised in the outstanding Examiner's Answer are fully addressed in the previously filed Reply Brief.

**PART B:  THE PETITION DECISION**

The Petition Decision has several themes:

**(1)  "Extensive and Tedious" Review**

The great bulk of the matters raised in the Original Petition are simply not answered, apparently because – as stated in the Petition Decision – "[a] review of the proceedings' history would be *extensive and tedious* to provide in full." (emphasis added).

**(2)  "Obvious Double Patenting"**

The Petition Decision refers to an "obvious double patenting" rejection.   There is nothing "obvious" in any way shape or form about a double patenting rejection that is keyed to the *Schneller* or *Bogese* type.  To the contrary, the fact that it took until the Examiner's Answer to introduce the double patenting rejection is far from obvious to anyone.

(3)  The Need for a Non-Final Rejection

The Petition Decision says that it is better for the *Board* to consider the double patenting issues.  It is stated that "[t]his is not a procedural issue with the conduct of this reexamination, but are [sic] concerned with the merits of the rejection of record. These arguments are better presented to the Board for determination of the propriety of the rejections.  Patent owner further comments on the length of time which was needed to obtain broad claims.  Again[,] such argument does not address procedural insufficiencies in the [Reexamination] Proceeding.  However, since this is an issue directed to the patentability of the claims, the issue will not be addressed in this decision."

But, precisely because this is a new ground of rejection introduced into the case in the Examiner's Answer, there has never been a pre-final rejection opportunity to present evidence under 37 CFR § 1.132 or otherwise.  It is only fair that Ochiai be given the opportunity to present evidence against a rejection raised for the first time in the Examiner's Answer.

(4)  The *Bogese* Rejection

Nothing underscores the new rejection more than the statement in the Petition Decision that "Patent Owner *** comments on the *Ex parte Bogese* decision cited by the examiner in support of the Obvious Double Patenting rejection suggesting that is it based on false premises of earlier cases and then proceeds through an analysis of *Woodbridge v. United States* which appears to have no bearing on this petition decision."  Clearly, this is a brand new ground of rejection that Ochiai should have a chance to traverse in the context of a non-final rejection.

## PART C:  PRAYERS FOR RELIEF

This section repeats Part B of the Original Petition and further expands the final portion of Part B of the Original Petition.

Reexamination Nos. 90/004,950 and 90/005,200

## (1) APA *LEE* COMPLIANCE

The first two grounds of rejection set forth in the Examiner's Answer simply fail to at all controvert the key points that are set forth in the response to the non-final rejection appealed from in this case.

As clearly seen in the concurrently filed Reply Brief, critical and uncontroverted points central to a reversal are simply *ignored*. See pages 4-6 (dealing with the failure to controvert the key basis of support for the claims in the parent case that, since uncontroverted, necessarily leads to a reversal of the anticipation rejection against claims 1 and 2 under 35 USC § 102) and pages 7-8 (establishing *the fact* that the process invention of this case is patentably independent and distinct from the claims of the parent product patents).

In connection with the first rejection — the issue of priority based upon the first parent — the lack of any refutation of the issue of priority as noted above means that the Board is given the choice of either (a) reversing the Primary Examiner for failure to controvert the critical factual evidence; (b) *sua sponte* digging through the factual issues, acting as senior examiners — involving both comparison of the disclosures of the relevant cases for support and the evidence relevant thereto that has been supplied under 37 CFR § 1.132 and which is *uncontroverted*; or (c) remanding the case to the Primary Examiner to remedy the deficiencies of the previous subsentence.

Since the Board in all likelihood would — absent the instant prayer for supervisory intervention — follow the final option without reaching the merits of the appeal, expeditious handling of this case as mandated by the "special dispatch" provisions of 35 USC § 305 compels such supervisory intervention.

## (2) UNAUTHORIZED NEW GROUND OF REJECTION

The Examiner's Answer introduces a *second* double patenting rejection which appears to be a hyrbid synthesized from the *Schneller* ground of rejection in combination with the *Ex parte Bogese* unpublished Board decision from the year 2000. Counsel hereby represents that counsel had no knowledge of *Ex parte Bogese* until *after* the issuance of the Examiner's Answer herein, which is the reason why that decision was not treated in the principal appeal brief.

Reexamination Nos. 90/004,950 and 90/005,200

The second and independent double patenting rejection is new to the Examiner's Answer. By petition herewith to the Director under 37 CFR § 1.181, it is respectfully requested that this rejection be stricken from the record and not considered further in this case.[11]

Without citation to a single case, a second double patenting rejection is entered that is based upon the dual positions of the Examiner that there was an "intentional" delay in filing the process claims.

### A.  New Law, New Claims vs. Intentional Claiming Delay

There was never any delay – "intentional" or otherwise – in filing the process claims in this case. Rather, at the time the original case was filed, process claims were simply out of the question: The long-standing line of cases stemming from *In re Larsen*, made it impossible to obtain valid claims of the type now granted, and there clearly was no incentive to seek to have the Office reach a decision contrary to *Larsen* —and later *Durden* — because the Office has no power to repudiate a well established decision of its reviewing court. Neither was there any practical reason for any applicant standing in the shoes of an Ochiai to pursue claims of this type because they were commercially worthless throughout virtually the entire pendency of the parent Ochiai cases: Claims to a method of making a pharmaceutical product would be easily and routinely circumvented through the simple expedient of offshore production.

Hence, there never was *any* intentional delay in filing the claims of this case as it was never even remotely comprehended that such claims would be sought!

What changed the course of events was the unexpected change in the patent law — the introduction of 35 USC § 271(g) that became effective in 1989 — which now,

---

[11]To the extent that the Director were to deem the rejection worthy of consideration, the due process dictates that the case be reopened for further consideration by the Examiner in a non-final action to give appellants-patentees the opportunity to present a showing under 37 CFR § 1.132 that demonstrates the reasons that the time taken in this case was appropriate and not a "submarine" situation as alleged by the Primary Examiner.

for the first time, put muscle into process claims of the instant type. Within one year of the effective date of the new law, the instant patent was filed with full presentation of the claims herein.

It is clear that where, as here, the law has been changed to open the possibility for new claim forms that had not previously been possible, applicants are encouraged to present such claims to the extent that they are not barred from doing so. This is precisely the situation that faced Rohm & Haas after the 1952 Patent Act retroactively opened up opportunities to claim a process where theretofore such a claim had not been possible. *Rohm & Haas Co. v. Roberts Chemicals, Inc.*, 245 F.2d 693 (4th Cir. 1957).

The presentation of claims after a favorable change in the law has been expressly approved in *In re Wadlinger*, 496 F.2d 1200, 1207-08, 181 U.S.P.Q. 826 (CCPA 1974), which involved the "late" filing of claims to take advantage of a change in the case law. *Wadlinger* cites with approval the *Rohm & Haas* case. There, "two specific provisions of the 1952 Patent Act * * * were new and * * * the patentee's belated reissue application was to take advantage of these new provisions * * *. '[W]e think that the validity of the [current situation in *Wadlinger*] should be construed in light of its provisions.'" *Wadlinger*, 496 F.2d at 1208 (quoting *Rohm & Haas*).

## B. "Fourteen Years": A Vigorous Fight for a Genus

The Primary Examiner implies that fourteen years were somehow used to put the case on hold. Nothing could be further from the truth: Prior to counsel taking over representation of this case, the record shows an orderly prosecution leading to the Ochiai '888 patent where the patentee was forced to take out extremely narrow claims, thereby forcing the filing of what ultimately became a series of continuing patents. From the time that current counsel[12] was asked to assume responsibility of this case there was a constant effort made to obtain broad, generic product claims befitting the

---

[12]The first named counsel has worked continuously with the instant assignee since prior to the transfer under the styling of Stevens, Davis, Miller & Mosher; from October 1, 1980, the representation was sub nom Wegner & Bretschneider and later Wegner, Cantor, Mueller & Player. The second named counsel affiliated with the latter firm in 1991 but had no principal involvement with the Ochiai cases prior to the reexamination. Both joined Foley & Lardner in 1994, after the appellate filings had been completed but before the decision of the court. Therefore, any recollections of counsel, here, refer to those of the first named counsel.

06/29/2007 11:24 FAX 7033059373          SOLICTOR'S OFFICE                    ☒049

Case 1:06-cv-01640-TFH    Document 23-8    Filed 06/29/2007    Page 22 of 32

status of this pioneering invention. Throughout the "fourteen years"[13] referred to by the Primary Examiner, the struggle for generic protection went on.

One of the unfortunate and complicating factors involved in this case was that applicants were put in the dilemma of having only very narrow claims granted with broad claims locked up in this extended prosecution. Over the years, third parties who had developed species within the scope of the Ochiai genus asked for usually exclusive licenses to cover their products. To oblige such requests, the several narrower patents were spun out of this chain of continuous attempts for generic coverage. Clearly, patentees should not be faulted for obtaining the several narrower patents while maintaining their fight for generic coverage.

## C. *Schneller* is Inapposite to this Case

In rare situations, the Office authorizes the issuance of a double-patenting rejection that is outside the "obviousness" arena under the following provision of the *Manual of Patent Examining Procedure*. The *Schneller* case cannot be read in a vacuum, because it is legally indistinguishable — in the opinion of Ochiai's counsel — from the later case of *In re Kaplan*, 789 F.2d 1574, 229 USPQ 678 (Fed. Cir. 1986). The Office says only that the cases are "similar". MPEP § 804, *Definition of Double Patenting* (Eighth ed. 2001). A fact situation similar to that in *Schneller* was presented to a Federal Circuit panel in *In re Kaplan*, 789 F.2d 1574, 229 USPQ 678 (Fed. Cir. 1986).[14]

---

[13]As indicated in a graphic demonstration presented early in the prosecution of this reexamination proceeding (a courtesy copy of which is attached to this petition in the form of a rolled-up color chart), for a period totally more than *ten years*, the applicant sat waiting for governmental action after having taken whatever action was required of the applicant or appellant: In the more than six years of pendency of the Ochiai patent under reexamination, most of that time was spent on appeal at the Federal Circuit. (The proceedings before this Honorable Board were greatly expedited and took very little time.)

The record of the Federal Circuit appeal will reflect that Ochiai filed its papers generally earlier than the deadlines set by the court and tried to expedite the case. Yet, the majority of the time that the case was at the Federal Circuit was spent in the interval *after* the oral hearing in the case: The decision on appeal was rendered *more than three full years later*.

[14] MPEP § 804, *Definition of Double Patenting* (Eighth ed. 2001) ("A fact situation similar to that in *Schneller* was presented to a Federal Circuit panel in *In re Kaplan*, 789 F.2d 1574, 229 USPQ 678 (Fed. Cir. 1986).")

Reexamination Nos. 90/004,950 and 90/005,200

The Office — in view of the fact that the case is either indistinguishable from (as per Ochiai's counsel) or "similar" to *Kaplan* — has laid down a stringent analysis for just when it considers *Schneller* to be a sustainable rejection:

## D. Independent and Distinct Inventions

Any suggestion of a *Schneller*-based double patenting rejection is extinguished where — as per MPEP § 804 — it is established that the claimed invention is "independent and distinct" from the claims of the other patents. Thus, the Office's interpretation of the case law is that, in a *Schneller* situation, "[t]o * * * prevail here, appellant has the burden of establishing that the invention claimed in his patent is 'independent and distinct' from the invention of the appealed claims * * *."[15] It is clearly and unequivocally shown in the section on obviousness double patenting, *supra*, that the fact of independent and distinct inventions has been established.

## E. A Reason for the Later Filing of Claims

The Manual distinguishes between the unexplained delay in *Schneller* and the justified filing of a separate case in *Kaplan* on the basis that in the latter case there was a *reason* for the applicant's actions. Where, as here, there is a *statutory change* that opens the door to claiming a process, clearly, this puts this case very safely in the *Kaplan* column.

## F. The *Bogese* Submarine Patent Precedent

Appellants-patentees herein have not previously addressed the case of *Ex parte Bogese*, a decision from a panel of this honorable Board, that applies the case of *Woodbridge v. United States* as a basis for what is later termed in of *Symbol Tech., Inc. v. Lemelson Med., Educ. & Research Found., Ltd. P'ship*, 277 F.3d 1361 (Fed. Cir. 2002), as "prosecution laches". The *Bogese* opinion suggests that Woodbridge was a patentee who somehow obtained a patent after many years. Indeed, from the time the Woodbridge invention was made in 1850 until the Supreme Court decision in 1923 there was a span of seventy-three (73) years! The horrific facts of patent procurement

---

[15] MPEP § 804, *Definition of Double Patenting* (Eighth ed. 2001) (quoting *Schneller* , 397 F.2d at 354-55; 158 USPQ at 214-15.)

in *Woodbridge* speak for themselves. However, there is no patent of any kind involved in the case: Dr. Woodbridge *never received a patent* for his 1850-made rifle cannon invention. Rather, the entire Woodbridge case involved a private law from 1901 that was enacted in order to consider granting Woodbridge *compensation* for his invention *if* several conditions were met, including establishment at the trial level that his invention would have been patentable, *and* with the special statutory caveat that before awarding compensation the trial court was required to ascertain whether or not the notorious inactivity of Dr. Woodbridge created laches. *There was thus a specific statutory mandate to make this inquiry in a compensation proceeding that had nothing to do with a granted letters patent.* On top of this, Dr. Woodbridge was guilty of egregious conduct which, had it occurred today, would have been deemed inequitable conduct. For example, just before the grant of the patent, in an era more than two full generations before the U.S. adoption of the Paris Convention, itself more than thirty years in the future, the United States had a law that permitted the applicant to request secrecy of his application before grant for one year, all for the purpose of investigating foreign filings and carrying out such activities. (Not only was there no FedEx or other overnight shipping in that period now nearly 150 years ago, but the principal means of communication with Europe was through sailing ships — the Wright Brothers were still to come in the following century.) The reason for secrecy was that then, as today, a publication of a patent in the United States would create a bar in Prussia, Bavaria, England, France and the other major patent territories of Europe. (Germany as a Federal Republic did not yet exist; Japan was still in the era of the Tokugawa shogunate with Admiral Perry's black ships still to arrive on Japan's shores.) Yet, Dr. Woodbridge had *published* his invention in a form parallel to the patent disclosure *even before filing his application* that Dr. Woodbridge knew would in any event defeat a foreign patent right.

As can be seen from the trial court record, 55 Ct.Cl. 234 (1920), there was no patent of any kind involved in the *Woodbridge* case. Rather, private legislation was enacted in 1901 to give one of the predecessors to the Federal Circuit — the Court of Claims — original jurisdiction to award money to Dr. Woodbridge *if* his 1850-made "rifle cannon" invention *would have been patentable* under the test of determining "[w]hether [Dr.] Woodbridge was the original and first inventor of the [rifle cannon] and entitled to a patent therefor" to the same extent as if he had been granted a patent at the time his application had been allowed.

Reexamination Nos. 90/004,950 and 90/005,200

In contrast to the general patent laws then in effect — and those of today — where the Patent Office is charged only with the objective considerations of novelty, support and the like, in *this* case where *no* patent was involved, the Claims Court as a condition precedent to granting an award to Dr. Woodbridge was to make an *affirmative finding* that there had been no prosecution laches. ("*Provided, however, That* the said court shall first be satisfied that the said Woodbridge did not forfeit, or abandon his right to a patent, by publication delay, laches, or otherwise[.]")

(1) The rifle cannon was invented and put into use at Fort Monroe in 1850 — seventy-three years before the Supreme Court decision in *Woodbridge v. U.S.*

(2) The application was filed February 11, 1852.

(3) Less than one week later, a first office action was issued on February 16, 1852, rejecting the claims.

(4) One week later, on February 23, 1852, Woodbridge responded, proposing claim changes in pencil.

(5) Less than six weeks after filing, on March 19, 1852, the case was indicated as allowable: "[C]laims substantially similar to those set forth in pencil illustrate your invention, and that if they be presented they may be allowed."

(6) On March 23, 1852, the necessary amendment was made and the applicant requested secrecy which — under the 1836 Act could be granted for one year for foreign filing purposes: "I wish to avail myself of this privilege when my patent may issue, in order that my ability to take out a patent in a foreign country may not be affected by the publication of the invention."

(7) On April 15, 1852, the Patent Office wrote Woodbridge: "[I]n accordance with your request, the papers were filed among the secret archives of the office, subject to your directions as to the time of issuing

Reexamination Nos. 90/004,950 and 90/005,200

the same."

(8) Contrary to any possibility of foreign patent rights, a printed
publication was made in December 1852 that was for the purpose of
advertising the invention, and which fully barred European patenting of
the invention. (The court held that "no attempt was ever made to secure
a foreign patent.")

(9) For 9 ½ years, nothing was done to call the continued secrecy of the
patent application to the attention of the Office.

(10) There was no commercial use for the invention from 1850 until a
decade later due to the absence of any war activity and the fact that the
government would be the sole source of commercial use of the invention.

(11) The Civil War commenced; when visiting West Point in 1861, Dr.
Woodbridge observed similar rifle cannon being used.

(12) On December 31, 1861, Woodbridge amended his claims to cover
the similar rifle cannon invented by third parties in the interval, and
asked that the patent be granted with the amended claims.

(13) On January 29, 1862, the Patent Office *denied* grant of a patent
because "the length of time you have allowed your invention to slumber
is a bar to the grant of a patent at the present. For nearly ten years
[under the pretense of secrecy for obtaining foreign rights, despite a
statutory limitation of a one year period] you have suffered your
application to remain locked up within the secret archives of this office
— not merely beyond the reach of the public, but beyond even the
cognizance of the examiners and other officers of this Department. In the
meantime various patents embracing the same invention have been issued
in England, and have for years been published in this country. * * * And
yet the only reason assigned in your letter of Dec. 31[, 1861,] for this
very unusual delay and prolonged silence is that you supposed the
invention would not prove remunerative until recently. It is to the
vigilant and not to the slumbering that the law extends its care * * *[.]

Reexamination Nos. 90/004,950 and 90/005,200

On the doctrine of abandonment * * * the office must refuse your
claims[.] * * * [Y]ou have the remedy of an appeal from the examiner's
decision to the board of examiners-in-chief."

(14) On April 15, 1862, Woodbridge appealed from this ruling of the
commissioner and lost said appeal on July 15, 1862, the board of
examiners in chief sustaining the commissioner.

(15) On January 7, 1871, Woodbridge appealed to the then
Commissioner of Patents in person, requesting a hearing, but none was
held.

(16) Woodbridge next asked for a hearing on January 23, 1879; at the
hearing, held on February 13, 1879, all former decisions were affirmed.

(17) Woodbridge then appealed, on April 9, 1879, from the decision of
the commissioner to the Supreme Court of the District of Columbia,
where, on February 28, 1880, the decision was affirmed.

(18) In 1901, a private bill was passed for Dr. Woodbridge's relief
vesting original jurisdiction with the predecessor to the Federal Circuit,
the Claims Court, to determine whether compensation should be granted
for the government's use of the invention.

(19) The plaintiffs' petition was filed March 7, 1901, and the first
deposition in support thereof was not filed for more than five years
thereafter, the plaintiffs making no effort to close their case until the year
1913, 12 years after the filing of the petition, and then absorbing an
additional period of more than four years in filing briefs.

(20) The case was calendared by the court's own motion on January 7,
1918, and finally argued and submitted in April, 1918. Tentative
findings were announced by the court in December, 1918, and we are
now concluding the final stage of the litigation on the motions of both
parties to amend the tentative findings.

Noting consideration of a claim having its origin more that sixty years earlier, the trial court said:

"[I]t is perfectly obvious that such a period of procrastination, even subsequent to the passage of the jurisdictional act of March 2, 1901, in a case so decidedly featured by laches and delays, can not in a judicial forum escape the indubitable conclusion that either some great, positive, and obvious wrong was imposed upon the inventor in ancient times, or some *ex post facto* event suddenly arising in the history of the country gave rise to a consciousness that a claimed invention thought to be valueless was by said event converted into one of value of sufficient proportions to revive its initiatory validity.

"It must be conceded as an elementary principle of law that a claim thus circumscribed will be rigidly scanned by the courts, and the reasons advanced for a large money judgment against the defendants must of necessity be sufficiently cogent to overcome the handicap that appears from the sequence of events upon the face of the record, and which is not, and can not be, disputed. The explanation put forward to remove this disability must be clear, positive, and free from ambiguity, and clearly attain the stage where, by the exercise of prudence and sound judgment, it would be convincing."

The *Woodbridge* case therefore provides absolutely no basis for any doctrine of statutory laches that can be applied — as was done in the *Bogese* case. (To be sure, the Federal Circuit referred to the Woodbridge "patent" in the *Symbol* case. This does not make *Symbol Technologies* a correct interpretation of the *Woodbridge* case.)

## G. The Unpublished Laches Opinions of the Board

The Petition Decision fails to reveal the fact that there have been actual cases beyond *Bogese* that deal with prosecution laches. As part of any decision on petition, it

is requested that the PTO *identify* all the cases since 1997 where there is any prosecution "laches" mentioned or any reference to the "Hull" case.[16]

Since the last filing of papers, we have identified the *Hieda* case[17] has held that the repetitive filing of continuations to allowed claims in lieu of accepting grant of a patent constitutes prosecution "laches" to deny the claims.

Canon's claims were rejected "under the doctrine of laches as expressed in *Ex parte Hull*, 191 USPQ 157 (Bd. App. 1975)." The sole issue on appeal was "whether the rejection based on the equitable doctrine of laches is sustainable."

### (a) No Suppression of Publication of the Invention

A major premise of the laches rejection historically has been to suppress publication of an invention, to maintain secrecy for a prolonged period of time. This factor had nothing at all to do with the case as Canon's *kokai* were all published before *any* continuation had been filed. Here, the Board disagreed with Canon because it "conclude[d] that publication of a Japanese [counterpart *kokai*] on the invention is not necessarily the same as the publication of the invention in the form of a U.S. patent, the disclosure requirements of which are specifically designed by the U.S. Patent Laws to appropriately disclose the invention to the U.S. public." *Ex parte Hieda* at pp. 6-7. Yet, this ground has no applicability, here, because a United States patent has been granted – and hence published – to meet the disclosure needs of the public.

---

[16] In an earlier Freedom of Information Act proceeding related to this case, it was indicated by the Chairman of the Board of Patent Appeals and Interferences that he has access to a whole text search for all Board opinions from that date forward, so there is essentially no burden in finding such opinions.

[17] *Ex parte Hieda*, App. No. 96-3189 (undated), *patent file*, Hieda et al., U.S. Patent 6,278,486, paper no. 19, assignors to Canon K.K. (2001).

(b) Repetitive Refilings of Allowed Claims

Insofar as the *statutory* right to file a continuation application under 35 USC § 120, the Board said that "it is not proper to file repetitive continuations, with the same claims without any amendments, when all the pending claims in the successive parent applications had been allowed. That conduct is against the public policy of disclosing an invention to the public as early as possible." *Ex parte Hieda* at p. 7 (citing *Moore v. United States*, 194 USPQ 423, 436, n. 9 (Ct. Cls. Trial Division 1977)).

Here, there has been absolutely *no* refiling of allowed claims; to the contrary, there has been a long struggle to gain allowance of generic claims as a cornerstone of the entire Ochiai series of prosecutions

(c) There has been No "Hull Warning"

The Board specifically noted that when it mailed a Notice of Allowance in 1994 that the Examiner had issued a "Hull warning" – mentioning the *Hull* case and that filing a further continuation could result in a laches rejection. *Ex parte Hieda* at pp. 13-14. This also happened in the *Bogese* case. ***There has been no Hull warning in this case.***

*          *          *

Reexamination Nos. 90/004,950 and 90/005,200

Wherefore, favorable consideration in the form of striking the second *Schneller/Bogese*-based double patenting rejection is courteously solicited.

Respectfully submitted,

Date _Sept. 9, 2002_                          _Stephen B Maebius_

FOLEY & LARDNER                              for Harold C. Wegner        Reg No 35,264
Customer Number: 22428                       Registration No. 25,258
*22428*
22428                                        _Stephen B Maebius_
PATENT TRADEMARK OFFICE                      Stephen B. Maebius
Telephone:     (202) 672-5569                Registration No. 35,264
Facsimile:     (202) 672-5399

Enclosure:     Color Chart of Reexamination Timeline

Should additional fees be necessary in connection with the filing of this paper, or if a petition for extension of time is required for timely acceptance of same, the Commissioner is hereby authorized to charge Deposit Account No. 19-0741 for any such fees, and applicant(s) hereby petition for any needed extension of time.

This paper is being filed as SIX originals, one for each of the two reexamination files, with four additional originals being provided for each of the reviewers of this paper. If any reviewer would like their own personal electronic copy they are invited to E-mail the undersigned at smaebius@foleylaw.com and an E-copy will be sent by return.

Reexamination Nos. 90/004,950 and 90/005,200

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 9, 2002, service of a true and complete copy of this paper was made upon E. Thomas Wheelock, attorney for the Third Party Requester, by depositing the same in the United States mail in an envelope properly addressed to E. Thomas Wheelock, Morrison & Foerster, 755 Page Mill Road, Palo Alto, California 94304-1018, with sufficient first class postage affixed.

_Stephen B Maeb_

Stephen B. Maebius