# BRIEF FOR APPELLANTS

UNITED STATES STEEL CORPORATION, HERCULES, INC., SHELL OIL COMPANY, NORTHERN PETROCHEMICAL COMPANY, HIMONT U.S.A., INC., ARISTECH CHEMICAL CORPORATION, NATIONAL DISTILLERS AND CHEMICAL CORPORATION

FILED
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MAR 29 1988

FRANCIS X. GINDHART
CLERK

RECEIVED

MAR 29 1988

United States Court of Appeals
For The Federal Circuit

IN THE

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

### Consolidated Appeal Nos.
### 88-1166    88-1167    88-1168
### 88-1169    88-1170    88-1171

UNITED STATES STEEL CORPORATION, HERCULES, INC., SHELL OIL COMPANY, NORTHERN PETROCHEMICAL COMPANY, HIMONT U.S.A., INC., ARISTECH CHEMICAL CORPORATION, NATIONAL DISTILLERS AND CHEMICAL CORPORATION, and EL PASO PRODUCTS COMPANY,

*Appellants,*

—v.—

PHILLIPS PETROLEUM COMPANY,

*Appellee.*

APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE CIVIL ACTION NOS. 83-143, 83-148, 83-547, 83-801, 84-79 AND 85-255 (JJL) (CONSOLIDATED FOR TRIAL)
HONORABLE JOSEPH J. LONGOBARDI, DISTRICT JUDGE

Kenneth E. Madsen
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

*Attorney for Appellants*

*Of Counsel:*
Francis T. Carr
Alan T. Bowes
James Galbraith
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

REPRODUCED AT THE NATIONAL ARCHIVES

I. T. T. 420 AMAXIA
I.T.T. 428719 AMAXIA
W.U. I2 7799 AMAXIA NYK

GI/II/III DEX 6200 (212) 425-5
GI/II/III DEX 6500 (212) 943-7
CABLE: AMAXIA

LAW OFFICES OF

# KENYON & KENYON

ONE BROADWAY

NEW YORK, N. Y. 10004

(212) 425-7200

FRANCIS T. CARR
HUGH A. CHAPIN
CHARLES B. SPENCER
RICHARD A. HUETTNER
EDWARD W. GREASON
WILLIAM T. BOLAND, JR.
ROBERT D. FIER
CHARLES R. BRAINARD
KENNETH E. MADSEN
RICHARD L. MAYER
JOHN O. McQUILLAN
DOUGLAS G. BRACE
WILLIAM J. UNGVARSKY
EDWARD J. HANDLER, III
ROBERT T. TOBIN
FRANCIS C. HAND
PAUL LEMPEL

ALAN T. BOWES
JOHN A. FOGARTY, JR.
PAUL H. HELLER
THOMAS L. CREEL
ARTHUR D. GRAY
ALBERT J. BRENEISEN
STUART J. SINDER
GEORGE E. BADENOCH
JOHN C. ALTMILLER •
MICHAEL J. LENNON
PHILIP J. McCABE
CHARLES E. HEPNER •
JAMES GALBRAITH
WALTER E. HANLEY, JR.
RICHARD L. DeLUCIA
JAMES E. ROSINI

PHILIP G. HAMPTON, II •
JOHN J. KELLY, JR.
LOUIS C. DUMICH
ALBIN J. NELSON
BRADFORD J. BADKE
DREW M. WINTRINGHAM
C. DOUGLAS WINGATE
PATRICK J. BIRDE
WILLIAM J. McNICHOL, JR.•
PHILIPPE BENNETT
GREGG A. DELAPORTA
JONATHAN D. REICHMAN
MICHAEL A. GOLLIN
WALTER SCOTT
DEBORAH S. RITTMAN
RICHARD S. GRESALFI
KATHLEEN G. DUSSAULT
JOSEPH S. CODISPOTI
RICHARD M. ROSATI
SCOTT A. WISSER
MICHAEL POLACEK
DANIEL P. BURKE •

THOMAS L. JARVIS
TIBERIU WEISZ
JOSEPH E. ROOT, III
STEVEN J. LEE
MARY E. O'BRIEN
JOSEPH M. MAZZARESE
MARK D. ENGELMANN
DAWN M. DiSTEFANO
HOWARD J. SHIRE
MICHAEL D. LOUGHNANE
CLARE J. BRITTON
THOMAS A. RESTAINO
CHRISTOPHER NICASTRI
FELIX L. D'ARIENZO, JR.
D. LEE ANTTON •
JONATHAN B. PENN
STUART D. SENDER
WILLIAM A. TANENBAUM
JOHN A. HANKINS •
RICHARD S. MEYER •
JOHN E. TSAVARIS, II

DONALD K. DUVALL•
COUNSEL

• RESIDENT, WASHINGTON OFFICE

April 4, 1988

WASHINGTON, D.C. OFFICE
1025 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036
TELEPHONE (202) 429-1776

Mr. Francis X. Gindhart, Clerk
Room 401
U.S. Court of Appeals
    Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

RECEIVED

APR 7   1988

United States Court of Appeals
For The Federal Circuit

Re:  US Steel v. Phillips Petroleum
     Appeal Nos. 88-1166 to 1171

Dear Sir:

In the BRIEF FOR APPELLANTS filed March 28, 1988, there is an error in the Certificate of Interest for Himont v. Phillips appearing on page vi. In subpart (c) lines 2-3 thereof, strike the words "wholly owned subsidiary" and substitute: "an affiliate", so that the entire paragraph reads as follows:

"(c) Himont U.S.A., Inc. is a wholly owned subsidiary of Himont Incorporated which is an affiliate of Montedison, S.p.A., an Italian Corporation."

Thank you and sorry for the inconvenience caused.

Very truly yours,

Kenneth E. Madsen

KEM:ll

cc:  Harry J. Roper, Esq.
     Stanton T. Lawrence, III, Esq.

PRODUCED AT THE NATIONAL ARCHIVES

i

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

**Appeal No. 88-1166**

◆

SHELL OIL

v.

PHILLIPS

◆

## CERTIFICATE OF INTEREST

The undersigned counsel of record furnishes the following information under Federal Circuit Rule 8.

(a) Counsel represents Shell Oil Company;

(b) Real parties in interest: same as in 8 (a);

(c) All of Shell Oil Company's common stock is owned by SPNV Holdings, Inc., a Delaware corporation, whose stock is owned by Shell Petroleum N.V., a Netherlands company. The voting shares of Shell Petroleum N.V. are held 60 percent by Royal Dutch Petroleum Company and 40 percent by the Shell Transport and Trading Company, a Public Limited Company in London, U.D. Shell Oil Company also wholly owns directly or indirectly a number of companies. The following companies are affiliated with Shell Oil company or one of the affiliates named above:

Fractionation Research, Inc.
Gravcap, Inc.
Heat Transfer Research, Inc.
Inland Corporation

REPRODUCED AT THE NATIONAL ARCHIVES

ii

LOOP, Inc.
MESBIC Financial Corporation of Houston
Oil Companies Institute for Marine
   Pollution Compensation Limited
Oil Insurance Limited
Seadock, Inc.
Pecten Cameroon Company
Thums Long Beach Company
East Texas Salt Water Disposal Company
Grande Ecallie Land Company, Inc.
Van Salt Water Disposal Company
Wyoming Industrial Development Corporation
Cortez Capital Corporation
Butte Pipe Line Company
Dixie Pipeline Company
Explorer Pipeline Company
LOCAP, Inc.
Olympic Pipe Line Company
Plantation Pipe Line Company
West Shore Pipe Line Company
Wolverine Pipe Line Company
Morrison Molded Fiber Glass Company
Premix/E.M.S. Inc.
CRI Ventures, Inc.
Glasstrusions, Inc.
Glass-Steel, Inc.
Lucky Chance Mining Company, Inc.
George Neuman and Company
United Scientific, Inc.
AFC, Inc.
Xerkon Inc.
Pecten Middle East Services Company
Pecten Portugal Company S.A.R.L.

(d) Appearances:

Kenyon & Kenyon
One Broadway
New York, NY 10004

iii

Potter, Anderson & Corroon
Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

Respectfully submitted,

/s/ KENNETH E. MADSEN

Kenneth E. Madsen
Kenyon & Kenyon
One Broadway
New York, NY 10004
(212) 425-7200

*Counsel for Appellant*
*Shell Oil Company*

iv

# United States Court of Appeals

### FOR THE FEDERAL CIRCUIT

### Appeal No. 88-1167

---

NORTHERN PETROCHEMICAL

v.

PHILLIPS

---

## CERTIFICATE OF INTEREST

The undersigned counsel of record furnishes the following information under Federal Circuit Rule 8.

(a) Counsel represents Northern Petrochemical Company and National Distillers & Chemical Corporation;

(b) Real parties in interest: same as in 8 (a);

(c) Interpreting "publicly held affiliates" to mean companies with publicly traded stock in which the party has a controlling interest,

For Northern Petrochemical Company—None;

For National Distillers & Chemical Corp.—None.

Note: National Distillers is now known as Quantum Chemical Corp.

(d) Appearances:

Kenyon & Kenyon
One Broadway
New York, NY 10004

REPRODUCED AT THE NATIONAL ARCHIVES

v

Potter, Anderson & Corroon
Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

Respectfully submitted,

/s/ KENNETH E. MADSEN

Kenneth E. Madsen
Kenyon & Kenyon
One Broadway
New York, NY 10004
(212) 425-7200

*Counsel for Appellant
Northern Petrochemical Company
and National Distillers &
Chemical Corporation*

REPRODUCED AT THE NATIONAL ARCHIVES

vi

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

**Appeal No. 88-1169**

HIMONT

v.

PHILLIPS

## CERTIFICATE OF INTEREST

The undersigned counsel of record furnishes the following information under Federal Circuit Rule 8.

(a) Counsel represents Himont U.S.A., Inc.;

(b) Real parties in interest: same as in 8 (a);

(c) Himont U.S.A., Inc. is a wholly owned subsidiary of Himont Incorporated which is a wholly owned subsidiary of Montedison, S.p.A, an Italian Corporation.

(d) Appearances:

Kenyon & Kenyon
One Broadway
New York, NY 10004

Potter, Anderson & Corroon
Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

vii

Respectfully submitted,

/s/ KENNETH E. MADSEN

Kenneth E. Madsen
Kenyon & Kenyon
One Broadway
New York, NY 10004
(212) 425-7200

*Counsel for Appellant
Himont U.S.A., Inc.*

viii

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

**Appeal No. 88-1170**

PHILLIPS

v.

U.S. STEEL

## CERTIFICATE OF INTEREST

The undersigned counsel of record furnishes the following information under Federal Circuit Rule 8.

(a) Counsel represents United States Steel Corporation and Aristech Chemical Corporation;

(b) Real parties in interest: same as in 8 (a);

(c) Interpreting "publicly held affiliates" to mean companies with publicly traded stock in which the party has a controlling interest,

For United States Steel Corporation—None.

For Aristech Chemical Corporation—None.

(d) Appearances:

Kenyon & Kenyon
One Broadway
New York, NY 10004

Potter, Anderson & Corroon
Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

REPRODUCED AT THE NATIONAL ARCHIVES

ix

Pravel, Gambrell, Hewitt & Krieger
1177 West Loop South
Houston, Texas

Respectfully submitted,

/s/ KENNETH E. MADSEN

Kenneth E. Madsen
Kenyon & Kenyon
One Broadway
New York, NY 10004
(212) 425-7200

*Counsel for Appellant*
*United States Steel Corporation*
*and Aristech Chemical Corporation*

REPRODUCED AT THE NATIONAL ARCHIVES

x

# United States Court of Appeals

FOR THE FEDERAL CIRCUIT

Appeal No. 88-1171

—————◆—————

PHILLIPS

v.

HERCULES

—————◆—————

## CERTIFICATE OF INTEREST

The undersigned counsel of record furnishes the following information under Federal Circuit Rule 8.

(a) Counsel represents Hercules Incorporated;

(b) Real parties in interest: same as in 8 (a);

(c) Interpreting "publicly held affiliates" to mean companies with publicly traded stock in which the party has a controlling interest, there are none.

(d) Appearances:

Kenyon & Kenyon
One Broadway
New York, NY 10004

Potter, Anderson & Corroon
Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

REPRODUCED AT THE NATIONAL ARCHIVES

xi

Respectfully submitted,

/s/ KENNETH E. MADSEN

Kenneth E. Madsen
Kenyon & Kenyon
One Broadway
New York, NY 10004
(212) 425-7200

*Counsel for Appellant*
*Hercules Incorporated*

REPRODUCED AT THE NATIONAL ARCHIVES

xii

## STATEMENT PURSUANT TO COURT RULE 13(e)

Counsel of record for Appellants states that no other appeals in or from the same civil actions were previously before this or any other appellate court, except *Phillips Petroleum Co. v. United States Steel Corp.*, 727 F.2d 1120 (Fed. Cir. 1983).

The following related case is pending in the United States District Court for the District of New Jersey: *Phillips Petroleum Co. v. Exxon Corp.*, (Civil Action 83-941).

PRODUCED AT THE NATIONAL ARCHIVES

xiii

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| TABLE OF AUTHORITIES | xvii |
| STATEMENT OF THE ISSUES | 1 |
| STATEMENT OF THE CASE | 1 |
| I. INTRODUCTION | 1 |
| II. NATURE OF THE LITIGATION | 1 |
| III. STATEMENT OF THE FACTS | 3 |
| A. The '851 Patent and Polypropylene | 3 |
| B. The Importance of Molecular Weight | 3 |
| C. The Broad Invention Described and Claimed in the '851 Patent Differs Significantly from the Narrow Invention that the Patentees Hogan and Banks Actually Discovered | 5 |
| 1. Hogan and Banks Actually Made Only a Weak, Brittle Low Molecular Weight Polypropylene Having No Utility as a Plastic | 5 |
| 2. The 1953 and 1954 Applications of Hogan and Banks Described and Claimed as an Invention Only a Weak, Brittle Low Molecular Weight Polypropylene | 6 |
| 3. Phillips Changed its Perception of the Hogan and Banks Invention as the Result of the Revelations of Ziegler and Natta | 7 |

REPRODUCED AT THE NATIONAL ARCHIVES

xiv

PAGE

4. Phillips' 1956 Application Broadened Hogan and Banks' Invention to Cover Tough High Molecular Weight Polypropylene Not Described in the 1953 Application and Unlike Anything Invented by Hogan and Banks ................... 9

5. The '851 Patent as Issued Continued to Reflect the Misrepresentations Incorporated in the January 1956 Application . 11

D. The Prior Art Natta '300 Patent Completely Discloses the Invention Described and Claimed in the '851 Patent.............. 12

E. The Tough Polypropylene Products of the Appellants Differ Fundamentally from the Brittle Polypropylene of Hogan and Banks 13

SUMMARY OF ARGUMENT ................... 15

ARGUMENT ........................... 16

I. THE DISTRICT COURT ERRED IN CONCLUDING THAT PHILLIPS COULD OVERCOME THE ANTICIPATORY PRIOR ART BY RELIANCE ON THE EARLIER LIMITED DISCLOSURE OF THE 1953 PARENT APPLICATION ........................... 16

A. The District Court Erred in Concluding That, as a Matter of Law, the Vast Differences in Disclosure and Scope between the 1956 and 1953 Applications Were Immaterial ........................... 17

B. Appellants Supplied the Evidence Which Judge Wright Lacked in the Interference Action........................... 22

REPRODUCED AT THE NATIONAL ARCHIVES

xv

PAGE

II. THE DISTRICT COURT ERRED IN HOLD-
ING THAT APPELLANTS INFRINGED THE
'851 CLAIM ............................    24

   A. The District Court Erred in Concluding that
Appellants Stipulated Literal Infringement .    24

   B. The District Court Misconstrued the
Reverse Doctrine of Equivalents ..........    24

      1. The Elements of the Reverse Doctrine of
Equivalents .........................    25

   C. The Undisputed Evidence Shows Appel-
lants' Independently Developed Products
Differ Substantially from the Polymer Dis-
covered by Hogan and Banks ............    27

   D. The Court Erred in Focusing
Only on Crystallinity ....................    28

III. THE DISTRICT COURT ERRED IN ITS
FAILURE TO FIND INEQUITABLE CON-
DUCT ...................................    31

   A. Phillips Withheld Material Information....    31

   B. Phillips Intended to Mislead
the Patent Office .......................    34

IV. THE '851 PATENT IS INVALID FOR DOU-
BLE PATENTING........................    36

   A. Claim 16 of Phillips' Expired '721 Patent
Exhausted the Exclusive Rights for Solid
Polypropylene of the '851 Claim..........    36

   B. The '721 Patent and its Relationship
to Claim 1 of the '851 Patent ............    37

   C. The District Court Erred in Construing the
Phrase "Recovering a Resulting Solid Poly-
mer"....................................    39

REPRODUCED AT THE NATIONAL ARCHIVES

xvi

PAGE

D.  Claim 16 of the '721 Patent Is for the Same
    Invention as Claim 1 of the '851 Patent ...    42

    1.  The Process of Claim 16 Is
        Not for Copolymers . . . . . . . . . . . . . . . .    43

    2.  The Unclaimed Processes Are
        Not Materially Different . . . . . . . . . . . .    44

    3.  The Fact that Later-Developed Proc-
        esses Can Be Used to Make Solid Poly-
        propylene Is Irrelevant . . . . . . . . . . . . .    44

    4.  The Difference in Statutory Subclasses
        Does Not Save Claim 1 . . . . . . . . . . . . .    46

E.  Claim 1 of the '851 Patent Is Obvious in
    Light of Claim 16 of the '721 Patent . . . . . .    47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

REPRODUCED AT THE NATIONAL ARCHIVES

xvii

## TABLE OF AUTHORITIES

**Cases**                                                    PAGE

*Autogiro Co. of America v. United States*, 384 F.2d 391,
    155 U.S.P.Q. 697 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . .   26

*In re Avery*, 518 F.2d 1228, 186 U.S.P.Q. 161 (C.C.P.A.
    1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41, 46, 47

*In re Barber*, 81 F.2d 231, 28 U.S.P.Q. 187 (C.C.P.A.
    1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*Boyden Power Brake Co. v. Westinghouse*, 170 U.S. 537
    (1898) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 27, 28

*Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 220
    U.S.P.Q. 481 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . .46, 48

*In re Coleman*, 189 F.2d 976, 90 U.S.P.Q. 100 (C.C.P.A.
    1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*In re Cone*, 121 F.2d 470, 50 U.S.P.Q. 54 (C.C.P.A.
    1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*DMI, Inc. v. Deere & Co.*, 755 F.2d 1570, 225 U.S.P.Q.
    236 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*In re Dubois*, 262 F.2d 88, 120 U.S.P.Q. 198 (C.C.P.A.
    1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*In re Fenton*, 451 F.2d 640, 171 U.S.P.Q. 693 (C.C.P.A.
    1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*In re Fisher*, 427 F.2d 833, 166 U.S.P.Q. 18 (C.C.P.A.
    1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18, 20-22

*In re Freeman*, 166 F.2d 178, 76 U.S.P.Q. 585 (C.C.P.A.
    1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565,
    219 U.S.P.Q. 1137 (Fed. Cir. 1983) . . . . . . . . . . . . . . . .   40

PRODUCED AT THE NATIONAL ARCHIVES

xviii

PAGE

*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 85 U.S.P.Q. 328 (1950)..................25, 26

*In re Hargraves*, 53 F.2d 900, 11 U.S.P.Q. 240 (C.C.P.A. 1931)......................................  46

*Hartness International, Inc. v. Simplimatic Engineering Co.*, 819 F.2d 1100, 2 U.S.P.Q. 2d 1826 (Fed. Cir. 1987)..........................................48, 49

*Ex parte Hogan* (Bd. App. March 30, 1981) .........40, 47

*In re Horneman*, 194 F.2d 108, 92 U.S.P.Q. 316 (C.C.P.A. 1952)...................................  46

*Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 U.S.P.Q. 473 (Fed. Cir. 1983)....................  27

*J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 223 U.S.P.Q. 1089 (Fed. Cir. 1984)...............  35

*Johns-Manville Corp. v. Guardian Ind. Corp.*, 586 F. Supp. 1034, 221 U.S.P.Q. 319 (E.D.Mich. 1983), *aff'd* 770 F.2d 178 (Fed. Cir. 1985) ...............  34

*In re Kaplan*, 789 F.2d 1574, 229 U.S.P.Q. 678 (Fed. Cir. 1986).........................................41-42

*In re Kyrides*, 159 F.2d 1019, 73 U.S.P.Q. 61 (C.C.P.A. 1947).........................................17, 22

*In re Longi*, 759 F.2d 887, 225 U.S.P.Q. 645 (Fed. Cir. 1985).........................................  48

*In re Lukach*, 442 F.2d 967, 169 U.S.P.Q. 795 (C.C.P.A. 1971).........................................  20

*In re Moore*, 439 F.2d 1232, 169 U.S.P.Q. 236 (C.C.P.A. 1971).........................................  18

REPRODUCED AT THE NATIONAL ARCHIVES

xix

PAGE

*Mosler Safe Co. v. Mosler*, 127 U.S. 354 (1888) . . . . . . .     46

*Paperless Accounting, Inc. v. Bay Area Rapid Transit System*, 804 F.2d 659, 231 U.S.P.Q. 649 (Fed. Cir. 1986), *cert. denied*, 107 S. Ct. 1573 (1987) . . . . . . . . .     17

*Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 4 U.S.P.Q.2d 1737 (Fed. Cir. 1987), *cert. denied*, ____ U.S. ____ (March 21, 1988) . . . . . . . . . . . . . . . . . . . . . . 25-26

*In re Phelan*, 205 F.2d 183, 98 U.S.P.Q. 156 (C.C.P.A. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     46

*Phillips Petroleum Co. v. United States Steel Corp.*, 604 F. Supp. 555, 225 U.S.P.Q. 1149 (D. Del. 1985) . . . . .      2

*In re Rainer*, 390 F.2d 771, 156 U.S.P.Q. 334 (C.C.P.A. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

*Ralston Purina Co. v. Far-Mar-Co.*, 772 F.2d 1570, 227 U.S.P.Q. 177 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . 17-18

*SRI International v. Matushita Electric Corp.*, 775 F.2d 1107, 227 U.S.P.Q. 577 (Fed. Cir. 1985) . . . . . . . . . . .26, 28

*Saranac Automatic Machine Corp. v. Wirebounds Patents Co.*, 282 U.S. 704, 8 U.S.P.Q. 115 (1931) . . . . . .     46

*Standard Oil Co. v. Montedison, S.p.A.*, 494 F. Supp. 370, 206 U.S.P.Q. 676, 207 U.S.P.Q. 298 (D. Del. 1980), *aff'd*, 664 F.2d 356, 212 U.S.P.Q. 327 (3d Cir. 1981), *cert. denied*, 456 U.S. 915 (1982) . . .1, 11, 22, 23, 30

*Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*, 784 F.2d 351, 228 U.S.P.Q. 837 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     46

*Swain v. Crittendon*, 332 F.2d 820, 141 U.S.P.Q. 811 (C.C.P.A. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

REPRODUCED AT THE NATIONAL ARCHIVES

xx

PAGE

*In re Swett*, 451 F.2d 631, 172 U.S.P.Q. 72 (C.C.P.A. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

*Texas Instruments, Inc. v. U.S. International Trade Commission*, 805 F.2d 1558, 231 U.S.P.Q. 833 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

*In re Vogel*, 422 F.2d 438, 164 U.S.P.Q. 619 (C.C.P.A. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41-42, 46, 47

*In re Wertheim*, 541 F.2d 257, 191 U.S.P.Q. 90 (C.C.P.A. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

*Wirebounds Patents Co. v. Saranac Automatic Machine Corp.*, 65 F.2d 904, 18 U.S.P.Q. 171 (6th Cir. 1933) .    46

*Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 177 U.S.P.Q. 481 (5th Cir.), *cert. denied*, 414 U.S. 1079 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

**Statutes and Rules**

35 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

35 U.S.C. § 102(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

35 U.S.C. § 112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 16, 34

35 U.S.C. § 120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

35 U.S.C. § 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

35 U.S.C. § 146 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

37 C.F.R. § 1.56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

**Other Authorities**

M.P.E.P. 806.05(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

3 Chisum, Patents § 9.03[3] . . . . . . . . . . . . . . . . . . . . . . . . .    49

REPRODUCED AT THE NATIONAL ARCHIVES

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that the broad claim of the '851 patent, which covers all crystalline polypropylene compositions, is entitled to the effective date of an earlier parent application which disclosed only a narrow and essentially useless class of crystalline polypropylenes.

2. Whether the district court erred in deciding that the reverse doctrine of equivalents was inapplicable because the products of the appellants, though differing fundamentally from the the invention described in the patent specification, were literally embraced by the patent claim.

3. Whether the district court erred in failing to find inequitable conduct despite the fact that Phillips failed to inform the Patent Office that the disclosure used to support the claim of the '851 patent was derived in significant part from the work of others and was not attributable to the inventors.

4. Whether the district court erred in holding that the '851 patent was not invalid for double patenting.

## STATEMENT OF THE CASE

### I. INTRODUCTION

This litigation presents the question why a narrow invention, which was shelved by its inventors as having no future, should, thirty years later, be permitted to form the basis for a patent which dominates a major industry founded on entirely independent discoveries which earned their originators the Nobel prize.

### II. NATURE OF THE LITIGATION

Following a lengthy interference and section 146 proceeding,[1] U.S. Patent 4,376,851 ("the '851 patent") issued on March 15,

---

[1]    *See Standard Oil Co. (Indiana) v. Montedison, S.p.A.*, 494 F. Supp. 370, 206 U.S.P.Q. 676, 207 U.S.P.Q. 298 (D.Del. 1980), *aff'd*, 664 F.2d 356, 212 U.S.P.Q. 327 (3d Cir. 1981), *cert. denied*, 456 U.S. 915 (1982).

PRODUCED AT THE NATIONAL ARCHIVES

2

1983 to Phillips Petroleum Company ("Phillips") as assignee of John P. Hogan and Robert L. Banks ("Hogan and Banks"). (A8000-10). On that same day, Phillips sued each of the appellants,[2] all of which were established manufacturers of polypropylene, for infringement of the '851 patent. Shortly thereafter all the original defendants entered into license agreements with Phillips. They are currently paying royalties to Phillips.[3] Three of the original suits were dismissed (Shell, Northern Petrochemical, El Paso), but each of those parties later brought declaratory judgment actions against Phillips claiming that the '851 patent was invalid, not infringed and unenforceable. The original suits not dismissed (Hercules, U.S. Steel) were consolidated with the declaratory judgment actions, and the consolidated actions were pre-tried and tried together.

On December 12, 1985, the appellants (except El Paso), brought a motion for summary judgment to declare the '851 patent invalid on the grounds of double patenting. That motion was denied on the merits by Judge Murray M. Schwartz. *Phillips Petroleum Co. v. United States Steel Corp.*, 604 F. Supp. 555, 225 U.S.P.Q. 1149 (D. Del. 1985). (A200-32). The other issues were tried before Judge Joseph J. Longobardi without a jury. On October 28, 1987 Judge Longobardi filed an opinion comprising findings of fact and conclusions of law. (A4-199).[4] On November 30, 1987, a final judgment was entered in which the '851 patent was found not invalid, enforceable and infringed by each of the appellants.[5] (A1-3).

---

2    Except Himont, U.S.A., Inc. ("Himont"), which did not exist until November 1, 1983, when it took over the Hercules polypropylene operations in the United States. Himont initiated a declaratory judgment action against Phillips in April 1985.

3    Except Hercules, which conveyed its license to Himont.

4    Judge Longobardi's opinion is reported at 673 F. Supp. 1278.

5    This brief is being filed on behalf of appellants Hercules, Himont, Shell, Northern and U.S. Steel. El Paso, represented by separate counsel, has filed its own brief concurrently herewith which the present appellants adopt by reference under Rule 28(i), F.R.A.P.

REPRODUCED AT THE NATIONAL ARCHIVES

3

## III. STATEMENT OF THE FACTS

### A. The '851 Patent and Polypropylene

The '851 patent is directed to compositions of polypropylene. The '851 patent issued on an application filed on January 11, 1956, which was a continuation-in-part of application Ser. No. 333,576 (A4721-63) filed by Hogan and Banks on January 27, 1953 (the "1953 application") and application Ser. No. 476,306 (A4520-89) filed by them on December 20, 1954 (the "1954 application"), both now abandoned. The sole claim of the '851 patent is:

> Normally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content.

When many *mono*mer molecules are linked together (polymerized) to form a long chain, the resulting molecule is a *poly*mer. Polypropylene is the polymer formed by polymerizing the monomer propylene:

$$CH_3-CH = CH_2$$

Polymerization is conducted in the presence of a catalyst, which dictates what polymer structure is obtained. (A11). The "crystalline" content of the polypropylene referred to in the '851 patent is due to the fact that the catalyst directs the propylene monomer to enter the polymer chain in a head-to-tail fashion ("recurring") and in such a way that the pendent methyl groups ($-CH_3$) are oriented in a regular pattern, *i.e.*, all are on the "same side" of the polymer backbone:

$$\ldots \; CH_2-CH-CH_2-CH-CH_2-CH. \ldots$$
$$\qquad\quad |\qquad\quad\; |\qquad\quad\; |$$
$$\qquad\; CH_3\qquad CH_3\qquad CH_3$$

(A11-13). Crystallinity influences polymer behavior and is a valuable property in polypropylene. (A12-15).

### B. The Importance of Molecular Weight

A polymer composition is normally composed of a large number of individual polymer chains or molecules. These mole-

REPRODUCED AT THE NATIONAL ARCHIVES

4

cules or chains are not all the same size, *i.e.*, their individual molecular weights vary. Consequently, a particular polymer composition is characterized by an *average* molecular weight. Polymer scientists use average molecular weight to distinguish among polymer compositions made from the same monomer. (A896-97). One particular average, the so-called "weight average" molecular weight, correlates with many important physical properties. (A1350-51). The weight average molecular weight is difficult to measure in an absolute sense, but it can be calculated from the "intrinsic viscosity" ("I.V.") of the polymer, which is a property that can be determined in the laboratory. Thus, polymers are often characterized by their I.V., which increases with increasing weight average molecular weight. (A178-79, 1013, 1352). Molecular weight is a critical characteristic of a polymer because only polymers having high molecular weight have the toughness and strength needed for plastics applications, *e.g.*, molded articles, film or fibers. (A180-86, 1803-06).

The importance of molecular weight in polymers was well recognized long before synthetic polymers even existed. High molecular weight is the reason natural polymers like silk, cotton and leather are so strong and tough. (A1235-45). Prof. Roger Porter, a recognized expert in the field of polymer behavior, considered high molecular weight to be the single most important property of a polymer. (A1749). Phillips' polymer scientist, Dr. Stahl, agreed. (A6994).

The district court likewise recognized that high molecular weight is "extremely important" (A29), and is directly related to the toughness of a polymer. This toughness is crucial to the success of a polymer as a plastic. As the district court stated (A180):

> The molecular weight of a polymer is directly related to its toughness. The toughness of a polymer is a very important property. It is the property which provides the durability and resistance to stress which enables the polymer to be processed into useful articles. Moreover, toughness is the property which enables the plastic to survive the rigors of its intended use.

REPRODUCED AT THE NATIONAL ARCHIVES

5

The toughness of polypropylene varies dramatically depending on the molecular weight. Appellants proved at trial that for polypropylene to have the toughness needed for any plastics application, it must have a *minimum* I.V. of about 1.7 to 2. (A179-85, 1836-37, 6881). Below these values the polymer weakens very rapidly. (A1837, 6895). When the value for I.V. falls as low as about 1.0, toughness is gone; the polymer is weak and brittle.[6] (A184-85, 1785-94, 6883, 6885, 6894, 6895).

### C. The Broad Invention Described and Claimed in the '851 Patent Differs Significantly from the Narrow Invention that the Patentees Hogan and Banks Actually Discovered

#### 1. Hogan and Banks Actually Made Only a Weak, Brittle Low Molecular Weight Polypropylene Having No Utility as a Plastic

The evidence shows, and the district court found, that the experimental work of Hogan and Banks in 1951-52 yielded a solid polymer which, because of its low molecular weight, was brittle and essentially useless as a plastic. (A185). In June 1951, Hogan and Banks, who worked in the Hydrocarbon Conversion Branch of Phillips Research Department, first used a catalyst comprising nickel oxide and chromium oxide (chromia) on a silica-alumina support to polymerize propylene, and obtained a "heavy waxy polymer." (A144-55). Subsequently, Hogan and Banks used a catalyst composed only of chromia on a silica-alumina support to polymerize propylene to a "tacky" polymer.[7] On occasion Hogan and Banks extracted the tacky polymer with selected solvents under certain conditions to separate an insoluble "solid" polymer component, which typically

---

6    As Prof. Porter explained and demonstrated with actual data and as the district court found, toughness is measured by the area under a tensile test curve. (A180-81). To have significant toughness, a polymer in a tensile test must be capable of showing a tensile yield, a "necking," and an elongation. (A182).

7    This catalyst ultimately became known as the MARLEX catalyst which was used commercially to make polyethylene. (A146). It has never been used commercially to make polypropylene. (A186).

REPRODUCED AT THE NATIONAL ARCHIVES

6

represented less than 10 percent of the total polymer mass. (A6887).

On only two occasions did Hogan and Banks characterize the solid polymer by specific physical properties. One, a sample designated PO-133, was characterized by melting point (236°F), density (0.914) and I.V. (0.508). The other sample, designated PO-116, was characterized by melting point (267°F), density (0.906-0.907) and I.V. (0.417-0.422). Both samples were reported to be "very brittle." (A145). There is no evidence that either polymer was used for plastics applications such as molded articles, fiber or film.

Late in 1952, Hogan, in response to a request for information to be included in a proposed patent application on the results of the 1951-52 work, specified the following ranges of properties for the solid polypropylene made with the chromia catalyst:

| | |
|---|---|
| melting point, F° | 240-280 |
| density | 0.90-0.95 |
| intrinsic viscosity | 0.2-1.0 |
| weight average molecular weight[8] | 5,000-20,000 |

(A146). These ranges were broader than those obtained experimentally, but they represented Hogan's judgment of the *maximum* realistic values for the polymer. (A4961, 7265-66).

Hogan and Banks at that time ceased their work with polypropylene. The few samples they had made were stored in a boxcar. (A5126-27).

### 2. The 1953 and 1954 Applications of Hogan and Banks Described and Claimed as an Invention Only a Weak, Brittle Low Molecular Weight Polypropylene

The properties of the solid polypropylene of the invention as described and claimed in the 1953 application of Hogan and Banks were essentially those proposed by Hogan in 1952:

---

8    The molecular weight values were calculated from the intrinsic viscosity values.

REPRODUCED AT THE NATIONAL ARCHIVES

7

> The solid polymer fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240 to 300°F, a density in the range 0.90 to 0.95, *an intrinsic viscosity of 0.2 to 1.0*, and a weight average molecular weight in the range of approximately 5,000 to 20,000.

(A4750-51; emphasis added). This description of the Hogan and Banks invention was the "written description" on which Phillips relied as support for its priority claim in the section 146 action. (A7817-18). The district court found that the polymer described was a weak, brittle, low molecular weight polymer. (A186).

The 1953 application taught that the "chromium oxide" catalyst was "absolutely essential" to the preparation of the solid polymer. (A4722). It described no other process. The application also contained no reference to or specific recognition of crystallinity. Hogan and Banks filed another co-pending application in December 1954, but its description of solid polypropylene was virtually identical to that of the 1953 application. (A146).

### 3. Phillips Changed its Perception of the Hogan and Banks Invention as the Result of the Revelations of Ziegler and Natta

A profound event in polymer chemistry occurred in Europe in 1953: Prof. Karl Ziegler in Germany discovered a broad spectrum of organometallic catalysts which would readily polymerize ethylene to a very high molecular weight polymer. (A146). One of the most promising catalysts in this new class was made from an aluminum alkyl, such as aluminum triethyl (AlEt$_3$ or TEA), mixed with titanium tetrachloride (TiCl$_4$). (*Id.*). Close on the heels of Ziegler's discovery came the discovery in mid-1954 by Prof. Giulio Natta in Italy that the Ziegler catalyst would polymerize propylene to a very high molecular weight crystalline polymer having plastic properties. (A147). Natta called the crystalline structure "isotactic." (A5050, 6-7).

REPRODUCED AT THE NATIONAL ARCHIVES

8

By early 1955 Phillips scientists learned of Natta's work on polypropylene. In late March 1955, immediately following Natta's publication of the properties of his polypropylene, Dr. Reynolds, an assistant director of research in the Phillips Chemical and Plastics Branch, met with Professor Herman Mark, who had visited Natta. Mark told Reynolds that Natta used Ziegler's catalyst. Reynolds correctly deduced that Natta had used aluminum alkyl and titanium tetrachloride. He considered Natta's development to be "very basic and important" and promptly recommended that Phillips study propylene polymerization using Ziegler chemistry. (A148).

Phillips researchers proceeded to do so. This work was not done by Hogan and Banks or anyone else in the Hydrocarbon Conversion Branch, but by other researchers in the separate Chemicals and Plastics Branch. In May 1955, Mr. Nowlin, who worked under Dr. Reynolds, twice polymerized propylene using Ziegler's triethyl aluminum and titanium tetrachloride catalyst, obtaining a solid polymer (unfractionated) which was a "tough" elastomer. (A7531-32, 4880-89). Reynolds reported in late June 1955 that

> The more I see of the so-called Ziegler polymerization, the more I am of the opinion that this process represents one of the most basic catalytic process discoveries in many years.

(A4877-79). He reported that its advantages over the Phillips Marlex (chromia) process included its ability to prepare the

> so-called "isotactical" polymers of Natta, i.e., an extremely tough polypropylene having an M.P. of 150C.

(*Id.*). Reynolds, encouraged by what he saw, recommended that the manpower devoted to the Ziegler studies be expanded. (A7564-65).

While Phillips' experimental program in Ziegler chemistry continued, Phillips also revived its interest in the solid polymers of Hogan and Banks made with the chromia catalyst. In August 1955, Phillips' Mr. Leatherman, who worked with Hogan and Banks, began a new study of their chromia catalyst in an at-

REPRODUCED AT THE NATIONAL ARCHIVES

9

tempt to make "solid polypropylene of high molecular weights similar to the Natta isotactical polypropylene polymers." (A149).[9] Leatherman was unable to do so. His best effort was still brittle. (A1459-64, 3767). He observed that the polymer made with the Hogan and Banks process would need an I.V. "greater than [2.0] for it to have much flexibility." (A3768, 1460-64). He ultimately concluded that the Hogan and Banks process "was not readily adaptable to making high molecular weight polypropylene, even in low yields." (A149-50, 3764).

However, an infrared analysis of polymer made by Leatherman showed it contained the same crystalline isotactic structure exhibited by the Natta polypropylene made with a Ziegler catalyst. (A5079). Further examination of old infra-red studies on previously prepared Hogan and Banks polypropylene, as well as additional infra-red and X-ray analyses of the samples exhumed from the boxcar, also showed that the polymer exhibited the isotactic structure (A5126-27, *see also* A4897-900). (A149-150).

After the Phillips Patent Department was informed in December 1955 of the presence of the crystalline isotactic structure in the Hogan and Banks polypropylene, Phillips' lawyers prepared a new patent application in which they sought to have the disclosure sufficiently specific in its reference to "crystallinity" to provoke an interference with Natta. (A151). That new application was filed on January 23, 1956 as a continuation-in-part of the 1953 and 1954 applications. (A8000).

#### 4. Phillips' 1956 Application Broadened Hogan and Banks' Invention to Cover Tough High Molecular Weight Polypropylene Not Described in the 1953 Application and Unlike Anything Invented by Hogan and Banks

The district court found the 1956 application "differed significantly" from that of the 1953 application. (A151-52). It did

---

9    The isotactic structure and the high molecular weight of Natta's polypropylene were publicly known by July 1955 (*See* A5129-37, 5158-73, 5207-12).

REPRODUCED AT THE NATIONAL ARCHIVES

10

not simply add a reference to "crystallinity." Rather, it broadened the range of intrinsic viscosities five-fold from "0.2 to 1.0" to "0.2 to 5.0" (A152-53):

> The solid crystalline polypropylenes produced according to this invention have . . . intrinsic viscosities in the range of 0.2 to 5.0 . . .

(A4126, lines 20-22). The 1956 application contained none of the examples of the prior applications, but included four new ones. One, Example IV, disclosed making flexible, high molecular weight polypropylene with the Ziegler/Natta TEA/TiCl$_4$ catalyst (though not identified as such). (A152-53). The court found that the increased I.V. range disclosed in the 1956 application was based on polypropylene made with the Ziegler/Natta catalyst. (A161). The 1956 application also deleted the 1953 teaching that chromium oxide is "absolutely essential" to the preparation of the solid polymer of the invention.

Also in furtherance of Phillips' purpose, the 1956 application asserted that the solid polypropylenes of the Hogan and Banks invention could be used in plastics applications to make molded articles such as containers or bottles capable of being sterilized, or could be extruded to form pipe or tubing, or to form filaments capable of being woven into textiles or films capable of making food packaging. (A4119).[10]

Thus, Phillips in 1956 expanded Hogan and Banks' invention from the brittle wax-like solid of 1953-54 to embrace a class of high molecular weight tough plastics which no Phillips re-

---

10    Phillips had no basis for making such a statement. No experiment it ever conducted remotely suggested that the weak, brittle polymer of Hogan and Banks would be suited to such demanding plastics applications. Indeed in 1959, inventor Hogan and colleague Kitchen once again attempted to see if the chromia catalyst could be used to make useful high molecular weight polymer. They failed. Given their expertise and years of experience, their candid conclusion is particularly revealing:

> These studies have failed to reveal any good lead in the search for a solid catalyst not related to the Natta system which will polymerize propylene to a useful, solid resin.

(A3781). Hogan and Banks' polypropylene was laid to rest.

Case 1:06-cv-01640-TFH    Document 29-2    Filed 08/21/2007    Page 33 of 71

REPRODUCED AT THE NATIONAL ARCHIVES

11

searcher ever obtained using the ''essential'' chromia catalyst of the 1953 application.

### 5. The '851 Patent as Issued Continued to Reflect the Misrepresentations Incorporated in the January 1956 Application

Phillips' strategem of filing the January 1956 application with its broadened disclosure worked. It was admitted to an interference involving Natta and others on a broad count: ''Normally solid polypropylene, consisting essentially of recurring propylene units, and having a substantial crystalline polypropylene content.'' *Standard*, 494 F. Supp. at 374, 206 U.S.P.Q. at 686.

Although the broadened January 1956 application gained Phillips admission to the interference, Phillips realized that in order to establish invention prior to Natta, it would need to rely on the 1953 application or underlying experiments. Phillips failed to convince the Patent Office.[11] However, Phillips filed an action under 35 U.S.C. § 146 to review the decision of the Patent Office. In the ensuing action before Judge Wright in the District of Delaware, Phillips persuaded the court that by January 1953, Hogan and Banks had reduced to practice a polypropylene within the count and hence were entitled to priority, and that the Patent Office had been wrong in awarding priority to Natta. *Standard*, 494 F. Supp. at 420-35, 206 U.S.P.Q. at 722-735. Judge Wright, citing Supreme Court precedent, also decided that he was required to determine whether the invention of the count was ''patentable'' to Phillips, even though priority, not patentability, was the sole issue actually tried in the interference. 494 F. Supp. at 456-61, 207 U.S.P.Q. at 299-303. He concluded that Phillips was entitled to a claim for the count and ordered the PTO to issue such a patent to Phillips. *Ibid.* The

---

11    Priority was awarded to Natta, who was ultimately granted U.S. Patent 3,715,344. (A4099-109).

REPRODUCED AT THE NATIONAL ARCHIVES

12

'851 patent ultimately issued to Phillips on March 15, 1983 containing a single claim identical to the interference count.

The whole proceeding took an incredible 27 years to complete. At no time in this period did Phillips take any steps to inform the Patent Office (before or after the interference), or the court, that significant portions of the teachings of the invention described in the 1956 application did not represent any discovery of Hogan and Banks (or anyone else at Phillips), or that the examples of the polymer made by the chromia catalyst did not fairly describe the weaknesses which Phillips knew were inherent in the nature of the Hogan and Banks polymer, *i.e.*, its low molecular weight and consequent brittle character.

### D. The Prior Art Natta '300 Patent Completely Discloses the Invention Described and Claimed in the '851 Patent

U.S. Patent 3,112,300 (the " '300 patent") (A5048-56), entitled "Isotactic Polypropylene," issued November 26, 1963 to Montecatini as the assignee of Giulio Natta *et al.* It has an effective filing date of June 8, 1955 (A1420), which is prior to the filing date of the January 1956 application resulting in the '851 patent.

The '300 patent describes the preparation of a wide variety of crystalline polypropylenes using Ziegler catalysts, in particular a catalyst formed from titanium tetrachloride and triethyl aluminum. (A1421). It is undisputed that the '300 patent fully discloses the invention claimed in the '851 patent. (A18). It teaches the preparation of polypropylene having a wide range of molecular weight (I.V. of 0.4 (Example XI, fraction C) to 5.1 (Example II, fraction D)), including tough polymers suited to plastics applications. (A5049, col. 2, lines 2-11; A5051, col. 5, lines 30-46; A1434).

REPRODUCED AT THE NATIONAL ARCHIVES

13

### E. The Tough Polypropylene Products of the Appellants Differ Fundamentally from the Brittle Polypropylene of Hogan and Banks

Each appellant makes a variety of polypropylene products of enormous versatility. Each such product is literally embraced by the claim of the '851 patent, yet none is remotely similar in properties or applications to what Hogan and Banks invented. Virtually all of the appellants' products are sold for plastics applications, *i.e.*, injection molded articles, extruded fibers and extruded film. These applications include a wide spectrum of specific products, including tough, heat resistant articles designed for high-stress uses. (A185-6)

Two common threads run through the vast variety of polypropylene products available from the appellants: (1) they are tough materials, resistant to stress; and (2) they are all made by processes originating with the discoveries of Ziegler and Natta. (A1023, 1049, 1258-60, 1283-84). These threads are related. The polymers are tough because the Ziegler/Natta systems and their progeny are capable of making tough polymers. The toughness of Ziegler/Natta polypropylenes comes from their high average molecular weight. (A1752, 1834-37, 3322, 6880, 6895).

In contrast the polypropylene of the 1953 application is weak and brittle. The only samples made by Hogan and Banks that were ever characterized before the filing of the 1953 application (*i.e.*, PO-116 and PO-133), were reported to be "brittle," "too brittle to mold," "broke with quite a snap when bent," or "very brittle." (A4893-96, 6807-08, 7630). At trial, Dr. Wendell Long, a polypropylene chemist with thirty years' experience, demonstrated samples of solid polypropylene he had made following the teachings of the 1953 application. These samples, consistent with the disclosure of the 1953 application, had I.V.'s less than or about 1.0. (A6795). They easily snapped when bent slightly. Corresponding samples of the much higher molecular weight commercial products were essentially un-

PRODUCED AT THE NATIONAL ARCHIVES

14

breakable. (A1380-87, 6796).[12] The district court found a "dramatic difference" between the exemplars of the polypropylene of the 1953 application and the commercial products used as plastics (A179), both of which are literally embraced by the '851 claim. Specifically, the court found substantial differences in molecular weight:

> [I]t is clear that the molecular weight of Defendant's commercial polypropylenes is substantially higher than the molecular weight of the polypropylene specified in Phillips' 1953 application

(A180); and in the related property of toughness:

> [T]he Court finds that a polymer having an intrinsic viscosity of 0.2 to 1.0 (*i.e.*, a polymer having the range of properties specified in the 1953 application) would not be considered "tough." Materials such as Defendants' commercial polypropylenes, however, having intrinsic viscosities of 1.7 or higher, are generally tough, flexible materials

(A185), and thus concluded:

> Defendants have thus established that polypropylene having the properties set forth in Phillips' 1953 application is a low molecular weight, brittle polymer from which no commercial product has ever been manufactured. In contrast, the polypropylene produced by Defendants is a high molecular weight polymer which is used in a wide array of commercial plastics applications.

(A186).

These dramatic differences separate crystalline polypropylenes into two different classes: one which has outstanding utility as plastics and the other which has none. Although both classes are composed of propylene and are crystalline, they are nonetheless totally different compositions of matter.

---

12    The polypropylenes of commerce were between seven and 500 times tougher than the Hogan and Banks material. (A183-4).

REPRODUCED AT THE NATIONAL ARCHIVES

15

## SUMMARY OF ARGUMENT

A.  The broad generic claim in the '851 patent is invalid because it is anticipated by the prior art '300 patent of Natta *et al.* Phillips is not entitled to rely on the parent 1953 application to overcome the Natta patent because neither the 1953 application nor the underlying work leading to it describe the broad invention of the '851 claim, or show how it can be made, in the manner required by 35 U.S.C. § 112.

B.  Under the reverse doctrine of equivalents, the appellants have not infringed the '851 patent because, although their products are literally within the scope of the claim, the tough, useful polypropylenes they make based on independent inventions are so vastly different from the weak, brittle and useless polypropylene which Hogan and Banks invented that it would be grossly unjust to require appellants to pay tribute to the '851 patent.

C.  The '851 patent is unenforceable because in seeking the patent, Phillips did not advise the Patent Office or the district court that the solid polypropylene invented by Hogan and Banks did not have the superior properties asserted for it in the '851 patent or that the superior properties disclosed were derived from the contributions and discoveries of third parties. The misrepresentation was knowingly made to induce the Examiner to allow a broad claim. Had the Examiner or the district court known the whole truth, they would have considered it important in determining whether to grant Phillips a patent having a broad generic claim.

D.  The '851 patent is invalid for double patenting because of the prior issuance to Phillips of the '721 patent, now expired, which claimed the preparation of a solid polypropylene covered by the '851 claim.

REPRODUCED AT THE NATIONAL ARCHIVES

16

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN CONCLUDING THAT PHILLIPS COULD OVERCOME THE ANTICIPATORY PRIOR ART BY RELIANCE ON THE EARLIER LIMITED DISCLOSURE OF THE 1953 PARENT APPLICATION

The district court found that the claim of the '851 patent covers all solid crystalline polypropylene. (A13). The full range of solid crystalline polypropylenes claimed by the '851 patent is disclosed in U.S. Patent No. 3,112,300 to Natta, which has an effective filing date of June 8, 1955. (A18). Hence, the Natta '300 patent is prior art to and anticipates the subject matter of the '851 claim unless the '851 claim is entitled to an earlier invention date. 35 U.S.C. § 102(e).[13]

Citing 35 U.S.C. § 120,[14] Phillips relied on the filing date of the 1953 application, of which the 1956 application for the '851 patent is a CIP, as the effective filing date for the '851 claim. The district court found that the claim was indeed supported by the 1953 application under 35 U.S.C. § 112, and that Phillips was therefore was entitled to rely on section 120. Specifically, the district court found that the 1953 application contained a written description of the claimed invention and disclosure of how to make it.

---

13    35 U.S.C. § 102(e) states:

A person shall be entitled to a patent unless—

*  *  *

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent . . .

14    35 U.S.C. § 120 states, in pertinent part:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States . . . shall have the same effect, as to such invention, as though filed on the date of the prior application . . .

17

The issue of support for claims in a specification is a question of law. *Paperless Accounting, Inc. v. Bay Area Rapid Transit System*, 804 F.2d 659, 664, 231 U.S.P.Q. 649, 652 (Fed. Cir. 1986), *cert. denied*, 107 S. Ct. 1573 (1987). In addressing that issue, the district court concluded that the narrow scope of the description of the invention in the 1953 application was immaterial to the analysis because that description did include all the limitations affirmatively recited in the broad '851 claim. (A25). In thus limiting the inquiry under section 112 to exclude a comparison of the scope of the claimed invention and the scope of the invention as the inventors described and understood it in 1953, the district court erred.

**A. The District Court Erred in Concluding That, as a Matter of Law, the Vast Differences in Disclosure and Scope between the 1956 and 1953 Applications Were Immaterial**

In addressing both the "written description" and "how to make" issues, the district court understood that the mere award of priority of a generic count in an interference does not necessarily entitle the winning party to a patent claim of the same scope, and that the written description and how to make issues were separate from the priority issue. (A21-22). *See Swain v. Crittendon*, 332 F.2d 820, 141 U.S.P.Q. 811 (C.C.P.A. 1964), and *In re Kyrides*, 159 F.2d 1019, 73 U.S.P.Q. 61 (C.C.P.A. 1947).

The court, however, lost sight of the purpose of the written description and how to make requirements, and adopted a mechanical analysis which ignored that purpose. With regard to the "written description" requirement, this Court has repeatedly held that the application must contain a written description sufficient to demonstrate that the applicant actually possessed the invention he is claiming. *See Ralston Purina Co. v. Far-Mar-Co.*, 772 F.2d 1570, 1575, 227 U.S.P.Q. 177, 179 (Fed. Cir. 1985). Thus, if the claimed invention is broad, the description must demonstrate possession of a broad invention. Similarly, the application must contain a teaching of how to make

REPRODUCED AT THE NATIONAL ARCHIVES

18

the invention that is "commensurate with the scope of protection sought by the claims." *In re Moore*, 439 F.2d 1232, 1236, 169 U.S.P.Q. 236, 239 (C.C.P.A. 1971). However, the court concluded that *only* limitations explicitly set forth in the issued claim could be considered in determining the scope of support necessary in the parent application:

> Defendants have misconstrued the inquiry under section 112. The focus of that inquiry is whether the *claimed* subject matter is adequately described. *See, e.g., Ralston Purina*, 772 F.2d at 1575; *In re Wilder*, 736 F.2d at 1520. If the '851 claim contained a limitation regarding intrinsic viscosity or molecular weight, Defendants' arguments would have merit. Yet, the '851 claim contains no such limitation. The fact that the 1953 application specified a range of intrinsic viscosities of only 0.2 to 1.0 is, therefore, immaterial to the present inquiry.

(A25; emphasis in original). The court reached the same conclusion on the issue of whether the 1953 application taught "how to make" any high molecular weight polypropylene within the scope of the '851 claim. (A28-29).

The district court's analysis is illogical. It implies that the broader the claim, *i.e.*, the fewer the limitations it contains, the less support is required to justify the breadth. The overriding questions are not whether the *words* of the claim can be supported by reference to words in the specification, but rather whether the written description in the prior application reasonably conveyed to the artisan that the inventor had *possession at that time of all the later-claimed subject matter*, and whether the scope of enablement provided to that artisan by the prior application was reasonably commensurate with the full scope of protection sought by the *later claim*. *Ralston*, 772 F.2d at 1575, 227 U.S.P.Q. at 179; *In re Fisher*, 427 F.2d 833, 839, 166 U.S.P.Q. 18, 24 (C.C.P.A. 1970). In addressing such issues no limiting characteristic of the invention actually described by the earlier application should or can be ignored.

REPRODUCED AT THE NATIONAL ARCHIVES

19

The district court lost sight of the fact that, by not reciting molecular weight, the '851 claim became open-ended as to that essential polymer characteristic. That claim was granted on the 1956 application in which the disclosed molecular weights covered the entire range from the very weak to the extremely tough. This very broad disclosure was used to support a broad generic claim to crystalline polypropylene that was not limited to any specific molecular weight range.

The written description of the invention in the parent 1953 application is entirely different. That application disclosed only weak, brittle polymers corresponding to I.V.'s in the range of 0.2 to 1.0.[15] In 1953 Hogan and Banks were never in possession of the broad invention described and claimed in 1956. Moreover, that application disclosed no process by which higher molecular weight solid polymers could be made. It is undisputed that neither the inventors nor anyone else at Phillips has ever used the teachings of the 1953 application to make solid polypropylene with I.V.'s significantly greater than those set forth in the 1953 application.

The district court's conclusion regarding the immateriality of subject matter not explicitly recited in the claim cannot be squared with the established precedent. In *In re Rainer*, 390 F.2d 771, 156 U.S.P.Q. 334 (C.C.P.A. 1968), one claim (claim 20) was directed to a genus of certain irradiated, foamed polyethylenes. The prior art disclosed making foamed polyethylene using four different catalysts. Rainer tried to antedate the reference by proof of reduction to practice with only two of the four catalysts of the reference. There was no showing, however, that the generic invention he was claiming could be reasonably inferred from his earlier experiments. The Court affirmed the rejection of the broad claim (claim 20) despite the fact that it did not specify *any* catalysts, or any particular properties. The Court recognized that because Rainer's open-ended claim cov-

---

15    When the inventors claimed solid polypropylene in their 1953 application, they limited the claim to polymers with I.V.'s of 0.2 to 1.0. *See* claim 31. (A4759).

REPRODUCED AT THE NATIONAL ARCHIVES

20

ered much more than he had invented, he could not antedate the reference. The same is true here.

In reaching its erroneous conclusion, the district court also improperly distinguished two of appellants' authorities, *In re Wertheim*, 541 F.2d 257, 191 U.S.P.Q. 90 (C.C.P.A. 1976), and *In re Lukach*, 442 F.2d 967, 169 U.S.P.Q. 795 (C.C.P.A. 1971), and failed to consider a third, *In re Fisher*, 427 F.2d 833, 166 U.S.P.Q. 18. The court distinguished *Wertheim* and *Lukach* on the ground that the prior applications in those cases provided inadequate support for "express limitations" appearing in the claims. (A26). The district court's sole reliance on express limitations places an undue restriction on the essential factual inquiry: whether the earlier application demonstrates that the inventors were then in possession of the broad invention they later claimed. *See Wertheim*, 541 F.2d at 262-63, 191 U.S.P.Q. at 96-97.

In *Wertheim*, the Court concluded that a claim calling for a solids content of "at least 35%" was not disclosed by a prior application disclosing a range of 25 to 60%. The Court expressly found no support for those embodiments having solids contents *greater than* 60%. 541 F.2d at 263-65, 191 U.S.P.Q. at 98-99. A comparable issue is presented here. The 1953 application disclosed intrinsic viscosities in a range of 0.2 to 1.0. The 1956 application claims *all* solid crystalline polypropylenes, *i.e.*, all having an I.V. at least high enough to be "solid." It thus reads on embodiments having I.V.'s greater than 1.0 *not* disclosed in the prior application. More importantly, it reads on undisclosed embodiments having I.V.'s of greater than about 1.7, which the district court found are dramatically different from those having I.V.'s of 1.0 or less. (A183, 185).

In *Lukach*, the issue was whether a single example of a polymer having a molecular weight distribution ratio (Mw/Mn) of 2.6 provided support for a polymer having a ratio (Mw/Mn) in the range 2.0 to 3.0. The Court, after noting that to justify a claim to a class the specification must disclose the class, held that the single example did not support the generic range. The basic issue here is similar, *i.e.*, whether the limited description

REPRODUCED AT THE NATIONAL ARCHIVES

21

of a species of solid, but weak and brittle crystalline polypropylene is a description of the entire genus, including the tough high I.V. crystalline polypropylene plastics. The district court erroneously avoided that issue.

Finally, the district court overlooked *Fisher*. In *Fisher*, the appellant was claiming an adrenocorticotrophic hormone (ACTH) preparation containing ''at least'' 24 amino acids. The claim had been rejected as anticipated by certain prior art which Fisher sought to overcome by reliance on a parent application disclosing only ACTH's having precisely 39 amino acids. The court held the prior specification did not support the broad claim in issue, because there was no showing that one of ordinary skill in the art would have been able to make ACTH's with other than those 39 amino acids. 427 F.2d at 836, 166 U.S.P.Q. at 21. Similarly, here, since Phillips' 1953 application did not disclose solid polypropylene having an I.V. substantially greater than 1.0, or how to make it, it cannot support the much broader '851 claim in which the I.V. is essentially unlimited.

*Fisher* also addressed the issue whether the application in issue supported the ''open ended'' requirement that the ACTH contain ''at least 1 International Unit'' of ACTH per milligram, in light of Fisher's disclosure of ACTH's having potencies of only 1.1 to 2.3. The court posed the issue as ''whether an inventor who is the first to achieve a potency of greater than 1.0 . . ., which potency was long desired . . ., should be allowed to dominate all such compositions having potencies . . . far in excess of those obtainable from his teachings plus ordinary skill.'' 427 F.2d at 839, 166 U.S.P.Q. at 23-24. While concluding that such dominance may be appropriate where future inventions ''were made possible by his work,'' the court also concluded that such dominance was not appropriate there:

> In cases involving unpredictable factors, such as most chemical reactions and physiological activity, the scope of enablement obviously varies inversely with the degree of unpredictability of the factors involved. In the present case we must conclude, on the record before us, that appellant has not enabled the preparation of ACTHs having poten-

REPRODUCED AT THE NATIONAL ARCHIVES

22

cies much greater than 2.3, and the claim recitations of potency of "at least 1" render the claims insufficiently supported under the first paragraph of 35 U.S.C. § 112.

427 F.2d at 839, 166 U.S.P.Q. at 24.

Just as Fisher was not allowed to use an open-ended claim to dominate future compositions having potencies far in excess of his teachings, so Phillips here should likewise not be allowed to use an open-ended claim to dominate future polypropylenes having vastly different properties from those taught in the 1953 application.[16]

While an applicant may not be required to predict every possible variation of his invention (A29), he also may not properly expand his invention in the face of anticipating art by filing a broader continuation-in-part application to cover the independent advances of others outside the scope of his original invention. That is exactly what happened here. Had the district court treated the absence of reference to molecular weight (or I.V.) in the '851 claim as an effective coverage of polymers of *all* molecular weights, the court would have recognized that the much narrower teachings of the 1953 application were clearly material. No reasonable construction of the description and enablement requirements of section 112 would permit a claim of the breadth of the '851 claim to issue on the disclosure of the 1953 application, taken as a whole. Consequently the '851 patent is invalid because it is anticipated by the intervening Natta '300 patent. *In re Kyrides, supra.*

### B. Appellants Supplied the Evidence Which Judge Wright Lacked in the Interference Action

Judge Wright, in the section 146 proceeding, felt compelled by precedent to decide the issue of patentability to Phillips even though that issue was not actually tried. 494 F. Supp. at 457, 207 U.S.P.Q. at 299. In deciding that issue, Judge Wright cor-

---

16   Given the inability of the art to improve the Hogan and Banks polymer to achieve a useful plastic and given the fact that the "future inventions" reflected in appellants' products were entirely independent of Hogan and Banks, the wisdom of *Fisher* is particularly appropriate in this case.

REPRODUCED AT THE NATIONAL ARCHIVES

23

rectly recognized that "Phillips may not be entitled to patent the full range of crystalline polypropylene unless its 1953 application specified all of them." 494 F. Supp at 430 n. 637, 206 U.S.P.Q. at 731 n.637. Montedison there argued that the 1953 application was deficient because its disclosure of molecular weights of 5,000 to 20,000 was insufficient to support a count reading on molecular weights as high as 50,000. 494 F. Supp. at 430-31, 206 U.S.P.Q. at 730-731. Judge Wright rejected Montedison's argument—not because it was immaterial—but because molecular weight calculations were so "notoriously unreliable," that the reported molecular weight values would have been disregarded "in favor of the viscosity measurements made in the laboratory." 494 F. Supp. at 431, 206 U.S.P.Q. at 731. Having thus suggested that the real issue was whether the disclosure of a narrow range of I.V.'s of 0.2 to 1.0 in the 1953 application was sufficient to disclose the "full range of crystalline polypropylenes," Judge Wright *never addressed that issue.* He did not because *he was never presented with any evidence of the significance of intrinsic viscosities above the 1.0 upper limit of the 1953 application.*

Here, however, as the district court found, the evidence clearly shows that increasing the I.V. of crystalline polypropylene above about 1.7 to 2.0 changes the nature of the polymer dramatically. (A182-85). Nonetheless, the district court rejected the impact of that incontrovertible evidence as "immaterial," and concluded, erroneously, that appellants "pointed to absolutely no evidence . . . different from that considered by Judge Wright." (A26) On the contrary, appellants squarely met the issue left unresolved by Judge Wright. They demonstrated what the parties in *Standard* did not—that the 1953 application did not disclose a significant range—much less a full range—of crystalline polypropylenes. It was plain error for the district court to reject that undisputed evidence.

REPRODUCED AT THE NATIONAL ARCHIVES

24

## II. THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS INFRINGED THE '851 CLAIM

The district court's error in finding infringement was premised on an erroneous conclusion that appellants stipulated to infringement (A164-66), and an erroneous refusal to apply the reverse doctrine of equivalents under the undisputed facts of this case. (A186-88).

### A. The District Court Erred in Concluding that Appellants Stipulated Literal Infringement

The district court, incorrectly believing that appellants had stipulated infringement, found appellant's arguments for non-infringement "curious," "puzzling," "squarely at odds" with, and a "retreat" from, the stipulation (A164-65). Appellants never made such a stipulation. The "stipulation" was only a concession that the claim can be literally read on the accused products. Appellants consistently took the position that they did *not* infringe *despite* literal correspondence with the claim. (A430, 569). Although the district court did purport to consider separately the issue of non-infringement under the doctrine of reverse equivalents, the court's erroneous conclusion that appellants "reneged" on their "stipulation" may have improperly influenced its treatment of the issue.

### B. The District Court Misconstrued the Reverse Doctrine of Equivalents

The district court erred in failing to apply the reverse doctrine of equivalents, belittling the doctrine as "seldom raised" and rarely successful. (A178). Appellants established at trial that dramatic differences exist between the polypropylene Hogan and Banks invented as described in their 1953 disclosure and the polypropylenes accused of infringement. *See supra*, p. 13-14. Although the district court agreed with appellants regarding these substantial differences (*see supra*, p. 14), it rejected appellants' argument, stating that appellants have "misconstrued" the reverse doctrine of equivalents and that they have not demonstrated that their polypropylene products are different "from

REPRODUCED AT THE NATIONAL ARCHIVES

25

the claim of the '851 patent,'' and that ''the claim and not the specification . . . measures the scope of an invention.'' (A186). However, it is the district court, not the appellants, which has misconstrued the nature of the inquiry under the doctrine of reverse equivalents.

### 1. The Elements of the Reverse Doctrine of Equivalents

Under the reverse doctrine of equivalents, the accused product is necessarily literally embraced by the language of the claim. Hence, it is necessary to go *beyond the claim* to determine whether, as a matter of equity, the activities of the accused are so far removed from what it was that the patentees actually invented that it would be unfair that such activities should be considered infringements.[17]

In *Boyden Power Brake Co. v. Westinghouse*, 170 U.S. 537 (1898), the Supreme Court gave early recognition to the reverse doctrine of equivalents:

> The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent.

170 U.S. 568. The Supreme Court reaffirmed this principle in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608-09, 85 U.S.P.Q. 328, 330 (1950). This Court has also

---

17    As Judge Newman stated in her commentary in *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 970 n.8, 4 U.S.P.Q.2d 1737, 1768 n.8 (Fed. Cir. 1987), *cert. denied*, _____ U.S. _____ (March 21, 1988).

> Note that the so-called ''reverse'' doctrine can *only* be applied to the invention viewed as a whole, since by definition all of the elements of the claim are literally present in the accused device, and the issue is whether the device as a whole is so far changed that it nevertheless avoids infringement.

(Emphasis in original.)

REPRODUCED AT THE NATIONAL ARCHIVES

26

recognized the vitality of the doctrine. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1123, 227 U.S.P.Q. 577, 587 (Fed. Cir. 1985). *See also Autogiro Co. of America v. United States*, 384 U.S. 391, 401, 155 U.S.P.Q. 697, 705 (Ct. Cl. 1967) ("[I]t is of little value that [the claims] read literally on the structures.")

In *Graver Tank* the Court recognized that an inquiry respecting equivalents, whether direct or reverse, is not the prisoner of a formula, and should leave room for investigation into varying circumstances. 339 U.S. at 609, 85 U.S.P.Q. at 331. This Court so recognized in *SRI International*, 775 F.2d at 1124, 227 U.S.P.Q. at 588.

The district court said appellants were wrong in urging that the invention as a whole as described in the 1953 specification must be considered in connection with this issue. Yet it has been recently recognized that such a consideration is an essential part of the inquiry:

> The "reverse" doctrine is seen to be no more than *a limitation on the scope of the claims*, based on the patentee's *description in the specification*. It reflects the Court's continuing emphasis on the substance of the invention, *viewed in its entirety*, rather than on the literal form of the claims, such that if justice should require restriction rather than expansion of their literal text, the courts are empowered to do so.

(Emphasis supplied). Commentary in *Pennwalt*, 833 F.2d at 962, 4 U.S.P.Q.2d at 1762.

Judge Newman's commentary in *Pennwalt* also recognizes that in considering the issue of equivalents, courts have avoided rigid rules, "for the great variety of technology situations are not amendable to all-encompassing rules." Rather, the precedents require that "the equitable view of an invention must be as a whole, in order to ascertain its scope and purpose, and the context in which to place the accused device." (833 F.2d at 970-71, U.S.P.Q.2d at 1768. *See also supra*, p.25n.17). To say that the inquiry should consider *only* the claim as written (as the dis-

REPRODUCED AT THE NATIONAL ARCHIVES

27

trict court has done here) would plainly rob the doctrine of its vitality and render it a nullity. Thus, it was clear error for the district court to limit the infringement inquiry only to the language of the '851 claim.

### C. The Undisputed Evidence Shows Appellants' Independently Developed Products Differ Substantially from the Polymer Discovered by Hogan and Banks

Different courts have expressed the infringement standard in different ways, but no matter how expressed, the issue is one of substantial identity. *Boyden Power-Brake Co. v. Westinghouse*, 170 U.S. at 568. The polymers of appellants are definitely not substantially the same as those invented by Hogan and Banks, as the district court found (A186):

> Defendants have thus established that polypropylene having the properties set forth in Phillips' 1953 application is a low molecular weight, brittle polymer from which no commercial product has ever been manufactured. In contrast, the polypropylene produced by Defendants is a high molecular weight polymer which is used in a wide array of commercial plastics applications.

*(See also* A96, A178-85). As a consequence, the market for commercial polypropylene is measured in billions of pounds per year, whereas the Hogan and Banks product remains a laboratory curiosity more than thirty years after its "discovery." Plainly, the results achieved are not the same; they are at opposite poles. One is a total success; the other a total failure.

It would be incredible to conclude, as the district court suggests, that appellants' products are a mere improvement over Hogan and Banks. (A196). The success of appellants' polymers does not build upon or derive in any manner from the discovery of Hogan and Banks.[18] Rather, appellants' products are made by processes derived from the independent, Nobel prize-

---

18    Therefore this is not a situation where the superior product of the accused was made possible by the patent disclosure. *Cf. Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1365, 219 U.S.P.Q. 473, 483 (Fed. Cir. 1983).

REPRODUCED AT THE NATIONAL ARCHIVES

28

winning discoveries of Professors Ziegler and Natta. They could not have been made using the Phillips' chromia oxide process, as Phillips itself found out. (*see supra* p. 8-9, 10n.10). (A149-50).[19] The district court ignored the impact of this independent development, despite its clear relevance ("one factor is whether the accused product resulted from independent research"). *SRI International*, 775 F.2d at 1124, 227 U.S.P.Q. at 588).[20] The district court's conclusion that the impressive success of appellants' products in commerce "has no bearing on . . . infringement" (A196), completely misses the point. That success is a reflection of the magnitude of the structural differences between the polymers of the Hogan and Banks invention and those of appellants. It is clearly relevant.

### D. The Court Erred in Focusing Only on Crystallinity

The district court focused solely on one property of the polymers, crystallinity, as being the "essence" or "heart" of the Hogan and Banks invention (A187, 162), and dismissed the other major differences between their polymers and those of appellants because the differences were not explicitly recited in the claim. (A195). However, the invention at issue is a composition of matter. A polymer, as a composition, is not defined by a

---

19    The architect for the structure of a polymer is the catalyst used to make it; the catalyst dictates what is made. (A11). It is significant that Phillips, after full investigation, concluded it could not make a polymer using its own chromia catalyst which would have the superior properties of those made using the Natta catalyst. (A149-50, 3781). Thereafter Phillips abandoned the thought of making polypropylene with the chromia catalyst and adopted instead the Ziegler/Natta discoveries. (*See Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 177 U.S.P.Q. 481 (5th Cir.), *cert. denied*, 414 U.S. 1079 (1973)).

20    As stated in *Boyden Power Brake Co. v. Westinghouse*, 170 U.S. at 573:

> [A]lthough Mr. Boyden [the alleged infringer] may have intended to accomplish the same results, the Westinghouse patent [in suit], if he had had it before him, would scarcely have suggested the method he adopted to accomplish these results. Under such circumstances, the law entitles him to the rights of an independent inventor.

29

single property; it is an indivisible composite of many inherent characteristics. It is the composition as *a whole* which must be examined in an equivalents analysis. Not only did the court's analysis ignore the law on reverse equivalents, but it gave the inventors credit for information they derived from others.

The 1953 application itself nowhere mentions "crystallinity," much less hints that the discovery of such a property was the "essence" or "heart" of the invention. Appellants have never denied that, to a person of skill in the art, the 1953 application discloses a polypropylene which *exhibits* crystallinity. But it was not until Professor Natta published his papers in 1955 on the "isotactic" crystalline character of the polypropylenes made with his catalyst, that anyone at Phillips woke up to the possibility that the Hogan and Banks polymer actually had a similar crystalline component, much less recognized its importance. (*See supra*, p. 7-9).[21] Once this characteristic was confirmed, Phillips' re-filed and re-energized 1956 application made much of the point. ("The thrust of Phillips' 1956 disclosure was that [crystalline] property" (A162-63)). Thus, Hogan and Banks (or more accurately the Phillips' patent department) may have had a "change of heart" regarding the nature of the Hogan and Banks invention, but to the extent they did, it resulted from information derived from the discoveries of others, and was unconnected with Hogan and Banks.

The court criticizes appellants for arguing non-infringement with the "benefit of hindsight" aided by more than three decades of advances in the art. (A196). On the contrary, it is improper hindsight to view the work of Hogan and Banks, as the district court did, in light of the subsequent revelations of oth-

---

21    The district court emphasized that one of appellants' own witnesses testified about the importance of crystallinity. (A187). This was, however, in the context of commercial polymers made long after the properties of crystalline polymers were well known.

REPRODUCED AT THE NATIONAL ARCHIVES

30

ers in order to determine that the "heart" of the 1953 invention was a property never even mentioned at that time.[22]

As a matter of equity, appellants are entitled to have their independently developed polymers considered as a whole against the Hogan and Banks invention as a whole. The common property of crystallinity is but one factor. When the proper comparison is made, it is clear that appellants' polymers and those of Hogan and Banks are two very different products. It would be inequitable to compel the polypropylene industry, which has contributed so much to the advancement of the art, and to which grew up independently of the Phillips invention, to now pay homage to Phillips on the basis of the discarded and unworkable discovery of Hogan and Banks.

That such a result means that the language of the claim is not the absolute measure of the grant is (contrary to the district court) inherent in the nature of the equivalency issue. As this Court observed in *Texas Instruments Inc. v. U.S. International Trade Commission*, 805 F.2d 1558, 1572, 231 U.S.P.Q. 833, 842 (Fed. Cir. 1986):

> We caution that the incentive to innovation that flows from "inventing around" an adversely held patent must be preserved. To the extent that the doctrine of equivalents represents an exception to the requirement that the claims define the metes and bounds of the patent protection, we hearken to the wisdom of the Court in *Graver Tank*, that the purpose of the rule is "to temper unsparing logic" and thus to serve the greater interest of justice.

---

22    As Judge Wright noted in *Standard Oil* with respect to duPont's priority case:

> It is illogical to believe that anyone who discovered a new product and realized that its distinguishing feature was its crystalline nature would fail to record that realization.

494 F. Supp. at 394, 206 U.S.P.Q. at 676.

REPRODUCED AT THE NATIONAL ARCHIVES

31

## III. THE DISTRICT COURT ERRED IN ITS FAILURE TO FIND INEQUITABLE CONDUCT

In its discussion of the law regarding inequitable conduct, the district court properly concluded that appellants must show Phillips withheld material information with an intent to mislead. (A142-44). However, the court erroneously concluded that appellants had presented no evidence of materiality and intent. (A155-56, 161-62).

In evaluating the facts, the district court examined the work at Phillips leading up to the 1953 and 1954 Hogan and Banks applications (A144-46), the independent discoveries of Professors Ziegler and Natta, the reactions of Phillips' researchers when they learned of those discoveries in 1955, and the circumstances surrounding the filing of Phillips' 1956 CIP application. (A147-52). The court then discussed the disclosure of the 1956 application and how it "differed significantly" from that of the 1953 application. (A151-52). Defendants do not dispute a single finding of fact in this presentation.

However, when the district court considered the consequences of the disclosures added to the 1956 application, and Phillips' silence concerning the genesis of that added disclosure, it committed errors of law in failing to find that Phillips' omissions were material, and in failing to find that Phillips intended to deceive the Patent Office.

### A. Phillips Withheld Material Information

The expanded 1956 application was filed for the purpose of provoking an interference with Natta. Had Phillips simply characterized the Hogan and Banks polypropylene in its 1956 application as having a crystalline component, like that of Natta, and then attempted to have the interference based on a broad count to "crystalline" polypropylene, there would be no misrepresentation. But Phillips did not take the chance that such a position would have accomplished its purpose. It deleted every example from the 1953 disclosure and submitted totally new ones. Example IV for the first time disclosed the use of a

REPRODUCED AT THE NATIONAL ARCHIVES

32

Ziegler catalyst to produce a tough, high molecular weight poly-propylene. At the same time, Phillips deleted reference to the chromium oxide catalyst as being "absolutely essential" to the preparation of solid polypropylene. Most significantly, it expanded the disclosure of the properties of the solid polymer of the invention (A4126, lines 20-22) to include higher molecular weight polymers, comparable to those of Natta and the appellants, which the district court found were "not attributable to the Hogan and Banks invention." (A96).[23]

The district court found the Example IV process was actually derived from the work of Ziegler and Natta (A156), and that the higher molecular weight range asserted for polymers of the invention (I.V. of 5.0 maximum rather than the original 1.0) was based on the polymer made using the process which had been thus derived from Ziegler and Natta. (A156-58). The court further found that the change in maximum I.V. from 1.0 to 5.0 made a world of difference in the properties and behavior of the resulting polymers. (A186). Phillips' patent lawyers were also advised of Leatherman's 1955 work that demonstrated that high molecular weight tough polymers could not be obtained with the chromia process of Hogan and Banks. (A3772). Yet the 1956 application and its file history do not reveal these important facts.

The consequence of these misrepresentations and conscious omissions by Phillips is that the 1956 application falsely implies that (1) both the chromia process and the titanium halide process are capable of making the *same* scope of products, and (2) the invention of Hogan and Banks includes propylene polymers ranging from the weak low molecular weight polymers to the strong high molecular weight polymers.

The district court erroneously rejected the impact of these omissions by concluding that because the claim *as issued* does not explicitly refer to molecular weight, the misstatements in

---

23    Neither Hogan and Banks knew why the disclosed range of molecular weight was so vastly increased, nor did they have anything to do with the new Example IV which laid the foundation for the expansion. (A152).

REPRODUCED AT THE NATIONAL ARCHIVES

33

the application about the molecular weight (I.V.) range of the polymers of the invention were not material to patentability. (A156-57). In restricting its analysis to the words of the claim the court erred, for reasons already discussed in connection with the similar error made by the court in connection with the section 112 issue. (*See supra* p. 17-22). The court supported its conclusion of non-materiality by finding that the Examiners who considered the '851 claim (pre- and post-interference) would have known that "propylene could be polymerized to products having a wide range of molecular weights" (A157), yet they imposed no molecular weight limitation. (A158). This is precisely the point. Had the Examiners known the truth—that such a wide range of molecular weights was *not* possible by practicing the *only* process Hogan and Banks invented, and that the resulting polymers differed significantly from those made by the Ziegler/Natta catalyst—the Examiners (or the district court in the section 146 action) could reasonably have insisted that there be a molecular weight (I.V.), or even a process limitation, in the Hogan and Banks claim.

When a broad claim is granted based on a disclosure which fabricates the breadth of what was actually invented by the applicants, these fabrications are plainly material to the issue of claim scope. Thus the information withheld is clearly the type which a reasonable Examiner would have considered important in deciding whether to allow the broad generic claim of the '851 patent. *See* 37 C.F.R. § 1.56(a). Indeed, it was information which Judge Wright plainly would have considered material on the issue of patentability, but which he also did not have. *See* discussion *supra*, p. 22-23. Without this knowledge, neither Judge Wright nor the Examiners had incentive or reason to even suggest a molecular weight (I.V.) limitation or a process limitation. The fact that this did not occur is a *consequence* of the fraud. It cannot be used, as the district court did, to exonerate Phillips' conduct.

34

## B. Phillips Intended to Mislead the Patent Office

In concluding there was no fraudulent intent, the district court accepted Phillips' contention that it had "good intent" in adding Example IV, which had been derived from Ziegler and Natta, because it was necessary to satisfy the "best mode" requirements of 35 U.S.C. § 112. (A160). This conclusion is clearly erroneous.

First, section 112 refers to the best mode "contemplated by *the inventor*," *i.e.*, by Hogan and Banks. There is no evidence at all that either inventor contemplated Example IV as the "best mode." They did not even know how Example IV got into the 1956 application. (A152). Second, there is no evidence of record to support Phillips' contention that Example IV was added to disclose the best mode. The attorney involved testified only that it was present for purposes of "comparison." (A10765, 10782-83). Third, we are aware of no authority (the district court cited none) which requires an updated best mode for a CIP where the claimed invention is asserted by the patentee to be supported by the original parent disclosure. Indeed, the law is to the contrary. *Johns-Manville Corp. v. Guardian Ind. Corp.*, 586 F. Supp. 1034, 1064-5, 221 U.S.P.Q. 319 (E.D.Mich. 1983), *aff'd*, 770 F.2d 178 (Fed. Cir. 1985). The plain inference from the facts is that the best mode excuse was something concocted for this litigation.

In any event, if Example IV was indeed required to satisfy the best mode for making the Hogan and Banks invention, that would hardly explain away the applicants' use of that example to enlarge the scope of the *properties* (including I.V.) asserted for the polymer of the *invention*. (*See supra* p. 9-11). Thus, Example IV did not simply provide an improved process for making the low molecular weight polymer discovered by Hogan and Banks. It was the springboard which allowed Phillips to expand its disclosure of the characteristics of the polymer of the invention, particularly molecular weight, so as to embrace the subsequent independent discoveries of others. The use of a derived example to expand the scope of the properties of the patented

REPRODUCED AT THE NATIONAL ARCHIVES

35

polymers under circumstances where Phillips was trying to support a broad generic claim implies a clear intent to mislead the Examiner as to the true scope of Hogan and Banks' invention. *See J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1564, 223 U.S.P.Q. 1089, 1092 (Fed. Cir. 1984) (intent inferred from fact that a reasonable person in the actor's position would have recognized materiality).

The district court excused Phillips' failure to disclose that the chromium oxide process (the only one used by Hogan and Banks) could not make a 5.0 I.V. polymer on the grounds that no *process* was claimed and that Phillips never asserted that the chromium oxide process could make a 5.0 I.V. polymer. (A161-62).[24] This misses the point that had Phillips told the whole truth, *i.e.*, that the chromium oxide process still made only low I.V. polymer and the titanium process discovered by someone else made high I.V. polymer, then the Examiners would have known the limits of the polymer that Hogan and Banks actually invented. The 1956 application obscures these facts.

Finally, the district court excused Phillips' failure to disclose the brittle nature of its polymer because Phillips made no statements in the application regarding the toughness or brittleness of its polymers and, therefore, did not imply that its polymer was tough. (A162). Had Phillips done so, the court stated it would have "little hesitation in finding an intent to mislead." (*Id.*).

The court's finding that Phillips did not assert toughness is clearly wrong. Phillips may not have used the *word* "tough" to describe its polymer in the 1956 application, but it did assert new uses for its polymer which could be achieved only with tough polymers. Specifically, Phillips asserted that "the polymers of this invention" could be used to make heat resistant molded articles such as bottles, to be extruded to form pipe or

---

24    However, Phillips did not provide *any* molecular weight or I.V. data in the chromium oxide examples, and asserted an I.V. range for the invention of 0.2 to 5.0 without reference to *any* process, thereby plainly implying that the process used to achieve the results of the invention was simply a matter of choice.

tubing, to be extruded into filaments for textiles, or into films, food packaging, etc. (A4119, lines 15-26). It is undisputed that these applications all require a *tough* material (A1803-06). The process of extrusion itself, particularly for filaments, demands a strong, tough polymer (A1805). Such products cannot be made from a brittle material (Porter A1803-06).[25] In short, the assertion of "toughness" that the district court concluded would compel it to find the requisite intent to mislead was in every practical sense actually made.

By any reasonable standard, appellants proved both materiality and intent. The district court clearly erred in concluding otherwise.

## IV. THE '851 PATENT IS INVALID FOR DOUBLE PATENTING

### A. Claim 16 of Phillips' Expired '721 Patent Exhausted the Exclusive Rights for Solid Polypropylene of the '851 Claim

In 1958, Phillips obtained U.S. Patent 2,825,721 (A 3794-825), on an application claiming priority back to the 1953 application of Hogan and Banks. The '721 patent claims a process that uniquely results in solid crystalline polypropylene. The '851 patent claims a product of that process. The exclusive right to the discovery patented in the '721 patent expired in 1975, and the '851 patent is therefore invalid for double patenting. The '851 patent is invalid because its sole claim is for the "same invention" as claim 16 of the '721 patent, or claims an obvious variation of the subject matter of that claim.

The defendants first presented this defense by way of a motion for summary judgment. The district court, in an opinion by Judge Murray Schwartz, denied the motion on the merits. (A200-32). Judge Schwartz's opinion was grounded on a fundamental misunderstanding of the meaning of claim 16 of the '721

---

25    The only "product" ever molded from a polypropylene having an I.V. of less than 1.0 was a comb which the court noted "crumbled to pieces." (A185).

REPRODUCED AT THE NATIONAL ARCHIVES

REPRODUCED AT THE NATIONAL ARCHIVES

37

patent. Judge Schwartz's claim construction error is one of law, freely reviewable on appeal. *DMI, Inc. v. Deere & Co.*, 755 F.2d 1570, 1573, 225 U.S.P.Q. 236, 238 (Fed. Cir. 1985). Judge Schwartz also committed other errors of law that led to his rejection of the defense. At trial, defendants presented additional evidence on the double patenting issue. Although Judge Longobardi apparently recognized Judge Schwartz's basic claim construction error, he nevertheless essentially adopted Judge Schwartz's reasoning and repeated the rejection of the defense. (A79).

## B. The '721 Patent and its Relationship to Claim 1 of the '851 Patent

The '721 patent issued March 4, 1958 on an application filed March 26, 1956, which was a continuation-in- part of the Hogan and Banks 1953 and 1954 applications. (A204-05). The 1953 and 1954 applications as filed both included claims to the Hogan and Banks chromia catalyst process and to the products produced by that process. The Patent Office never treated the processes and corresponding products as anything other than unitary inventions, and never required that the process claims be placed in a separate application from the claims to the products. The Patent Office made no requirement of restriction between the subject matter of the '721 and '851 patents, so that 35 U.S.C. § 121 does not apply. Phillips nevertheless voluntarily separated out the process claims for making solid polypropylene, and allowed them to issue in the '721 patent. Phillips included that patent in a polyolefins technology package that it licensed to several large polyolefin producers. (A348-54).

The '721 patent describes, with respect to polypropylene, the same invention as the 1953 and 1954 applications. It includes a description of the same catalyst, the same process, and the same resulting product. The disclosures concerning polypropylene are virtually identical—Examples I through XX of the 1953 application are carried over essentially verbatim to the '721 patent. The two documents define the product obtained from polymerizing propylene in virtually the same words:

38

Throughout the specification, it is to be understood that the term "total polymer" as applied to polymers of propylene, designates [descriptions] . . . *and the solid polymer is the higher molecular weight portion of the semi-solid fraction, which constitutes the raffinate or insoluble portion left from the extraction with n-pentane or methylisobutyl-ketone (MIBK).*

(A3800, col. 2, lines 32-45; emphasis added; *compare* A4723).

Not only do the two documents *define* the "solid polymer" of propylene identically—that is, the portion that is insoluble in n-pentane or MIBK—they include the identical "written description" of that material:

The solid polymer fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240° to 300°F., a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, and a weight average molecular weight of approximately 5,000 to 20,000.

(A3813, col. 27, lines 23-30; *compare*, A4750 line 30-A4751, line 4).

This "written description" was found by the district court to support claim 1 of the '851 patent. That is, the district court found that it constitutes a written description of the claimed crystalline polypropylene. There is no dispute that the "solid polymer" of propylene described in the '721 patent is the same as the "solid polymer" of propylene described in the 1953 application. Thus, if the district court is correct that the "solid" polypropylene of the 1953 application is the crystalline polypropylene claimed in the '851 patent, then the "solid" polypropylene of the '721 patent is by definition also the crystalline polypropylene claimed in the '851 patent.

Claim 16 of the '721 patent is for a process for making one of the products—the "solid" polypropylene—that result from polymerizing propylene using the Hogan and Banks process. The claimed process includes two steps:

39

A process which comprises

[1] polymerizing propylene at a polymerization tempera-
ture in the range 150° to 250°F. with a catalyst comprising
as the sole essential effective ingredient thereof, chromium
oxide supported on silica-alumina, said catalyst containing
at least 0.1 weight percent hexavalent chromium at the ini-
tial contacting of hydrocarbon with said catalyst, and

[2] recovering a resulting solid polymer.

(A3823, col. 47, lines 33-40). In analyzing this claim, and in ap-
plying settled law to its terms, the district court erred.

## C. The District Court Erred in Construing the Phrase "Recovering a Resulting Solid Polymer"

Judge Schwartz erred in construing the step of "recovering a
resulting solid polymer" of claim 16. This error led to his erro-
neous conclusion with respect to both the "same invention"
and "obviousness" issues.

The term "solid polymer" is not self-defining; Judge
Schwartz found that the "meaning of claim 16 is less readily ap-
parent" than the meaning of the claim of the '851 patent.
(A218). He also noted that "[n]o precise description of that
solid polymer is contained in the claim." *Id.* Nevertheless,
Judge Schwartz declined to examine the specification to deter-
mine how the inventors themselves had defined "solid poly-
mer." Judge Schwartz assumed that the "solid polymer" of the
claim was somehow different from the "solid polymer" the in-
ventors had defined in the '721 specification. He reasoned (in-
correctly) that the solid polymer disclosed in the specification
could only be isolated by the use of an *additional* process step
not recited in claim 16—fractionation:

Thus, in interpreting Claim 16, movants would, in effect,
read an additional process step—fractionation—into the
phrase "and recovering a resulting solid polymer."

40

(A219). Judge Schwartz further stated:

> All parties agree, unless the product produced by the speci-
> fied process steps of the claim were subjected to the added
> step of fractionation, solid crystalline polypropylene
> would never be recovered.

(A221). Judge Schwartz was mistaken. Not only did the appel-
lants not agree with this proposition, Phillips did not even sug-
gest it. The step of "recovering a resulting solid polymer"
described in the specification *is* the step of fractionation.
(A1679 -80) (~~A911-15~~). Indeed, the patentees specifically defined "solid
polymer" as that material which is the insoluble residue of a
fractionation with selected solvents. Fractionation is the only
method disclosed for "recovering" such a "solid polymer."
For propylene, it is the product described at col. 2, lines 30-45
of the '721 patent.[26] (~~A915~~) (A1680). Thus, fractionation is not an
"added" step, but is itself the step of "recovering," and the
"solid polymer" so recovered is the "solid polymer" described
and defined in the specification.

Judge Longobardi, after hearing undisputed testimony that
"recovering a resulting solid polymer" was a fractionation and
that the solid polymer so recovered was the solid polypropylene
of the '721 specification, apparently modified the decision to
correct Judge Schwartz's misconception. (A79). Nevertheless,
he declined to refer to the '721 specification to determine what
the patentees meant by "solid polymer." This was error.

This Court has held that the specification must *always* be
consulted to determine the proper scope of a patent claim.
*Fromson v. Advanced Offset Plate, Inc.*, 720 F.2d 1565, 219

---

26    As Judge Schwartz noted, the double patenting defense was raised
by one of the parties hereto (U.S. Steel) in the form of a Protest against the
application for the '851 patent. (A4235-58). The Examiner found the protes-
tor's reasoning "quite cogent," but rejected the defense for the stated reason
that he was compelled to follow the unpublished Board of Appeals decision
of *Ex parte Hogan* (Bd. App. March 30, 1981) (A425-29). (A4290). In con-
struing claim 16, however, the Examiner correctly found an "exact corre-
spondence" between the product of claim 16 and that of claim 1 of the '851
patent. (*Id.*).

41

U.S.P.Q. 1137 (Fed. Cir. 1983). Merely because the issue is double patenting does not mean that the specification can be ignored. *See In re Vogel*, 422 F.2d 438, 441, 164 U.S.P.Q. 619, 621-22 (C.C.P.A. 1970) ("In determining the meaning of a word in a claim, the specification may be examined"); *see also In re Avery*, 518 F.2d 1228, 1232, 186 U.S.P.Q. 161, 164 (C.C.P.A. 1975).

Judge Longobardi recognized this principle, but declined to apply it to claim 16. He stated, inexplicably, that the use of the inventors' own definition would be an "unwarranted expansion" of the claim. (A78). This reasoning does not withstand analysis. The '721 specification explicitly *defines* "solid polymer":

> Throughout the specification, *it is to be understood that . . . the solid polymer . . . constitutes the insoluble portion left from the extraction with n-pentane. . . .*

(A3800, col. 2, lines 32-45; emphasis added). This definition does not "expand" the term "solid polymer"; rather it confines it to what the inventors actually considered the solid polymer to be.[27]

Judge Longobardi relied upon *In re Vogel* for his refusal to look to the specification for clarification. In *Vogel* the claim of the patent recited a process which employed "pork." A claim of the application was for a process and recited "meat" instead of "pork." The court refused to read into the first claim the generic term "meat" because that term did not support and was not necessary to support the claim, *i.e.*, the claim was supported by specific disclosures of "pork." Similarly, in *In re Kaplan*, 789 F.2d 1574, 229 U.S.P.Q. 678 (Fed. Cir. 1986), which Judge Longobardi also cited, the patent claim recited "organic solvents" generally, while the claim of the later application recited a specific mixture of organic solvents. This Court

---

27    The error in Judge Schwartz's reasoning was to "expand" the term "solid polymer" by using a chemical dictionary instead of the inventors' own "dictionary"—their specification—which included a specific limited definition of the term. (*See* A218n.36).

42

held that the *disclosure* in the patent of the mixed solvent system that was later claimed in the application could not be read back into the claim of the patent because

> [t]here is adequate support for the ''organic solvent'' limitation in claim 4 apart from appellants' specific *mixed solvent invention, including the disclosure of the separate solvents in the mixture. . . .*

789 F.2d at 1580, 229 U.S.P.Q. at 683 (emphasis in original). Unlike in *Vogel* and *Kaplan*, there exists *no* support in the '721 specification for the term ''solid polymer'' apart from the specific definition set forth by the inventors. Plainly, the inventors *defined* their solid propylene polymer in a certain way (''it is to be understood that. . . .''). To construe the claim to encompass anything else would be contrary to the inventors' intent. Since the ''solid polymer'' of claim 16 is the pentane-insoluble portion of the total, and since the district court found that the disclosure of that material in the 1953 application was a disclosure of the product of claim 1 of the '851 patent, then, *if* the district court is correct, the ''solid polymer'' of propylene of claim 16 must be the product of claim 1.

## D. Claim 16 of the '721 Patent Is for the Same Invention as Claim 1 of the '851 Patent

The doctrine of ''same invention'' double patenting is derived from the requirement of 35 U.S.C. § 101 that only one patent can validly issue for a single invention. *In re Vogel*, 422 F.2d at 441, 164 U.S.P.Q. at 621. The test for ''same invention'' double patenting is ''whether one of the claims could be literally infringed without infringing the other.'' *Id.* Judge Schwartz found that claim 16 of the '721 patent and claim 1 of the '851 patent were not for the ''same invention.'' He based his decision on four grounds: First, he misinterpreted claim 16, and found that the ''solid polymer'' was not the solid polymer of the specification (and of claim 1 of the '851 patent) (*see supra*, p. 39-42); second, he found that claim 16 encompassed the production of *copolymers* outside the scope of claim 1 of the '851 patent, and could therefore be infringed without infringing

43

claim 1 of the '851 patent; third, he found that the '721 patent disclosed alternative unclaimed processes (*i.e.*, processes using slightly modified catalyst supports) and that the "solid" polypropylene could therefore be made without infringing claim 16; finally, he found that since the product of claim 1 of '851 can be made by different, *later-discovered* processes, the claims failed the "cross-reading" test. These reasons do not withstand analysis.

### 1. The Process of Claim 16 Is Not for Copolymers

The district court concluded that the use of "comprising" in claim 16 means that the claim would include a polymerization process in which propylene could be mixed with other comonomers thereby producing copolymers not covered by the '851 patent.

This construction is flawed. The object of the verb "comprises" in claim 16 is *not* propylene. Instead, it is the two recited process steps of (1) polymerizing propylene, and (2) recovering a solid polymer. Thus, the use of "comprising" does not imply that the claim covers modifications to any of the individual process steps; it merely means that a process which contained additional process *steps* would be within the scope of the claim.[28] Judge Schwartz's reliance on *In re Fenton*, 451 F.2d 640, 642, 171 U.S.P.Q. 693, 695 (C.C.P.A. 1971), and *In re Cone*, 121 F.2d 470, 472, 50 U.S.P.Q. 54, 56 (C.C.P.A. 1941), is misplaced. Neither case supports his interpretation of claim 16.

Moreover, the patentees plainly intended claim 16 to cover only homopolymerization. They included as the temperature range for polymerization the one uniquely preferred for making polypropylene. (*See* A3802, col. 5, lines 30-31). Copolymers are covered in other claims. Claim 17, for example, claims the prep-

---

28    Had the inventors wished to claim mixed feeds as well as single monomer feeds, they could have written claim 16 to recite for example, "a process comprising polymerizing a feed comprising propylene. . . ."

44

aration of copolymers of ethylene and propylene. There, the temperature range is broader; the low temperature being that taught for propylene and the high temperature being that taught for ethylene. Thus, the inventors intended that claim 16 cover polypropylene and that claim 17 cover copolymers.

## 2. The Unclaimed Processes Are Not Materially Different

Judge Schwartz found that the cross-reading test was not met because the solid polymer could be made by other processes disclosed in the '721 patent itself—specifically, by using for the catalyst "support" silica alone or alumina alone, rather than silica-alumina as set forth in claim 16. (A227n.48). This distinction exalts form over substance. The patent specification makes clear that either silica or alumina may be used as the support, but makes no distinction between silica, alumina or co-precipitated silica-alumina, except that the latter results in a slightly better yield. The Patent Office has long recognized that such trivial differences in claimed and alternative processes do not make the claimed process and product different inventions. Specifically, M.P.E.P. 806.05(f) requires *material* differences to support a showing that the product and process are distinct inventions. Phillips cannot seriously dispute that the use of a pure silica support for its chromium oxide catalyst is not materially different from the preferred support, which is 90 percent silica and 10 percent alumina. As the specification makes clear, it is the chromium component that is "absolutely essential," not the material for the support.

## 3. The Fact that Later-Developed Processes Can Be Used to Make Solid Polypropylene Is Irrelevant

Judge Schwartz found that because alternative processes for making crystalline polypropylene, developed by others, became available *after* Hogan and Banks, the claims do not cross-read, *i.e.*, claim 1 of '851 can now be infringed without infringing claim 16 of '721. (A227-30). Judge Schwartz's conclusion that later-developed technology can be relied on to avoid double patenting was not supported by any authority; as he noted, the

45

issue was one of first impression. His conclusion, however, is not consistent with the rationale of the double patenting doctrine, which is to prevent the unwarranted extension of an exclusive right.

Common sense and logic compel the conclusion that if an inventor makes a unitary invention, such that the process and product are at the time unique to each other and inseparable, and the inventor files an application covering that process and product, and the Patent Office maintains the process and product claims together, then the unitary invention cannot later become two separate inventions merely because of the unpredictable future discoveries of others. Professor Natta's discovery in 1954 of new processes for making polypropylene has no effect on whether Hogan and Banks made two inventions instead of one. The district court cited no justification for permitting Phillips an additional seventeen-year exclusionary right merely because of the subsequent discoveries of someone unconnected with Phillips.[29] Phillips voluntarily separated out its process claims. Phillips then issued the '721 patent to exploit its own economic interests. To permit Phillips to extend its exclusive right yet again because Natta (not Phillips) discovered another way to make the solid polymer of claim 16 is to stand the patent system on its head.

The availability of alternative processes should thus be judged as of the invention date for the product and process— here, January, 1953. The district court found that at that time no alternative processes were known for making the ''solid polymer'' of claim 16.

### 4. The Difference in Statutory Subclasses Does Not Save Claim 1

The district court recognized that the fact that the process of claim 16 is in a different subclass of section 101 from that of

---

29    The district court's reasoning would preclude ''same invention'' double patenting rejections of pending applications, since the applicant could always argue that new processes will no doubt be discovered by others in the future.

46

claim 1 of the '851 patent was not dispositive of the "same invention" issue, relying upon, e.g., In re Freeman, 166 F.2d 178, 180, 76 U.S.P.Q. 585, 586-87 (C.C.P.A. 1948). Recently, however, a panel of this Court in Studiengesellschaft Kohle mbH v. Northern Petrochemical Co., 784 F.2d 351, 354, 228 U.S.P.Q. 837, 840 (Fed. Cir. 1986), in rejecting a "same invention" double patenting attack, relied on the fact that the claims of the two patents were in different statutory subclasses—one was for a product and the other was for a process using that product. The Court also concluded that the claims did not "cross-read" and were not for the "same invention" under this Court's traditional double patenting criteria. (Ibid.) Whatever merit there may have been in relying on different subclasses when the respective patents are for a product and the use of that product, no reason exists to apply that rationale to process/product situations where, as here, the process necessarily produces the patented product, and the patented product could only have been produced by the process. The two inventions are plainly the same.

Consequently, appellants respectfully submit that the Court's statement in Northern should not, in light of established precedent,[30] be extended beyond the facts of that case.

---

30   Established precedent shows that claims in different statutory classes are not necessarily insulated from "same invention" double-patenting. See Mosler Safe Co. v. Mosler, 127 U.S. 354 (1888) (product/process); Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 8 U.S.P.Q. 115 (1931) (method/machine); Wirebounds Patents Co. v. Saranac Automatic Machine Corp., 65 F.2d 904, 18 U.S.P.Q. 171 (6th Cir. 1933) (method/machine); In re Freeman, supra; In re Coleman, 189 F.2d 976, 90 U.S.P.Q. 100 (C.C.P.A. 1951) (method/product); In re Horneman, 194 F.2d 108, 92 U.S.P.Q. 316 (C.C.P.A. 1952) (process/product); Carman Industries, Inc. v. Wahl, 724 F.2d 932, 220 U.S.P.Q. 481 (Fed. Cir. 1984) (design/utility); In re Swett, 451 F.2d 631, 172 U.S.P.Q. 72 (C.C.P.A. 1971) (design/utility); In re Dubois, 262 F.2d 88, 120 U.S.P.Q. 198 (C.C.P.A. 1958) (design/utility); In re Phelan, 205 F.2d 183, 98 U.S.P.Q. 156 (C.C.P.A. 1953) (design/utility); In re Barber, 81 F.2d 231, 28 U.S.P.Q. 187 (C.C.P.A. 1936) (design/utility); In re Hargraves, 53 F.2d 900, 11 U.S.P.Q. 240 (C.C.P.A. 1931) (design/utility).

47

### E. Claim 1 of the '851 Patent Is Obvious in Light of Claim 16 of the '721 Patent

The test for "obviousness" double patenting has traditionally been whether the claimed subject matter of the later claim would have been obvious from that of the first.[31] *See In re Avery*, 518 F.2d at 1232, 186 U.S.P.Q. at 164 ("does any claim in the application define merely an obvious variation of an invention disclosed and claimed in the patent?"); and *In re Vogel*, 422 F.2d at 441, 164 U.S.P.Q. at 622. Under this test, the '851 patent is invalid if the subject matter of claim 1 would have been obvious from the subject matter of claim 16 of the '721 patent—that is, if the product of claim 1 would have been obvious from the process that produces the product of claim 16.

Judge Schwartz recognized that most of the distinctions between claim 16 and claim 1 on which he relied in rejecting the "same invention" defense (the "comprising" language, the use in the claim 16 process of a "silica-alumina" support, and later-discovered processes) have no bearing on the obviousness question. In rejecting the "obviousness" double patenting defense, Judge Schwartz relied on only two factors. First, he stated:

> Moreover, it would be necessary that the product obtained by the process of claim 16 be fractionated before solid crystalline polypropylene would be obtained.

(A231). This conclusion is erroneous for reasons already discussed; *see supra*, p. 39-42. If the district court is correct on the issue of support for claim 1 of the '851 patent in the 1953 specification then the subject matter of claim 1 would have been obvious from the "solid polymer" of claim 16 of the '721 patent, since they are *precisely the same product*.

---

31    The "obviousness" double patenting issue was raised in U.S. Steel's Patent Office Protest. Although the Examiner apparently rejected the argument, his reliance on *Ex parte Hogan* (Bd. App. March 30, 1981) was misplaced, since the reasons articulated by the Board in that case (no "cross-reading" and different statutory subclasses) (A429) have never been held relevant to a consideration of "obviousness" type double patenting.

48

Second, Judge Schwartz held not only that the invention of claim 1 of the '851 patent must have been obvious from that of claim 16 of the '721 patent, but that the subject matter of claim 16 must also have been obvious in view of the subject matter of claim 1. He found that this second requirement was not satisfied. (A231). This ground for rejecting the defense was derived from this Court's decision in *Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 940, 220 U.S.P.Q. 481, 487 (Fed. Cir. 1984), which stated:

> the test is whether the subject matter of the claims of the patent sought to be invalidated would have been obvious from the subject matter of the claims of the other patent, and *vice versa*.

(Emphasis added). *Carman* involved a utility patent and a design patent. The "vice versa" test stated in *Carman* was apparently never a requirement before *Carman*, certainly not in the context of two utility claims. The requirement was criticized in Judge Nies's concurring opinion in *Carman*:

> I do not agree that in obviousness type double patenting each patent must be found obvious from the other. If one patent is obvious from the other and has the effect of extending its term, the second to issue is invalid.

724 F.2d at 943, 220 U.S.P.Q. at 489. Except for the district court in this case, no court has ever applied the "vice versa" test to two utility claims since *Carman*. In *In re Longi*, 759 F.2d 887, 893 n.5, 225 U.S.P.Q. 645, 648 (Fed. Cir. 1985), this Court suggested that the "vice versa" requirement should only apply to design/utility cases, and not to situations in which the claims are both found in utility patents, and in *Hartness International, Inc. v. Simplimatic Engineering Co.*, 819 F.2d 1100, 1108-09, 2 U.S.P.Q. 2d 1826, 1832 (Fed. Cir. 1987), this Court affirmed a holding of obviousness-type double patenting without considering whether the claimed invention of the first patent would have been obvious from that of the second.

The "vice versa" requirement is contrary to the policy behind the double patenting doctrine, which is to ensure that a subse-

49

quently issued patent does not have the effect of extending the term of an earlier patent. Here, the '851 patent plainly had the effect of extending the term of claim 16 of the '721 patent. Even today, no one can use the process of expired claim 16 to polymerize propylene without infringing claim 1 of the '851 patent, which does not expire until the year 2000. Thus, the "vice versa" requirement is antithetical both to precedent and to public policy. The Court should reject its application to this case. *See* 3 Chisum, Patents, § 9:03[3] at 9-35-36 n.8.

The conclusion is inescapable that the process of claim 16 (correctly construed) makes a product of claim 1 of the '851 patent. The product of claim 1 therefore would have been obvious from the subject matter of claim 16, since the products are identical. Claim 1 of the '851 patent is invalid for "obviousness-type" double patenting.

## CONCLUSION

For the reasons given, appellants respectfully request that the judgment of the district court be reversed.

Respectfully submitted,

March 28, 1988

Kenneth E. Madsen

Kenyon & Kenyon
One Broadway
New York, New York 10004
(212) 425-7200

*Attorney for Appellants*

*Of Counsel*:

Francis T. Carr
Alan T. Bowes
James Galbraith

Kenyon & Kenyon
One Broadway
New York, New York 10004
(212) 425-7200